## <u>APPENDIX OF UNPUBLISHED CASES</u>

**Cases**                                                                    **Page(s)**

*Rosenblatt v. 7-Eleven, Inc.,*
   2007 WL 2187252 (N.D. Tex. July 27, 2007) ........................................................................01

*Sanchez v. Chevron N. Amer. Exploration & Prod. Co.,*
   2020 WL 6685002 (E.D. La. Nov. 12, 2020..........................................................................11

*Smith v. Houston Indep. Sch. Dist.,*
   2014 WL 4471386 (S.D. Tex. Sept. 9, 2014) .......................................................................16

48786593.1

2007 WL 2187252
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

Ellis Richard ROSENBLATT, Plaintiff,
v.
7-ELEVEN, INC., Defendant.

Civil Action No. 3:06-CV-0957-D.
|
July 27, 2007.

**Attorneys and Law Firms**

Sylvan S. Lang, Jr., Lang & Kustoff, San Antonio, TX, Yona Rozen, Gillespie Rozen Watsky Motley & Jones, Dallas, TX, for Plaintiff.

Robert E. Luxen, Hallett & Perrin, Dallas, TX, Eric A. Welter, Welter Law Firm, Herndon, VA, for Defendant.

*MEMORANDUM OPINION AND ORDER*

SIDNEY A. FITZWATER, United States District Judge.

 **\*1**  In this age discrimination action brought by an employee who was discharged as part of a reduction in force ("RIF"), the employer moves for summary judgment. The court concludes that the employee has not adduced sufficient evidence to enable a reasonable jury to find that the employer's reasons for including him in the RIF were pretextual, and it grants the employer's motion for summary judgment.

I

Defendant 7-Eleven, Inc. ("7-Eleven") hired plaintiff Ellis Richard Rosenblatt ("Rosenblatt") as a Procurement Manager when he was 61 years old. Rosenblatt was employed at 7-Eleven for almost four years before he was discharged in January 2006 as part of a RIF . [1]

Before January 2006, Allen Udisky ("Udisky") was the Vice President of 7-Eleven's Procurement Department. At that time, there were three separate groups within the Procurement Department, each headed by a separate director: Facilities

Procurement, Direct Product Procurement, and Indirect Procurement. During his tenure at 7-Eleven, Rosenblatt worked in the Facilities Procurement Group, reporting directly to Wayne Stoltzman ("Stoltzman"), who in turn reported to Udisky. 7-Eleven maintains that, as a member of the Facilities Procurement Group, Rosenblatt "most frequently supported the real estate and construction group," procuring products and services related to the structure of and equipment for the stores.

As part of an overall reorganization of the Department, Denis Wojcik ("Wojcik") became the Director of the Procurement Department. Following Wojcik's appointment, Udisky and all three directors of procurement (including Stoltzman) were eliminated from the structure of the Department. The reorganization plan called for the elimination, among other positions, of three Procurement Managers in the Facilities Procurement Group. 7-Eleven's stated reasons for undertaking the reorganization were to better serve the customer, to save money, and because the "Integrated Asset Management" project, which gave 7-Eleven the ability to improve how it handled procurement with customers, decreased the number of employees necessary in the Procurement Department.

Andrew Kuster ("Kuster") was asked to work with Wojcik to carry out the RIF, and he was tasked with facilitating the elimination of three of the seven Procurement Managers in the Facilities Procurement Group. 7-Eleven initially planned to eliminate one position in the Direct Product Procurement group, but it later decided not to. Kuster used a weighted factor analysis ("WFA") to determine which Procurement Managers in the Facilities Procurement Group would have their positions eliminated as part of the RIF. This WFA analysis had never been used at 7-Eleven, and Kuster admits that he "made up" the process. The WFA used six factors, including tenure, review, human resources plan ("HRP"), future potential, education, and customer satisfaction, to select which positions should be eliminated. The same factors were used for all employees evaluated for the RIF, and 7-Eleven maintains that the WFA did not take age into consideration.

 **\*2**  Kuster prepared the WFA forms for the RIF in the Facilities Procurement Group. He came up with the tenure rating of each employee based on the date of the employee's offer letter. 7-Eleven hired Rosenblatt in March 2002, and at the time of the RIF he had been an employee for three years. Accordingly, Rosenblatt's tenure rating on his WFA was "3."

Kuster based the employee's education rating on the highest level of education that the employee had received, assigning a "0" for a high school degree, a "5" for a bachelors degree, and a "10" for a masters degree. Because Rosenblatt had earned a master's degree, he received a score of "10."

For the review rating, Kuster considered each employee's most recent performance review, assigning a "0" for an "N" rating, a "5" for an "M" rating, and a "10" for an "I" rating. Rosenblatt had received an "M" on his most recent performance review, completed in 2005, so his review rating score on his WFA worksheet was a "5."

The HRP rating was based on the Facilities Procurement Group's HRP matrix. Kuster derived the HRP rating by examining a combination of the performance and potential portions of the HRP matrix. For the Facilities Procurement Group, the rankings of performance and potential had been prepared by Stoltzman and approved by Udisky. Kuster added the numerical performance ranking and the potential ranking of each employee in the Facilities Procurement Group and divided that total by two to arrive at an HRP score. Based on this calculation, Rosenblatt received an HRP score of "5" on his WFA worksheet.

Kuster based each employee's customer satisfaction rating on the employee's ability to satisfy future customers. Wojcik assisted Kuster with this factor, meeting with the future customers of the reorganized Procurement Department and reporting to Kuster his findings about each Procurement Manager's customer service abilities. 7-Eleven maintains that it was Wojcik's understanding that, at the time of Rosenblatt's termination in January 2006, his primary customers were in the Development Construction Group. Accordingly, to determine Rosenblatt's customer satisfaction rating, Wojcik consulted Steve Hall ("Hall"), the head of the Facilities and Construction Group. 7-Eleven maintains that Hall had "colorful" comments about Rosenblatt, which Wojcik summarized as "[n]o value, not sure what he does." Rosenblatt actually served several customers outside of Facilities, including 7-Eleven's Loss Prevention, Travel, Finance and V-Com Groups, but Wojcik did not contact any of these departments regarding Rosenblatt's performance. Scot Lins ("Lins") was a customer of Rosenblatt and testified that he would be in a good position to evaluate Rosenblatt's performance. But Lins was not consulted in any way in the decision to terminate Rosenblatt. All Procurement Managers in the Facilities Procurement Group that Hall rated as "no use

for him" received a "1" for their customer satisfaction rating, and those who Hall said were "ok" received a score of "5." Because Hall's impression of Rosenblatt was that he "had no use for him," the customer satisfaction rating on Rosenblatt's WFA was a "1."

**\*3** The future potential rating on the WFA was based on a combination of the potential rating on the HRP matrix and the customer feedback score. An employee with low to above average potential on the HRP matrix, plus a low customer rating, received a "1" score on the WFA. An employee with a low to above average potential on the HRP matrix, plus an average customer rating, received a "5" on the WFA. And an employee with above average potential on the HRP matrix, and a very good customer rating, received a "7." Rosenblatt received a "1" score on his WFA worksheet.

After the WFA was completed, Wojcik's process for determining which positions should be eliminated as part of the RIF was to consider the HRP profile sheet and the WFA that Kuster had completed. Wojcik had also met beforehand with Hall, the Facilities Procurement Group's primary customer. Based on this, Wojcik made the decision to terminate Rosenblatt. Wojcik had never met Rosenblatt, had never reviewed Rosenblatt's personnel file, and did not know what projects Rosenblatt had worked on. Wojcik also never interviewed Rosenblatt's two immediate supervisors, Stoltzman or Udisky, regarding Rosenblatt's employment or performance. Other than input from Hall and his own review of the WFA page and the HRP page, Wojcik considered no other information or data related to Rosenblatt before selecting him for termination.

Two other Procurement Managers were terminated in the Facilities Procurement Group: Luis Inguanzo ("Inguanzo") and Scott Thompson ("Thompson"). Inguanzo, Thompson, and Rosenblatt had the lowest WFA scores of the Procurement Managers in the Facilities Procurement Group. Inguanzo and Thompson were both in the protected class of persons age 40 and over, while several Procurement Mangers who were retained were much younger than Rosenblatt. One Procurement Manager who was retained, Scott Thorp ("Thorp"), was 37. 7-Eleven maintains that Wojcik did not know the ages of any of the Procurement Managers at the time he was conducting the RIF.

Following his termination, Rosenblatt filed this lawsuit alleging age discrimination, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"),

Rosenblatt v. 7-Eleven, Inc., Not Reported in F.Supp.2d (2007)

29 U.S.C. § 621 *et seq.*[2] 7-Eleven moves for summary judgment.

## II

Under the ADEA, "[i]t shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In a case such as this one, where direct evidence of discrimination is unavailable, the plaintiff can prove discrimination using the "modified *McDonnell Douglas* approach." *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir.2004). As modified, *McDonnell Douglas* consists of three stages. First, the plaintiff must establish a prima facie case of discrimination, which "creates a presumption that the employer unlawfully discriminated against [him]." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for discharging the employee. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The defendant's burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 385 (5th Cir.2003). After the defendant articulates its legitimate nondiscriminatory reason for the action taken against the plaintiff, the burden shifts back to the plaintiff to demonstrate that the reason produced was a pretext for discrimination. *Id.* Rosenblatt may satisfy this burden by showing "that the legitimate reasons offered by [7-Eleven] were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Burdine,* 450 U.S. at 253). That is, he must produce sufficient evidence for a reasonable trier of fact to find either that 7-Eleven's proffered explanation is unworthy of credence or that a discriminatory reason more likely motivated the decision to terminate him. *See Burdine,* 450 U.S. at 256. Even without direct evidence of age-motivated discrimination, if Rosenblatt can provide sufficient evidence to permit a reasonable jury to conclude that 7-Eleven's proffered

legitimate nondiscriminatory reason is unworthy of credence, 7-Eleven's motion for summary judgment must be denied.

## III

**\*4** To determine whether 7-Eleven is entitled to summary judgment on Rosenblatt's discrimination claim, the court first addresses whether he has demonstrated a prima facie case.

## A

To establish a prima facie case of discriminatory discharge under the ADEA, Rosenblatt must show that "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Rachid,* 376 F.3d at 309 (citations and internal quotation marks omitted); *see also Brown v. CSC Logic, Inc.* 82 F.3d 651, 654 (5th Cir.1996). In a RIF case, a plaintiff can satisfy the fourth element by providing " 'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.' " *Palasota v. Haggar Clothing Co.,* 342 F.3d 569, 576 (5th Cir.2003) (per curiam) (quoting *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 41 (5th Cir.1996)).

Because 7-Eleven will not have the burden of proof at trial on Rosenblatt's age discrimination claim, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support the claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once it does so, Rosenblatt must go beyond his pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in plaintiffs' favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rosenblatt's failure to produce proof as to any essential element renders all other facts immaterial. *Edgar v. Gen. Elec. Co.,* 2002 WL 318331, at \*4 (N.D.Tex. Feb.27, 2002) (Fitzwater, J.) (citing

*Celotex Corp.,* 477 U.S. at 323). Summary judgment is mandatory if Rosenblatt fails to meet his burden. *Little,* 37 F.3d at 1076.


### B

7-Eleven maintains that Rosenblatt cannot establish the fourth element of a prima facie case because he has not presented evidence tending to indicate that he was discharged because of his age. [3] 7-Eleven points to the absence of evidence that it intended to discriminate against Rosenblatt when it eliminated his position in the RIF. It posits that it reached its decision to terminate him based on a business decision to restructure the Procurement Department, that the restructuring involved the elimination of three Procurement Managers in the Facilities Procurement Group, and that it conducted a ranking of the Procurement Managers in the Facilities Procurement Group based on reasonable factors other than age. 7-Eleven contends that Rosenblatt has not been replaced, no new Procurement Managers have been hired since the RIF, and it has not rehired any Procurement Managers who were terminated as a result of the RIF. 7-Eleven contends that Rosenblatt has failed to offer any evidence that suggests a nexus between his termination and his age and that, because he cannot establish the fourth element of a prima facie case, summary judgment should be granted.

**\*5** Rosenblatt responds that discharging an older worker while retaining similarly-situated younger workers is sufficient to satisfy the fourth element in a RIF case. He maintains that each of the three Procurement Managers who were terminated, including he, was in the protected class of persons over age 40, and that 7-Eleven retained several Procurement Managers who were much younger than he, at least two of whom was younger than age 40. Rosenblatt specifically points to Thorp, who was 37 when the RIF occurred. Rosenblatt also cites three other Procurement Managers who were younger than he and who were retained during the RIF: Carolyn Carter ("Carter") (age 44), Greg Wilmeth ("Wilmeth") (age 48), and Terry McGill ("McGill") (age 45). Rosenblatt maintains that the WFA scores of Carter, Wilmeth, and McGill were the same as or below his. He contends that the evidence of disparate treatment appears on the face of the record because the oldest Procurement Manager, with superior performance, better qualifications, more experience, and higher education was terminated,

while less experienced, less educated, and lower performing employees were retained. Rosenblatt argues that because the ADEA prohibits discrimination based on age, an employer's decision to retain a substantially younger employee is a reliable indicator of age discrimination.


### C

"[T]o establish a prima facie case, a plaintiff need only make a very minimal showing." *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 639 (5th Cir.1985). That is, the burden is not an onerous one. *Burdine,* 450 U.S. at 253. A prima facie case merely raises the inference of discrimination, because the courts presume the employer's acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

In cases involving a RIF where the plaintiff has not been replaced, the fourth element of a prima facie case may be established by evidence that members outside the protected class remained in similar positions after the RIF. *Tucker v. SAS Inst., Inc.,* 462 F.Supp.2d 715, 725 (N.D.Tex.2006) (Fish, C.J.) (citing *Faruki v. Parsons S.I.P., Inc.,* 123 F.3d 315, 318 (5th Cir.1997)); *Best v. GTE Directories Serv. Corp.,* 1993 WL 13143213, at \*4 (N.D.Tex. Mar.19, 1993) (Fitzwater, J.) ("The discharge coupled with the retention of younger employees creates the presumption of discrimination in a RIF case." (citing *Thornbrough,* 760 F.2d at 644).

Rosenblatt maintains that he was the oldest Procurement Manager, that he was terminated at age 64, and that 7-Eleven retained several Procurement Managers who were much younger than he, with at least one under age 40. Because establishing a *prima facie* case is not difficult, the court holds that Rosenblatt's allegations are sufficient to satisfy the fourth element of the prima facie case. *See Amburgey v. Corhart Refractories Corp.,* 936 F.2d 805, 813 (5th Cir.1991) (finding that plaintiff established a prima facie case of discrimination by producing evidence that at the time of his dismissal, "younger, allegedly less qualified persons were retained"); *Nichols,* 81 F.3d at 41 (a "very minimal" amount of circumstantial evidence is sufficient to make out a prima facie case of discrimination).

IV

**\*6** 7-Eleven contends that it is entitled to summary judgment because Rosenblatt has not adduced evidence of pretext. It maintains that it restructured the Procurement Department and implemented the RIF to save money and to better serve the customers of the Procurement Department, and that the new "Integrated Asset Management" project decreased the number of employees necessary for the Procurement Department to function efficiently. 7-Eleven argues that a RIF is presumptively a legitimate, nondiscriminatory reason for discharging an employee and that, to avoid summary judgment, Rosenblatt must, but has failed to, demonstrate that each of the reasons articulated by 7-Eleven is a pretext for age discrimination.

A

A RIF is presumptively a legitimate, non-discriminatory reason for a discharge. *Tucker,* 462 F.Supp.2d at 727 (citing *EEOC v. Tex. Instruments, Inc.,* 100 F.3d 1173, 1181 (5th Cir.1996)). Accordingly, the burden shifts to Rosenblatt to "raise a genuine issue of material fact as to whether the employer's proffered reason was merely a pretext for age discrimination." *Medina v. Ramsey Steel Co.,* 238 F.3d 674, 680 (5th Cir.2001) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 326 (5th Cir.1993)). To create a material issue of fact, Rosenblatt must present "sufficient evidence to find that the employer's asserted justification is false ." *Crawford v. Formosa Plastics Corp., La.,* 234 F.3d 899, 903 (5th Cir.2000) (quoting *Reeves,* 530 U.S. at 148). "[A]n employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason." *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415, 1430 (5th Cir.1996) (en banc) (affirming summary judgment when plaintiff offered in response to employer's legitimate, nondiscriminatory reason only his personal perceptions and speculation that his employer's decision was based on age).

B

As evidence of pretext, Rosenblatt first points out that each of the three Procurement Managers who were terminated, including he, was in the protected class of persons over age 40, and that 7-Eleven retained several Procurement Managers who were significantly younger, including Thorp, who was 37. Rosenblatt also points to three other Procurement Managers who were younger than he and who were retained: Carter (44), Wilmeth (48), and McGill (45). Rosenblatt maintains that the WFA scores of Carter, Wilmeth, and McGill were the same as or below his.

Rosenblatt next argues that his performance exceeded that of almost all the other Procurement Managers who reported to Stoltzman, and that his cost savings and cost avoidance performance as a Procurement Manager exceeded that of most of his peers, including the younger ones who were retained. Rosenblatt contends that this is evidence that he was clearly better qualified than younger employees who were not discharged.

**\*7** 7-Eleven contends in its reply that Rosenblatt's assertion that his qualifications, experience, and education exceeded that of younger Procurement Managers who were retained does not demonstrate pretext; that although Rosenblatt may believe his experience and education should have counted more than other factors in the WFA, he has only succeeded in providing evidence that he disagrees with business decisions 7-Eleven made about which factors to consider, and not that 7-Eleven's stated reasons for terminating him are untrue; that with respect to the criteria for the RIF, it has adduced evidence that Rosenblatt was not as well qualified as the retained employees; that Rosenblatt's assertion that he was clearly better qualified does not support the conclusion that he actually was better qualified; that Stoltzman's testimony that Rosenblatt was one of the top two Procurement Managers applied only to his alleged cost savings, which were not considered as part of the WFA, and even if Rosenblatt was one of the top two Procurement Managers in terms of cost savings, this does not establish that he was clearly better qualified than the retained Procurement Managers under the relevant criteria; that the evidence is clear that it based its termination decision on the WFA rankings, and Rosenblatt has not shown that he was "clearly better qualified" than other retained employees; and that Rosenblatt's comparison of his qualifications and WFA scores to Carter, Wilmeth, and McGill is irrelevant because those Procurement Managers worked in Direct Procurement under the supervision of Glenn Sparks ("Sparks") while Rosenblatt worked in the Facilities Procurement Group under Stoltzman's supervision, and these

three are not "similarly situated" or "nearly identical" to Rosenblatt.

C

A plaintiff can raise a fact issue on the question of pretext in a RIF case by adducing evidence that "he was *clearly* better qualified than younger employees who were retained." *Walther v. Lone Star Gas Co.,* 952 F.2d 119, 123 (5th Cir.1992) (emphasis in original) (citing *Thornbrough,* 760 F.2d at 647). "However, this evidence must be more than merely subjective and speculative." *Nichols,* 81 F.3d at 42 (citing *Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 119 (5th Cir.1993); *Elliott v. Group Med. & Surgical Serv.,* 714 F.2d 556, 564 (5th Cir.1983)). "To establish a fact question as to relative qualifications, a plaintiff must provide sufficiently specific reasons for his opinion; mere subjective speculation will not suffice." *Id.*

At the outset, the court notes that Rosenblatt cannot-by comparing his qualifications and WFA scores to those of Carter, Wilmeth, and McGill-establish that he was clearly better qualified than younger employees who were retained. This is because these three Procurement Managers worked in a different division of the Procurement Department from the one in which Rosenblatt was employed. Although 7-Eleven completed the WFA on the members of the Direct Procurement Group, it ultimately chose to eliminate three of the seven Facilities Procurement Managers and not to terminate any members of the Direct Procurement Group. 7-Eleven's choice to conduct the RIF this way is a business decision that the court will not second-guess. *See Bienkowski v. Am. Airlines, Inc.,* 851 F.2d 1503, 1507-08 (5th Cir.1988) ("The ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions, nor was it intended to transform the courts into personnel managers." (citing *Thornbrough,* 760 F.2d at 647; *Elliott,* 714 F.2d at 567)); *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir.1988) ("[W]e do 'not sit as a super-personnel department that reexamines an entity's business decisions.' " (quoting *Dale v. Chi. Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)). The only relevant 7-Eleven employees to whom Rosenblatt can compare himself are those other members of the *Facilities*

Procurement Group who were younger and whom 7-Eleven retained during the RIF.

**\*8** Rosenblatt maintains that his qualifications, experience, and education exceeded that of the younger Procurement Managers who were retained. He also argues that his performance exceeded that of almost all of the other Procurement Managers who reported to Stoltzman. As evidence that his performance exceeded that of almost all the other Procurement Managers who reported to Stoltzman, Rosenblatt points to the deposition of Stoltzman, in which Stoltzman testified that "the cost savings and cost avoidance achieved by Richard was always the top one or two of the group." P.App. 7. Rosenblatt also cites the deposition testimony of Lins, one of Rosenblatt's customers during his employment with 7-Eleven, in which Lins testified that Rosenblatt was at the "[t]op of the heap" in terms of procurement knowledge. P.App. 36. But neither Stoltzman nor Lins was tasked with conducting the RIF in the Facilities Procurement Group. And their subjective opinions of Rosenblatt's performance are insufficient to enable a reasonable jury to find that Rosenblatt was "clearly better qualified" than the younger employees who were retained. *See Smith v. Hewlett-Packard Co.,* 2007 WL 669508, at *5 (N.D.Tex. Mar.6, 2007) (Fitzwater, J.) (holding that "the mere fact that [the person charged with conducting the RIF]'s evaluation differed from the opinions of others does not raise a genuine issue of fact"); *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir.1991) ("The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." (citing *Bienkowski,* 851 F.2d at 1507)). Rosenblatt's evidence establishes that he was terminated, that younger employees were retained, and that his former supervisor and one of his customers had high opinions of his performance. But this evidence is insufficient to enable a reasonable jury to find that Rosenblatt was clearly better qualified than the younger employees whom 7-Eleven decided to retain. And the proof is also insufficient to permit a reasonable jury to find that 7-Eleven's proffered reason for terminating Rosenblatt was pretextual.

Rosenblatt does not point to specific evidence that would enable a reasonable jury to find that any of the retained employees was *less* qualified than Rosenblatt. In fact, the evidence establishes that the employees whom 7-

Eleven retained during the RIF all scored higher than Rosenblatt did on the WFA. The WFA was designed to quantify the qualities that 7-Eleven determined were most important for the position of Facilities Procurement Manager. Rosenblatt's evidence that his cost savings and cost avoidance performance as a Procurement Manager exceeded that of most of his peers, including the younger ones who were retained, is insufficient to enable a reasonable jury to find that Rosenblatt was "clearly better qualified," because this factor was not even taken into account as part of the WFA. Accordingly, accepting as true the fact that Rosenblatt excelled in these areas, this proof would not enable a reasonable jury to find pretext.

D

1

**\*9**  Rosenblatt next maintains that 7-Eleven's conscious departure from its written policies and procedures when conducting its RIF may support an inference of age discrimination if the plaintiff establishes some nexus between employment actions and the plaintiff's age. Rosenblatt points out that although 7-Eleven's Human Resources Policy 4.2 states that an employee's immediate supervisors should be consulted before an involuntary termination, his selection for termination occurred without any warning to, or consultation with, his supervisors, Stoltzman and Udisky.

7-Eleven responds that Rosenblatt's former supervisors, Stoltzman and Udisky, were both terminated as a result of the RIF in the Procurement Department. Accordingly, Kuster worked with the new head of the Procurement Department, Wojcik, in designing and carrying out the RIF. 7-Eleven maintains that it in fact complied with its policy in conducting the RIF, because Wojcik was the supervisor of all Procurement Managers, including Rosenblatt, at the time the RIF was implemented. 7-Eleven maintains that even if it did not follow its own termination procedures, this does not alone raise a fact issue because there is no evidence that Rosenblatt's age was a factor in the decision to terminate his employment.

2

"An employer's conscious, unexplained departure from its usual polices and procedures when conducting a RIF may

in appropriate circumstances support an inference of age discrimination if the plaintiff establishes some nexus between employment actions and the plaintiff's age." *Tyler v. Union Oil Co. of Cal.,* 304 F.3d 379, 396 (5th Cir.2002) (citing *Tex. Instruments,* 100 F.3d at 1182).

> Proof that an employer did not follow correct or standard procedures in the termination or demotion of an employee may well serve as the basis for a wrongful discharge action under state law. As we have stated, however, the ADEA was not created to redress wrongful discharge simply because the terminated worker was over the age of forty. A discharge may well be unfair or even unlawful yet not be evidence of age bias under the ADEA. To make out an ADEA claim, the plaintiff must establish the existence of discrete facts that show some nexus between the employment actions taken by the employer and the employee's age .... [A] bald assertion that one exists ... simply will not suffice.

*Moore v. Eli Lilly Co.,* 990 F.2d 812, 819 (5th Cir.1993) (citing *Bienkowski,* 851 F.2d at 1508 n. 6). But even assuming *arguendo* that in not consulting Stoltzman or Udisky, 7-Eleven departed from its standard termination procedures, this variance alone is not sufficient to raise a genuine issue of fact on the issue of pretext.

Rosenblatt has not adduced evidence sufficient to establish a nexus between his termination and his age. The fact that Rosenblatt was the oldest Procurement Manager terminated, combined with the allegation that 7-Eleven departed from standard termination procedures, does not of itself establish the requisite nexus between termination and age. Moreover, there is nothing that a reasonable jury could find is suspect in 7-Eleven's decision to permit Wojcik and Kuster to make the termination decisions without consulting Stoltzman or Udisky, because Stoltzman and Udisky *were also being terminated* as part of the restructuring of the department. Accordingly, any failure to follow proper termination

procedures is insufficient of itself to permit a reasonable jury to find pretext.

E

1

**\*10** Rosenblatt next challenges the method by which 7-Eleven chose the employees to terminate. He argues that Kuster "made up" the WFA analysis, and the newly fabricated process was not written down within the memos, policies, or procedures of 7-Eleven's Human Resources Department. Rosenblatt maintains that, by collecting the arbitrary and subjective data and then scoring and weighting it for impact, 7-Eleven could manipulate the numbers to reach the desired result. He points to the fact that he worked for several customers within and outside the Facilities Procurement Group, but that the only customer with whom Wojcik spoke regarding Rosenblatt's performance was Hall. Rosenblatt contends that Wojcik's sparse subjective records of Hall's feedback are inherently suspect given the similarity to the customer feedback in Sparks's group, the absence of detail, and the absence of notes, and maintains that it is clear that Wojcik and Kuster did little or no independent investigation regarding the reasons Rosenblatt was being fired. He points out that Wojcik had never met him, had never reviewed his personnel files, did not know what projects he had worked on, did not know if he had ever been written up or counseled, did not have a good working knowledge of what factors made up the WFA, including the HRP element, and was not involved in the WFA process. Rosenblatt also points to evidence that Kuster had never met him, had no records of write-ups, counseling, or anything else in Rosenblatt's file that negatively questioned his performance, did not review his resume or job description, did not talk either to Stoltzman or to Udisky before deciding to terminate him, never totaled up the numbers on the competency assessments that existed for the Procurement Managers, and did not use Rosenblatt's 2004 or 2005 performance appraisals in determining whether he should be terminated.

7-Eleven responds that Rosenblatt cannot defeat summary judgment by asserting that he would have carried out the RIF differently. It posits that it was entitled to implement the RIF according to its preferred criteria of performance, and that the exercise of its business judgment should not be disturbed. 7-Eleven contends that Rosenblatt has not raised a genuine issue of material fact as to the truth of the explanation

7-Eleven gave regarding the process used in the RIF that resulted in his termination; Rosenblatt does not dispute that Kuster was asked to facilitate the elimination of three of the seven Procurement Managers in the Facilities Procurement Group; he does not dispute that Kuster developed the WFA to carry out this assignment; he does not dispute that Kuster actually used the factors that he testified he followed in the WFA to accomplish his assignment; he does not dispute the mathematical calculations of the factors of the WFA; and he does not dispute that the Procurement Managers in the Facilities Procurement Group with the three lowest scores were terminated. 7-Eleven also points out that Rosenblatt does not challenge Hall's assessment of Rosenblatt's customer service or Wojcik and Kuster's reliance on that assessment in the WFA. Rather, Rosenblatt has relied on the opinion of different customers to suggest that Wojcik and Kuster "made a mistake" in relying on Hall's assessment. 7-Eleven maintains that the mere fact that Hall's evaluation differed from the opinions of others does not raise a genuine issue of fact, and it argues that Rosenblatt has failed to establish that 7-Eleven's ranking of him in the WFA, accurate or not, was not the real reason for his termination.

2

**\*11** "The ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions, nor was it intended to transform the courts into personnel managers." *Bienkowski,* 851 F.2d at 1507-08 (citing *Thornbrough,* 760 F.2d at 647; *Elliott,* 714 F.2d at 567). "The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated." *Id.* at 1508 (citations omitted). Rosenblatt's criticism of the WFA and of Kuster and Wojcik's business decision to rely on the WFA in determining which employees to terminate is insufficient to enable a reasonable jury to find that the reasons on which 7-Eleven relies for including Rosenblatt in the RIF are pretextual. 7-Eleven correctly points out that although Rosenblatt criticizes the way in which 7-Eleven conducted the RIF, he has not adduced any evidence that would enable a reasonable jury to find that 7-Eleven did not include him in the RIF for the reasons stated but instead did so because of his age. *See Smith,* 2007 WL 669508, at \*5 (granting summary judgment in RIF case where plaintiff presented no evidence that would enable reasonable jury to find that person whose evaluation was used in RIF did not in fact subjectively hold opinion of plaintiff's

performance that resulted in his termination). Rosenblatt argues that, by collecting the arbitrary and subjective data and then scoring and weighting it for impact, 7-Eleven could manipulate the numbers to reach the desired result. But he has failed to adduce evidence that would enable a reasonable jury to find that this is what 7-Eleven actually did. Rosenblatt's allegations are conclusory and unsupported by the evidence and, as such, are not competent summary judgment evidence. *See Eldridge v. Am. Residential Servs. L.L.C., 2006 WL 2035654, at \*11 (N.D.Tex. July 19, 2006)* (Fitzwater, J.) ("Conclusory assertions, made without any citation to evidence, are insufficient to withstand summary judgment." (citing *Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir.2002)*)). It is undisputed that the three employees who scored the lowest on the WFA were the three whom 7-Eleven terminated in the RIF. Rosenblatt's criticism of the WFA and the methods by which 7-Eleven selected the employees to terminate is insufficient to enable a reasonable jury to find that the reasons on which 7-Eleven relies for including him in the RIF were pretextual.

### F

#### 1

Finally, Rosenblatt argues that 7-Eleven's Notice of Employee Separation for Rosenblatt belies its reasoning because it failed to so characterize Rosenblatt's separation. He also maintains that he has evidence that he was targeted for termination before January 16, 2006 and that 7-Eleven then "made up" an unprecedented unwritten scheme that relied on subjective, arbitrary criteria to achieve a predetermined result. Rosenblatt posits that the alleged restructuring was no more than a reshuffling of personnel.

**\*12** 7-Eleven replies that the "projected termination date" of January 16, 2006 is actually seen by the 7-Eleven Human Resources Department as "Date Last Worked," and it is the last day worked that is entered into that field; that the printout showing Rosenblatt's "reason for leaving" as voluntary is not indicative of the reason for his termination, because 7-Eleven uses the field to classify an employee for retiree benefits purposes; and that the "reshuffling" argument fails by Rosenblatt's own arguments, since Rosenblatt acknowledges that three Procurement Managers were terminated as part of the RIF and that the terminations were based on the WFA. 7-Eleven also maintains that the organizational structure of

the Department undisputedly changed as a result of the RIF. Before the RIF, the Procurement Department had 18 Procurement Managers and three Procurement Directors, and after the RIF, it had 12 Procurement Managers and no Procurement Directors. 7-Eleven also contends that it is uncontroverted that an entire supervisory level of Procurement Directors was eliminated in the RIF, and that the overall number of employees in the department decreased from 32 in October 2004 to 24 in August 2006. [4]

#### 2

The court holds that neither Rosenblatt's evidence relating to the HR files nor his argument that the RIF was merely a reshuffling establishes that the reasons 7-Eleven gave for selecting him for the RIF were pretextual. A reasonable jury could only find that the RIF took place, that Wojcik removed and replaced the heads of the three Procurement Departments, and that three of the seven Facilities Procurement Managers were terminated. Furthermore, the notations regarding Rosenblatt's "projected termination date," and "reason for leaving" would not permit a reasonable jury to find pretext.

### G

Even if the court were unable to conclude that Rosenblatt has failed to raise a genuine issue of material fact on the question of pretext, it would nonetheless conclude in this case that 7-Eleven is entitled to summary judgment. "[T]here [are] instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves, 530 U.S. at 148.* The plaintiff might create "only a weak issue of fact as to whether the employer's reason was untrue and there [may be] abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* (citing *Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1291-92 (D.C.Cir.1998)*). It is "possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination." *Crawford, 234 F.3d at 903* (citing *Travis v. Bd. of Regents of the Univ. of Tex. Sys., 122 F.3d 259 (5th Cir.1997)*).

Assuming that Rosenblatt has somehow raised a genuine issue of fact concerning pretext, it is a weak issue of fact, and there is abundant, uncontroverted evidence that no age discrimination occurred. When 7-Eleven hired Rosenblatt, he was 61. There is no evidence that Rosenblatt's age was ever considered in any respect or that anyone at 7-Eleven ever made any negative age-related comments about Rosenblatt or anyone else. In fact, the evidence shows that those responsible for deciding whom to include in the RIF were not even aware of Rosenblatt's age at the time they decided to terminate his employment. Rosenblatt does not contend that there is such proof, and he cites none in his brief. His case relies on pretext alone.

 **\*13** There is abundant proof, however, that age did not play a role in 7-Eleven's RIF determination. As noted, the summary judgment record establishes that 7-Eleven hired Rosenblatt when he was 61. Moreover, during the RIF, all of the retained employees, with the exception of Thorp, were over the age of 40, and those responsible for deciding which employees to terminate were unaware of the ages of any of the Procurement Managers.

\* \* \*

Rosenblatt has failed to introduce evidence that would permit a reasonable jury to find that 7-Eleven's legitimate, nondiscriminatory reasons for including him in the RIF were pretextual. Accordingly, the court grants 7-Eleven's April 6, 2007 motion for summary judgment and dismisses this action with prejudice by judgment filed today.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2187252

---

## Footnotes

1   The court recounts the evidence in a light favorable to Rosenblatt as the summary judgment nonmovant and draws all reasonable inferences in his favor. *E.g.,* *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.,* *422 F.Supp.2d 698, 701 n. 2 (N.D.Tex.2006)* (Fitzwater, J.) (citing *Clift v. Clift,* *210 F.3d 268, 270 (5th Cir.2000)*).

2   Rosenblatt originally asserted disparate treatment and disparate impact claims. Based on the parties' joint stipulation of dismissal, the court later dismissed the disparate impact claim, leaving only the disparate treatment claim to be litigated.

3   It is undisputed that Rosenblatt was discharged and that he is a member of a protected class. It also appears undisputed that Rosenblatt was qualified for his position.

4   7-Eleven filed on a May 22, 2007 a motion for leave to file a reply appendix supporting these allegations. Because the court is not relying on the evidence that 7-Eleven includes in the reply appendix, it denies the motion as moot.

---

   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6685002
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

Luis SANCHEZ

v.

CHEVRON NORTH AMERICA EXPLORATION
AND PRODUCTION COMPANY

CIVIL ACTION NUMBER: 19-11232
|
Signed 11/12/2020

**Attorneys and Law Firms**

Wanda Anderson Davis, Leefe, Gibbs, Sullivan, & DuPre, LLP, Metairie, LA, for Luis Sanchez.

Monique M. Weiner, Skylar B. Rudin, Kuchler Polk Weiner, LLC, New Orleans, LA, for Chevron North America Exploration and Production Company.

SECTION: "J"(5)

**ORDER AND REASONS**

MICHAEL B. NORTH, UNITED STATES MAGISTRATE JUDGE

 **\*1** Before the Court is Plaintiff's motion for reconsideration of the Court's order of July 20, 2020 (rec. doc. 45) granting as unopposed the third Rule 12(b)(6) motion to dismiss of Defendant, Chevron North America Exploration and Production Company ("Chevron"). (Rec. doc. 46). The motion for reconsideration is opposed. (Rec. doc. 49). For the reasons that follow, it is ordered that Plaintiff's motion for reconsideration is granted, as is the Defendant's motion to dismiss are granted and that Plaintiff's suit is dismissed pursuant to Rule 12(b)(6) and 41(b) of the Federal Rules of Civil Procedure.

The procedural history of this case is tortured indeed. It began with the filing of a 30-page complaint by Plaintiff that was essentially a lengthy amalgam of petty grievances and conclusory statements and which, as pled by him, did not pass muster under the requirements of  Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and  Ashcroft v. Iqbal,

556 U.S. 662 (2009). (Rec. doc. 1). Following initial service delays and the placement of the case on the Court's call docket (rec. docs. 3, 8, 9, 10), Chevron filed its first Rule 12(b)(6) motion to dismiss, which was heard on January 15, 2020 after being fully briefed by the parties. (Rec. docs. 11, 18, 21, 23). On January 30, 2020, the Court issued a written ruling on Defendant's first motion to dismiss, affording Plaintiff one opportunity to amend his complaint as a lesser sanction for untimely service in lieu of dismissing the case. (Rec. doc. 24). In doing so, the Court expressed significant concerns about the adequacy of the factual allegations in Plaintiff's complaint, even identifying specific examples of those that were vague and/or non-actionable, (*id.* at pp. 12-15), but ultimately gave him the benefit of the doubt and afforded him one opportunity to amend.

On February 13, 2020, Plaintiff filed his first supplemental and amended complaint in response to the Court's order. (Rec. doc. 27). Rather than submitting a more concise and comprehensible pleading, Plaintiff's amended complaint ballooned from 30 to 39 pages, including 10 pages of facts that clearly fell outside of the applicable limitations period. (*Id.*). On February 18, 2020, the Court entered an order striking Plaintiff's first amended complaint as violative of both Rule 8's requirement of a short and plain statement of the claim and the Court's order and reasons of January 30, 2020. (Rec. doc. 29). Plaintiff was thus given until March 11, 2020 within which to properly amend his complaint. (Rec. doc. 30). Plaintiff subsequently filed a 28-page first supplemental and amending complaint on March 10, 2020. (Rec. doc. 31).

Not unexpectedly, on March 23, 2020, Chevron filed its second Rule 12(b)(6) motion, arguing that Plaintiff's most recent pleading did not comply with the Court's previous orders and that the complaint as amended otherwise pled non-viable causes of action. (Rec. doc. 32) [1] . Following additional briefing by the parties (rec. docs. 34, 37), on May 8, 2020, the Court issued a written opinion on Defendant's second motion to dismiss, agreeing that the most recent iteration of Plaintiff's pleading ran afoul of its previous orders but nevertheless granting him one last and final opportunity to adequately plead whatever it was that he was trying to plead, providing him with specific "plead-by-numbers instructions" and imposing a 15-page limit. (Rec. doc. 38). The order also directed Plaintiff's counsel to show cause why she and/or Plaintiff should not be monetarily sanctioned for repeatedly failing to comply with Rule 8 and the Court's orders. (*Id.*). Inexplicably, or perhaps not so given the history of this case, what Plaintiff subsequently filed, without first seeking leave

to do so, was a second supplemental and amending complaint which exceeded the Court-imposed page limitation and which suffers from the same infirmities as his previous pleadings in terms of the inclusion of unnecessary and time-barred factual allegations under ill-defined and lumped-together causes of action. (Rec. doc. 41). Predictably following in the wake of Plaintiff's second supplemental and amending complaint was the filing of Chevron's third motion to dismiss, which it noticed for submission on July 1, 2020. (Rec. doc. 44). When Plaintiff failed to formally oppose that motion within the time prescribed by Local Rule 7.5, the Court granted the motion as both unopposed and on the merits on July 20, 2020. (Rec. doc. 45). That resulted in the motion for reconsideration that is presently before the Court as well as additional briefing from the parties on Chevron's third motion to dismiss. (Rec. docs. 46, 49, 53).

**\*2** Motions for reconsideration are not recognized by the Federal Rules of Civil Procedure but are nevertheless to be considered under Rules 54(b), 59, or 60. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994); *Castrillo v. American Home Mortgage Service, Inc.*, No. 09-CV-4369, 2010 WL 1424398 at \*3-4 (E. D. La. Apr. 5, 2010). Rules 59 and 60, however, apply only to final judgments. *Mitchell v. Amica Mutual Ins. Co.*, No. 14-CV-2766, 2015 WL 9488457 at \*3 (E.D. La. Dec. 30, 2015). Thus, when a party seeks reconsideration of an order that adjudicates fewer than all of the claims among the parties, Rule 54(b) controls. *Gulf Fleet Tiger Acquisition v. Thoma-Sea Ship Builders*, 282 F.R.D. 146, 152 (E.D. La. 2012). In the Eastern District, the general practice has been to evaluate Rule 54(b) motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment. *Id.* at 152 n. 40; *Castrillo*, 2010 WL 1424398 at \*4 n. 54. A Rule 59(e) motion calls into question the correctness of a judgment, and courts have considerable discretion in deciding whether to grant or deny such a motion. *Gulf Fleet*, 282 F.R.D. at 152 (internal quotations and citations omitted). In exercising this discretion, courts must carefully balance the interests of justice with the need for finality. *Id.* Courts in the Eastern District generally consider the following four factors for deciding a motion under the Rule 59(e) standard:

1) the motion is necessary to correct a manifest error of law or fact upon which the judgment is based;

2) the movant presents newly discovered or previously unavailable evidence;

3) the motion is necessary in order to prevent manifest injustice; or

4) the motion is justified by an intervening change in controlling law.

*Gulf Fleet*, 282 F.R.D. at 152-53 (citing *Castrillo*, 2010 WL 1424398 at \*4)

Rule 59(e) serves the narrow purpose of correcting manifest errors of law or fact or presenting newly discovered evidence. *Advocare Int'l, LP v. Horizon Labs, Inc.*, 524 F.3d 679, 691 (5th Cir. 2008). "'Manifest error' is one that 'is plain and indisputable, and that amounts to a complete disregard of the controlling law.' " *Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 200)(quoting *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 195 (1st Cir. 2004)). In the Fifth Circuit, altering, amending, or reconsidering a judgment "... is an extraordinary remedy that should be used sparingly." *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir.), *cert. denied*, 543 U.S. 976 (2004)(citations omitted). While district courts are vested with "... considerable discretion in deciding whether to grant or deny a motion to alter a judgment," denial is favored. *Crain v. Schlumberger Technology Co.*, No. 15-CV-1777, 2016 WL 4508335 at \*1 n. 9 (E.D. La. Aug. 2016)(citing *Hale v. Townley*, 45 F.3d 914, 921 (5th Cir. 1995)). "When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted." *Blythe v. Offshore Service Vessels, L.L.C.*, 423 F.Supp.3d 299, 304 (E.D. La. 2019).

Plaintiff's reliance on Rule 60 is unavailing here as no final judgment has been entered that adjudicates all claims between the parties. His motion for reconsideration otherwise fails to satisfy the demanding requirements needed to obtain relief under Rule 59(e). Nevertheless, because other independent, adequate reasons exist for dismissing Plaintiff's lawsuit, the Court grants his motion for reconsideration and proceeds to those other grounds. [2]

**\*3** In addition to its Rule 12(b)(6) defense, the overarching theme in Defendant's most recent motion to dismiss is

Plaintiff's repeated failure to comply with the Court's previous orders. On that point, the Court readily agrees. Among the instructions that the Court provided Plaintiff in its order and reasons of May 8, 2020 was the simple directive that his amended complaint be 15 pages or less. (Rec. doc. 38, p. 5). That Plaintiff was simply unwilling to comply with that simple requirement, even after being ordered to show cause why he and/or his counsel should not be assessed a sanction of $1,000 in attorney's fees and costs for repeatedly failing to comply with Rule 8 and the Court's previous orders of February 18, 2020 and January 30, 2020, demonstrates a complete and abject disregard for the orders of the Court. In that regard, it is well-established that Rule 41(b) of the Federal Rules of Civil Procedure vests trial courts with the authority, subject to review for abuse of discretion, to dismiss an action *sua sponte* based on a plaintiff's failure to prosecute or to comply with any order of the court. *Simmons v. Jackson*, No. 15-CV-1700, 2019 WL 360636 at *4 (N.D. Tex. Jan. 4, 2019), *accepted*, 2019 WL 358751 (N.D. Tex. Jan. 20, 2019)(citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629-30, 82 S.Ct. 1386, 1388 (1962) and *Larson v. Scott*, 157 F.3d 1030, 1031 (5th Cir. 1998)). In *Simmons*, dismissal under Rule 41(b) was found to be warranted where the plaintiff failed to comply with a court order, issued in response to "prolix" pleadings which made unnecessarily detailed an evaluation of the sufficiency of his claims, directing him "... to state his claims succinctly ..." and "... reasonably limited Plaintiff to [an amended complaint of] 20 pages." *Id.* In *Larson v. Scott*, 157 F.3d 1030, 1032 (5th Cir. 1998), the Fifth Circuit found that the trial court had "... acted well within the bounds of its discretion ..." in dismissing a prisoner's civil rights lawsuit after he failed to file a new application to proceed *in form pauperis* with a certification of his inmate trust account despite being given warnings and a period of four months within which to comply. In this case, Plaintiff was first alerted to the deficiencies in his complaint in January of this year but despite two subsequent warnings,[3] specific instructions on how to remedy his pleadings, and the passage of over four months he could not even comply with the most simple, rudimentary requirement of a page limitation. Dismissal of this matter for that reason alone is justified here. *Simmons*, 2019 WL 360636 at *4.

The second instance of non-compliance identified by Defendant centers on Plaintiff's failure to comply with the Court's clear pleading instructions that directed him to first decide what causes of action he wished to plead. (Rec. doc. 38, p. 4). In doing so, the Court alerted Plaintiff to the

fact that race discrimination, hostile work environment, and retaliation were all separate causes of action that must be pleaded separately, not lumped together as a single cause of action under a particular statute as he had done. (*Id.*). Rather than complying with that straightforward directive, Plaintiff's second supplemental and amending complaint, while purporting to identify certain causes of action, begins with the following:

### NATURE AND CAUSES OF ACTION

1. The First Cause of Action is under Title VII of the Civil Rights Act of 1964 ("Title VII"), Title I of the Civil Rights Act of 1991, and

2. The Second Cause of Action is 42 U.S.C. § 1981 as amended

(Rec. doc. 41, p. 1).

Following this assertion, Plaintiff offers that "[b]oth causes of action are to correct unlawful employment practices on the basis of national origin, race, a hostile work environment, retaliation, [and] a retaliatory hostile work environment ...," and "... that all paragraphs in the complaint are interrelated in the establishment of the hostile work environment claims." (*Id.* at p. 2).[4] After sections of the pleading directed to jurisdiction and venue, a description of the parties, and prior administrative proceedings, Plaintiff provides a "statement of claims" in which he recounts a number of incidents that do not on their face raise a plausible inference that actual decisionmakers took any adverse employment against Plaintiff based on his race, national origin, or in retaliation for engaging in protected activity. (*Id.* at pp. 4-5). Contrary to the Court's previous instructions against pleading time-barred allegations, Plaintiff then proceeds to provide a "reservation of rights background information" for 42 U.S.C. § 1981 limitations purposes and reportedly supporting his hostile work environment claims. (*Id.* at p. 5). And rather than heeding the second and third directives of the Court's "plead-by-numbers" instructions, Plaintiff persists in lumping allegations together as follows and without clearly delineating which factual allegations pertain to which cause of action:

### CLAIMS OF RACE AND NATIONAL ORIGIN DISCRIMINATION WITHIN THE FOUR YEAR NATIONAL

### ORIGIN DISCRIMINATION WITHIN THE FOUR YEAR 🔖 42 USC 1981 STATUTE OF LIMITATIONS AND BACKGROUND INFORMATION FOR TITLE VII HOSTILE WORK ENVIRONMENT CLAIMS BASED ON RACE AND NATIONAL ORIGINS

**\*4**

(*Id.* at p. 6).

Plaintiff's continued assertion of national origin discrimination under 🔖 § 1981 is particularly troublesome as he was previously alerted that no such claim lies under that statute. 🔖 *Nnadozie v. Genesis Healthcare Corp.*, 730 Fed.Appx. 151, 156-57 (4th Cir. 2018); 🔖 *Torgerson v. City of Rochester*, 643 F.3d 1031, 1053 (8th Cir. 2011); *El-Zabet v. Nissan North America, Inc.*, 211 Fed.Appx. 460, 462 (6th Cir. 2006); *Morey v. Carroll County Gov't*, No. 17-CV-2250, 2018 WL 2064782 at *13 (D. MD May 3, 2018). That fact notwithstanding, elsewhere in his complaint Plaintiff appears to variously identify his national origin as American (¶16, 24(f)) and as Puerto Rican. (¶23). Plaintiff also repeats allegations that the Court previously identified as petty and non-actionable grievances. (Compare rec. doc. 24, pp. 13-14 with rec. doc. 41, pp. 6-8). And despite the Court's specific admonition that Plaintiff not plead facts outside the relevant statute of limitations (rec. doc. 38, p. 5), Plaintiff forges ahead and repackages the stale factual matters as a long-running hostile work environment even though he did not separately plead a hostile work environment claim as he was instructed to do. Instead, Plaintiff amalgamates the allegations in collective support of all of his putative causes of action.

The fifth "plead-by-numbers" instruction provided to Plaintiff by the Court was that he identify each actor whose conduct was pleaded and explain in sufficient detail why that conduct is actionable and/or important. (Rec. doc. 38, p. 5). Despite that directive, Plaintiff continues to advance allegations against co-workers that do not raise a plausible inference that actual decisionmakers took any adverse employment action against him based on his race, national origin, or in retaliation for engaging in protected activity. By way of example, Plaintiff identified Kevin Tauzier as the supervisor

who oversaw the department where he worked, determined promotions, made certain hiring and firing recommendations, and took other employment-based actions but he does not specifically allege that Tauzier made any of the alleged race-based comments or insults set forth in his amended pleading. In any event, the comment attributed to Tauzier by Plaintiff does not, on its face, support an inference that discriminatory or retaliatory motives were the reasons undergirding his alleged distaste for Plaintiff. Additionally, Plaintiff alleges that Jeff Pope had supervisory authority over and participated in promotion decisions regarding him but he does not specifically identify and allege that concrete personnel actions were made with discriminatory or retaliatory intent or even with an awareness that Plaintiff had engaged in protected activity. The Court previously expressed grave concerns over the actionable nature of these allegations in passing upon the sufficiency of Plaintiff's original complaint. (Rec. doc. 24, p. 13). That Plaintiff has been unwilling to heed the Court's advices on pleading separately valid causes of action despite being given several opportunities only underscores what has now become obvious: that he is unable to do so.

**\*5** As the Court previously noted earlier in this case, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" 🔖 *Ashcroft*, 556 U.S. at 678 (quoting 🔖 *Twombly*, 550 U.S. at 570). In a case such as this one, a plausible claim for relief ultimately requires facts supporting a causal link between Plaintiff's race, national origin, or protected activity and an actionable adverse employment action or pervasive and extreme harassment. *English v. Perdue*, 777 Fed.Appx. 94, 97 (5th Cir. 2019). Rather than separately pleading causes of action supported by distinct fact patterns, Plaintiff cobbles together disparate grievances against co-workers with no supervising authority over him as well as complaining of comments that were made entirely out of his presence. Federal anti-discrimination laws are not a general code of civility. 🔖 *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Considering the factors identified by the Supreme Court, 🔖 *id.* at 787-88, the conduct complained of by Plaintiff is not so sufficiently severe or pervasive so as to alter the conditions of his employment and to create an abusive working environment. Simply put, the style of pleading employed by Plaintiff has presented the Court a Gordian Knot of allegations, from which a plausible cause of action cannot be readily discerned. Accordingly, Plaintiff's lawsuit is dismissed pursuant to Rules 12(b)(6) and

41(b) of the Federal Rules of Civil Procedure. Judgment will be entered accordingly.

**All Citations**

Slip Copy, 2020 WL 6685002

## Footnotes

| 1 | Among the non-viable causes of action identified by Defendant were a "pattern and practice of race discrimination, harassment, and retaliation" under 42 U.S.C. § 1981 and a "pattern and practice of race and national origin discrimination, harassment, and retaliation" under Title VII. (Rec. doc. 3, pp. 25, 26). "Pattern or practice" liability is not a separate cause of action but is simply one method of proving discrimination in class-action suits. *Rogers v. Pearland Independent School District*, 827 F.3d 403, 407-008 (5th Cir. 2016). "[T]he pattern-or-practice method of proving discrimination is unavailable in a private, non-class action ..." like this one. *Id.* |
|---|---|
| 2 | In its response in opposition to Plaintiff's motion for reconsideration, Defendant expressly disavows any interest in recouping the costs and attorney's fees it incurred in responding to the motion. (Rec. doc. 49, p. 2). |
| 3 | In the most recent of those warnings the Court pondered whether the continued pleading deficiencies were the result of counsel engaging in some kind of "war of wills" as opposed to lack of effort. (Rec. doc. 38, pp. 3-4). |
| 4 | Plaintiff persists with this line of pleading despite being alerted earlier on in the case that the causes of action are separate and distinct. |

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4471386
United States District Court,
S.D. Texas,
Houston Division.

Scwyana SMITH, Plaintiff,
v.

HOUSTON INDEPENDENT
SCHOOL DISTRICT, Defendant.

Civil Action No. 4:12–CV–3083.
|
Signed Sept. 9, 2014.

**Attorneys and Law Firms**

L. Mickele Daniels, Attorney at Law, Houston, TX, for Plaintiff.

Lisa R. McBride, Frances R. Broussard, Thompson and Horton LLP, Houston, TX, for Defendant.

***OPINION AND ORDER***

MELINDA HARMON, District Judge.

 **\*1** Pending before the Court in this employment-discrimination action is Defendant Houston Independent School District's ("HISD") Motion for Summary Judgment (Doc. 16) on all claims brought by Plaintiff Scwyana Smith ("Smith"). Upon review and consideration of the motion, the response (Doc. 19), the reply (Doc. 20), the record, and the applicable law, the Court concludes that the motion should be granted.

**I. Background**

HISD hired Smith in 2004HISD hired Smith in 2004 as a "Document Control Specialist" in Procurement Services, a department within the central administration of HISD. Offer Letter, Doc. 16, Ex. 1 at 2. In 2009, Smith's position was reclassified as "General Clerk III," a title she held for the remainder of her employment with HISD. Reclassification Letter, Doc. 16, Ex. 7. Smith was at all times an at-will employee. Aff. of Chalita Cyprian, Doc. 16, Ex. 39 ¶ 4; Aff. of Selika Robinson, Doc. 16, Ex. 43 ¶ 3. In response to a statewide budget shortfall, HISD implemented a districtwide Reduction in Force ("RIF") during the 2011–2012 school year. Doc. 16, Ex. 43 ¶ 5. On February 10, 2011, the

General Manager of Procurement Services, Stephen Pottinger ("Pottinger"), notified all Procurement Services employees of the impending RIF. *See* RIF Script, Doc. 16, Ex. 11; RIF Memo, Doc. 16, Ex. 12.

On May 6, 2011, Pottinger gave written notice to each of the four General Clerk IIIs, including Smith, that their positions were subject to the RIF and that two General Clerk III positions would be eliminated. *See* Doc. 16, Ex. 12. Pottinger, acting within the discretion afforded to him by the applicable HISD Board Policy, developed a procedure for effectuating the RIF in his department whereby he interviewed each of the four clerks for the two available positions. *See* Interview Script, Doc. 16, Ex. 13; Interview Questions, Doc. 16, Ex. 14. In each interview Pottinger asked each candidate four questions regarding her individual efforts and contributions to the Procurement Services Department. *See* Doc. 16, Ex. 13; Doc. 16, Ex. 14.[1] Each question was worth 25 points, for a total of 100 points. *See* Doc. 16, Ex. 13; Doc. 16, Ex. 14. On May 9, 2011, Pottinger and Guy Mazzola, Smith's direct supervisor, interviewed Smith. *See* RIF Memo, Doc. 16, Ex. 12; Smith Dep., Doc. 16, Ex. 32 at 39:15–24. During her interview, Smith "failed to provide substantive or meaningful answers to the questions asked." Doc. 16 at 7. She took credit for suggestions that she did not actually make and reiterated ideas that had previously been discussed and rejected as "impractical or infeasible." *See* Mazzola Depo. Doc. 16, Ex. 32 at 64–67. After the interviews, Mazzola and Pottinger assigned each interviewee a letter grade resulting in the grade distribution of one "B," one "C," and two "Ds." with Smith receiving one of the "Ds". Level I Grievance Recommendation, Doc. 16, Ex. 30. On May 11, 2011, Smith was terminated. *See* Termination Script, Doc. 16, Ex. 16.

 **\*2** Smith challenged her termination in accordance with the HISD grievance process outlined by the applicable HISD Board Policy. Aff. of Veronica Mabasa, Doc. 16, Ex. 42 ¶ 7; *see also* Termination Grievance, Doc. 16, Ex. 29; Level I Recommendation, Doc. 16, Ex. 30; Level II Grievance, Doc. 16, Ex. 31; Level II Hr'g Tr., Doc. 16, Ex. 32; Level II Recommendation, Doc. 16, Ex. 33; Notification of Level III Decision, Doc. 16, Ex. 34. Smith argued that "the selection process did not comport with HISD's lay-off procedures, it was arbitrary and capricious, and it constituted a denial of [her] rights to equal protection under the laws and due process." Doc. 16, Ex. 29. At the first level of the grievance protocol, Pottinger concluded that Smith's termination was consistent with Board Policy, was fair and impartial, was neither arbitrary nor capricious, and did not deny Smith her

rights to equal protection or due process under the law. Doc. 16, Ex. 30. Smith appealed the Level I decision by requesting a Level II hearing. Doc. 16, Ex. 31. On November 18, 2011, a Level II Grievance hearing took place before an independent hearing examiner, who concluded that the District followed its policies in terminating Smith and denied her request to rescind her termination. Doc. 16, Ex. 32; Doc. 16, Ex. 33 at 8–9. Smith appealed the Level II Decision to HISD's Board and on August 23, 2012, the Board upheld the Level II Decision. Doc. 16, Ex. 34.

Smith timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division (Charge No. 460–2011–02381), checking the boxes on the charge forms for "race," "religion," and "retaliation." EEOC Charge, Doc. 16, Ex. 25. In stating the particulars of her discrimination charge, Smith wrote: "Guy Mazzola, Procurement Manager, negatively referred to my major, Theology, in my Bachelor of Science degree, and it hindered my being selected for training. I believe that I have been discriminated against because of my race, black, and religion, Christian, and retaliated against, in violation of Title VII of the Civil Rights Act of 1964, as amended." *Id.* With regard to her retaliation charge, Smith wrote: "I believed that I was laid off in retaliation for complaining about having to do higher level duties without the proper compensation and title." *Id.*

Smith received notice of her right to sue on July 29, 2012, and timely filed her complaint asserting claims for sex and race discrimination under Title VII and claims for race, and religious discrimination and retaliation under Texas Labor Code § 21.051. Pl.'s Compl., Doc. 1. Smith's complaint contains even fewer details regarding the basis for her claims than her EEOC Charge. She does, however, add a disparate impact claim and a reference to discrimination based on age. She states that HISD's RIF had a disproportionate impact on "African American females ... over the age of 40." *Id.* ¶ 14.[2]

*3  On November 14, 2012, HISD moved to dismiss Smith's gender and age claims for failure to exhaust her administrative remedies. Doc. 11 at 2. The Court granted that motion on July 22, 2013. HISD now moves for summary judgment on Smith's remaining claims. Doc. 16.

## II. Legal Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is material if, according to the substantive law governing the claims, it is determinative of an element essential to the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Id.* at 250. Therefore, the court must not make determinations of credibility or weight, and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 896 (5th Cir.2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

Where the nonmovant bears the burden of proof at trial, the movant need only point to the absence of evidence supporting an essential element of the nonmovant's case; the movant does not have to support its motion with evidence negating the case. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). If the movant succeeds, the nonmovant can defeat the motion for summary judgment only by identifying specific evidence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir.1998). Conclusory allegations unsupported by evidence will not preclude summary judgment. *Nat'l Ass'n of Gov't Emps.,* 40 F.3d at 713; *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). The Fifth Circuit requires the nonmovant to submit " 'significant probative evidence.' " *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.,* 174 F.3d 636, 644 (5th Cir.1999).

## III. Discussion

In this case, the substantive law governing Smith's claims is Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* and the Texas Labor Code, also known as the Texas Commission on Human Rights Act ("TCHRA"). Both Title VII and the TCHRA make it unlawful for an employer to discharge or discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin. In the Fifth Circuit, employment discrimination claims under the TCHRA or Title VII that are based on circumstantial evidence are analyzed using the same three-step burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 356 (5th Cir.2005); *Sandstad,* 309 F.3d at 896. Therefore, the Court will proceed to analyze all of Smith's claims under the *McDonnell Douglas* framework whether she brings them under Title VII or the TCHRA.

**\*4** Under this analysis, the plaintiff must establish a *prima facie* case according to the specific requirements of her particular claim. *McDonnell Douglas,* 411 U.S. at 802. If successful, the plaintiff creates a rebuttable presumption of unlawful activity. *Id.* In the second step, the defendant bears a burden of production, which it can meet only by "articulat[ing] a legitimate, nondiscriminatory reason" for its activity. *Id.* If the defendant meets its burden, then, in the third step, the plaintiff "must show that the employer's putative legitimate, nondiscriminatory reason was not its real reason, but was merely a pretext for discrimination." *Id.* at 804. The ultimate burden of persuasion rests with the plaintiff. *Reeves,* 530 U.S. at 142–42; *Reed v. Neopost USA, Inc.,* 701 F.3d 434, 439 (5th Cir.2012).

### A. Smith's Race and Religious Discrimination Claims

The Fifth Circuit utilizes a modified version of the *McDonnell Douglas* test in the context of discrimination cases involving a general reduction in force ("RIF") since an RIF "is itself a legitimate, nondiscriminatory reason for discharge." *EEOC v. Tex. Instruments, Inc.,* 100 F.3d 1173, 1181 (5th Cir.1996) (in Title VII action); *see also Russo v. Smith Int'l, Inc.,* 93 S.W.3d 428, 438 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (in TCHRA action). Therefore, in order to present at prima facie case in an RIF case, a plaintiff must

demonstrate (1) that she is within a protected group; (2) that she was adversely affected by the employer's decision; (3) that she was qualified to assume another position; and (4) others who were not members of the protected class remained in similar positions. *Eugene v. Rumsfeld,* 168 F.Supp.2d 655, 668 (S.D.Tex.2001) (citing *Bauer v. Albemarle Corp.,* 169 F.3d 962, 966 (5th Cir.1999); *Meinecke v. H & B Block,* 66 F.3d 77, 83 (5th Cir.1995); *Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir.1990)). The plaintiff has to make only a minimal showing to establish such a prima facie case.

HISD argues that Smith cannot make out a prima facie case for race or religious discrimination because "she cannot show that she was qualified to assume another available position or that individuals outside of her protected class remained in similar positions after she was terminated." Doc. 16 at 14. With regard to the third prong of the prima facie case, HISD points out that in Smith's deposition, she was asked whether she had knowledge of any open positions in other departments that were not offered to her. She responded: "I don't know. I can't answer your question." Doc. 16, Ex. 32 at 303:3–9. As such, Smith has not shown that there was any other available position within her department, let alone a position that she was qualified to assume. As to the fourth prong of the prima facie case, HISD contends Smith cannot show that any individuals outside of her protected class remained in similar positions to the one from which she was terminated. Prior to the RIF, all four employees who held the General Clerk III position were African American and at least two of them were Christian. After the RIF, both of the remaining General Clerk IIIs were African American, and at least one was Christian. *See* Procurement Servs. Dep't Org. Chart, Doc. 16, Ex. 22; Aff. of Ethyl Kujimiyo, Doc. 16, Ex. 38; Aff. of Chalita Cyprian, Doc. 16, Ex. 39, Aff. of Everlynn Goff, Doc. 16, Ex. 40. Furthermore, in her deposition Smith admitted that she did not know the religious affiliations of others in her department and could not say whether she was treated differently than other similarly-situated employees of a different religion. Doc. 16, Ex. 37 at 248:18–21. As such, Smith has not shown that other individuals outside of her protected class remained in the General Clerk III position.

**\*5** Smith's reply fails to raise a material issue of fact on either of these points. *See* Doc. 20. She does not address the arguments or evidence offered by HISD. She simply repeats the allegations from her complaint and also objects to the admission of affidavits from employees who are still employed by HISD as self-serving and conclusory. Doc.

2014 Fair Empl.Prac.Cas. (BNA) 169,639

20 ¶ 10. Smith's objections to the employees' affidavit are overruled. In the Fifth Circuit, courts do not define "interested witness" so broadly as to require the exclusion of all "testimony from a company's agents regarding the company's reasons for discharging an employee ... [T]o so hold would foreclose the possibility of summary judgment for employers, who almost invariably must rely on testimony of their agent to explain why the disputed action was taken." *Sandstad,* 309 F.3d at 898 (5th Cir.2002).

The Court finds that Smith cannot show that she was qualified to assume another position at HISD or that others outside her protected classes remained in similar positions. She, therefore, fails to state a prima facie case and HISD is entitled to summary judgment on Smith's discrimination claims.

### B. Smith's Retaliation Claim

HISD argues that it is entitled to summary judgment on Smith's retaliation claim because "she cannot show that she engaged in any protected activity prior to her termination, or that there is a causal nexus between any alleged protected activity and Plaintiff's termination." Doc. 16 at 36. To plead a prima facie case of retaliation, a plaintiff must show: (1) she engaged in an activity that is protected by Title VII; (2) the employer took an adverse employment action against the employee; and (3) there is a causal connection between the protected activity and the adverse employment action. *Brazoria Cnty., Tex. v. EEOC,* 391 F.3d 385, 692 (5th Cir.2004); *McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir.2007).

The statute defines "protected activity" as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding or hearing under Title VII. 42 U.S.C. § 2000e–3(a); *see also Glorioso v. Miss. Dep't of Corr.,* 193 F.3d 517, No. 99–60147, 1999 WL 706173, at *3 (5th Cir. Aug.20, 1999) (citing *Grimes v. Tex. Dep't of Mental Health & Mental Retardation,* 102 F.3d 137, 140 (5th Cir.1996)). "[T]o establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co., LLC,* 332 F.3d 874, 883 (5th Cir.2003).

Smith's only allegation to support her retaliation claim is that she was laid off "for complaining about having to do higher level duties without the proper compensation and title." Doc. 16, Ex. 25. Complaining generally about one's job duties is not a protected activity under Title VII. *See, e.g., Harris–Childs v. Medco Health Solutions, Inc.,* 169 F. App'x 913, 916 (5th Cir.2006) (finding no protected activity where plaintiff's complaints to her employer did not allege that she was discriminated against because of her race or gender); *Moore v. United Parcel Serv., Inc.,* 150 F. App'x 315, 319 (5th Cir.2005) (finding that plaintiff's grievance was not a protected activity because it did not protest any unlawful employment action under Title VII). Neither Smith's complaint nor her EEOC Charge alleges that she was retaliated against for engaging in a protected activity under Title VII. "[A] vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected employment activity." *Davis v. Dallas Indep. Sch. Dist.,* 448 F. App'x 485, 493 (5th Cir.2011). Furthermore, even if Smith could demonstrate that she engaged in a protected activity under Title VII, she cannot show a causal connection between her termination and any actual or alleged protected activity since the record clearly shows that Smith was terminated as part of an equitably-implemented District-wide RIF. Thus, the Court finds that Smith cannot establish a prima facie case for retaliation and her claim is dismissed.

### C. Smith's Disparate Impact Claim

**\*6** HISD argues that it is entitled to summary judgment on Smith's claim that HISD's RIF had a disparate impact on "African American females ... over the age of 40" because Smith failed to exhaust this claim by including it in her administrative charge prior to bringing suit and because she fails to establish a prima facie case for disparate impact. Doc. 16 at 42–44.

An employee asserting a claim against her employer under Title VII must exhaust administrative remedies before commencing an action in federal court. *Pacheco v. Mineta,* 448 F.3d 783, 788 (5th Cir.), *cert denied,* 549 U.S. 888, 127 S.Ct. 299, 166 L.Ed.2d 154 (2006). It is well-established that "that 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *McClain v. Lufkin Indus., Inc.,* 519 F.3d 264, 274 (5th Cir.2008) (citing *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 465 (5th Cir.1970)). Courts are instructed, however, to read a plaintiff's administrative charge "broadly, in a fact-specific inquiry into

what EEOC investigations can reasonably be expected to trigger." *Pacheco, 448 F.3d at 788*. In *Pacheco v. Mineta*, the Fifth Circuit explained:

> One the one hand, because the provisions of Title VII were not designed for the sophisticated, and because most complaints are initiated pro se, the scope of an EEOC complaint should be construed liberally. On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in an attempt to achieve non judicial resolution of employment discrimination claims. Indeed, a less exacting rule would also circumvent the statutory scheme since Title VII clearly contemplates that no issue will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance ... [A]llowing a federal complaint to proceed despite its loose "fit" with the administrative charge and investigation is precluded it if would circumvent agency efforts to secure voluntary compliance before a civil action is instituted.

*Id.* (citing *Sanchez, 431 F.2d at 463*).

Smith's EEOC Charge does not allege any facts from which a disparate impact claim could possibly be inferred. In fact, her charge does not reference any HISD employees other than herself. It is not reasonable to presume that an EEOC investigation into disparate impact on the part of HISD could have grown out of Smith's EEOC charge.

*Compare Pacheco, 448 F.3d at 792* (holding that an EEOC charge that only "facially alleged disparate treatment; ... identified no neutral employment policy; and ... complained of past incidents of disparate treatment only" did not exhaust a disparate impact clam). Accordingly, Smith's Title VII disparate impact claim must be dismissed.

**IV. Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that HISD's Motion for Summary Judgment (Doc. 16) is **GRANTED** and Smith's claims of race discrimination, religious discrimination, retaliation, and disparate impact are **DISMISSED.**

*\*7 Final judgment will be entered by separate document.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4471386, 2014 Fair Empl.Prac.Cas. (BNA) 169,639

---

**Footnotes**

1    Pottinger asked the following questions of each interviewee: (1) provide examples of any suggestions you personally made in the past year to improve any business process; (2) provide examples of any suggestions you personally made in the past year to reduce District costs; (3) provide examples of tasks or projects you have personally taken on in the past year-above and beyond your current job description; and (4) provide examples of any value added services you have personally provided to schools in the past year. Doc. 16, Ex. 14

2    Smith also complains that she was "denied to train [sic] on the position to be a buyer." *Id.* ¶ 12. It is unclear how, if at all, this allegation is related to her discrimination claims. Regardless, "the Fifth Circuit has consistently refused to find that a denial of training can constitute an adverse employment action" under Title VII. *Jones v. BP Amoco Chem. Co.,* Civ. No. H–10–1399, 2012 WL 1424986 (S.D.Tex. Apr.23, 2012) *aff'd,* 516 F. App'x

**Smith v. Houston Independent School Dist., Not Reported in F.Supp.3d (2014)**

2014 Fair Empl.Prac.Cas. (BNA) 169,639

330 (5th Cir.2013) (citing *Roberson v. Game Stop/Babbage's,* 152 F. App'x 356, 361 (5th Cir.2005)). Accordingly, any claim related to this allegation is dismissed.

---

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.