**Tam Hoang v. Microsemi Corporation, et al.**
**United States District Court, Southern District of Texas, Houston Division**
**Case No. 4:19-cv-01971**

**Defendants' Itemization of Exhibits**

| EXHIBIT NO. | DESCRIPTION |
|:---:|---|
| 1 | David Sheffield Declaration |
| 2 | Mike Tran Declaration |
| 3 | Tam Hoang Deposition Excerpts |
| 4 | Mike Bondi Declaration |
| 5 | Tam Hoang RIF Assessment (Microchip-Microsemi000110-133) |
| 6 | Tam Hoang RIF Candidate Form (Microchip-Microsemi000068-69) |
| 7 | Michael Hoang RIF Assessment (Microchip-Microsemi000365-385)(Redacted DOBs) |
| 8 | Michael Hoang RIF Candidate Form (Microchip-Microsemi000108-109) |
| 9 | RIF Selection Process (Microchip-Microsemi000049-41, 53-66) |
| 10 | Dwight Steward's Expert Report, dated September 1, 2020 |
| 11 | Mitigation Documents (Plaintiff's resume with name spelled wrong, emails back from his job applications, Resume he submitted to Wharton with name spelled correctly and job offer from Wharton) |
| 12 | Lauren Carr Declaration |
| 13 | Confidentiality Policy (Microchip-Microsemi000443-444) |

# Exhibit 1

## DECLARATION OF DAVID SHEFFIELD

I, David Sheffield, declare:

1.      I am over eighteen years of age and authorized to execute this Declaration. The facts stated in this Declaration are based on my personal knowledge. If called upon to testify to these facts, I could and would do so competently.

2.      I am employed by Microchip Technology, Inc., and work in Microsemi's Quality Assurance Group ("QA Group"), which is part of the company's Software Solutions Group ("SSG"). I am, and since I was hired in May 2017 have been, the QA Group Director.

3.      The SSG produces software-based products, called "solutions," for computer-stored data retrieval. The QA Group is responsible for testing aspects of the solutions created or being created by the SSG's Development Group.

4.      My date of birth is December 13, 1969.

5.      For approximately 13 years, from 2000 until 2013, I worked at Hewlett-Packard Enterprises ("HPE") as a QA manager. From approximately 2004 until sometime in or about 2013, I managed the "Level 1" automated test engineers who supported HPE's smart array products.  As a result of various corporate transactions, divestitures and acquisitions, the functions of that group, and many of its employees, constitute a large part of the Level 1 automated test team in the QA Group within Microsemi's SSG.

6.      In or about 2006, I recruited Mike Tran to be an automated test engineer on my "Level 1" team at HPE. From then until I left the Level 1 team in or about 2013, Mr. Tran reported to me.  At various times during the years I managed Mr. Tran, we had personal conversations and we talked about him having been born in Vietnam, and his experiences in coming to the U.S. as a young émigré from Vietnam.

7.      In 2014, HPE sold its "smart array" technology to PMC-Sierra, Inc. At that time, along with about 50 other HPE employees who had been working on/supporting the smart array technology, Plaintiff, Mike Tran, and others moved to PMC-Sierra to continue working as a PMC-Sierra employee on the smart array technology it had acquired from HPE. About a year earlier, I moved management roles to oversee a different team at HPE. That team did not support the smart array technology and, consequently, I remained with HPE when the team of engineers supporting the smart array technology moved to PMC-Sierra, which was acquired in 2015 by Microsemi.

8.      In January 2017, Mr. Tran sent me a text message to inform me of a job vacancy at Microsemi.  In particular, he told me the company was searching for a Director of the QA Group within its SSG. Mr. Tran told me that I thought I was very qualified for the Director position, despite my concerns that I wasn't because I did not have a college degree. Mr. Tran encouraged me to apply, and told me that I was "perfect" for the job and because the Microsemi Vice President, John Buck, shared my perspective and mindset about both automated testing and Agile Manufacturing techniques.

9.      After Mr. Tran messaged me and encouraged me to apply for the QA Director position, I submitted a resume and interviewed for the job. Mr. Buck, along with Jeff Moll, Kumar Gajjar, Lisa Manzo, and Gana Sridaran, conducted the interview and offered me the job.  I spoke with Mr. Tran several additional times to get more information about the teams I would be managing, and the strengths and weaknesses of the managers and key engineers who would be reporting to me. In these conversations, Mr. Tran advised me that Plaintiff remained committed to manual testing and did not believe that he did not support increasing the QA Group's focus on automated testing rather than manual testing.  He also shared with me his perspective that Plaintiff did not allow the engineers to share information freely with him or the development engineers,

2

and that Mr. Tran had significant challenges getting accurate data that he needed from Plaintiff's group.  I interpreted Mr. Tran's statements about Plaintiff as extremely negative in light of John Buck's directive to me to increase automated testing in the QA Group, and to fully implement Agile Manufacturing methodologies in the QA Group, and those methodologies are founded on principles of open and transparent communication, empowerment of individual engineers rather than managers, and servant leadership.

10.    I started my employment with Microsemi on May 8, 2017, and I was tasked with fully implementing "Agile Manufacturing" methodology, which depends upon increased use of automated testing, less reliance on manual testing, and greater transparency and open communication within the QA Group, and between the QA Group and the SSG Development Group – at both the manager and individual engineer level. Agile Manufacturing also helps expedite project completion, as testing occurs throughout the development process. Development engineers are able to fix problems during development rather than wait until the development phase has been completed.

11.    Before I started as the QA Director, Mr. Tran spoke with me several times about the QA Group, including the challenges he perceived, how it was organized, and the strengths and weaknesses of the QA managers who would be reporting directly to me.

12.    After evaluating the QA Group's operations for several weeks, in July 2017, I reorganized the QA Group by reallocating various management responsibilities. Because Plaintiff's experience and emphasis focused on manual testing, and managing manual test engineers, I concluded that he was not committed to increasing the QA Group's reliance on automated testing while decreasing its reliance on manual testing. Therefore, I assumed direct management of the entire "Level 1" team of automated test engineers.

13.    Before February 2017, the Level 1 automated test engineers who supported array controllers had reported to Hinendra Somaiya, but in February 2017, the SSG Development Director, who was then acting temporarily as the interim director of the QA Group, had reorganized the QA Group by consolidating all Level 1 test engineers (automated) who supported array controllers under Plaintiff's management. This meant Plaintiff supervised all Level 1 test engineers who supported array controllers, as well as the manual test engineers Plaintiff previously managed. This did not, however, give Plaintiff responsibility for all of Level 1 (automated testing), as Level 1 test engineers responsible for switch testing remained with Mr. Somaiya.

14.    Plaintiff's conduct demonstrated to me that he also did not support Agile Manufacturing processes, as he continued to manage in a way that the engineers on his team did not willingly share information, obfuscated their methodologies so that engineers on other teams could not rely on or use their data, and he did not embrace servant leadership principles, as his engineers did not engage directly with their peers in other QA teams or the development engineers in the SSG Development Group.

15.    On one occasion shortly after I became the QA Director, I directed the leadership team to automate the process of collecting and presenting the QA Group's product testing metrics, as that process was being done manually at the time by engineers on Plaintiff's team. I specifically instructed Mr. Tran to work with Plaintiff and Plaintiff's team to understand the process they had been using to generate the metrics, so that he could automate it. However, Plaintiff directed Mr. Tran to work with an engineer who proved unable to explain the methodology they had used to generate the specific metrics that had been presented to the QA management team and more senior SSG management a few weeks earlier. Mr. Tran spent most of his time over several days trying to get data from that engineer, and working with the data the engineer provided, but he could not

4

validate the test results Plaintiff provided to the management team. After a number of days, the engineer informed Mr. Tran that she had not actually created the queries to run, and that he needed to have Plaintiff direct a different engineer to respond to his inquiries. Mr. Tran did that, and after several more days, learned that the entire methodology Plaintiff's team was using to generate the metrics, which were then used in the report of the QA Group's testing results, was fatally flawed. The metrics were flawed, in part, because the queries Plaintiff's team was using did not limit test results to the engineers who were actually testing the particular product. After nearly two weeks of Mr. Tran's dedicated efforts – and numerous email exchanges on which Plaintiff had been copied – Plaintiff emailed the group and stated that the data he presented was "raw" and not intended to be reliable. Mr. Tran spoke with me about this incident on a number of occasions, and shared his frustration with me.  I was shocked that Plaintiff would present "raw" or unreliable data to senior management as the QA Group's metrics, particularly given that the spreadsheet he had presented did not include any such disclaimer.  I also shared Mr. Tran's frustration, which grew more pronounced over time, given the amount of hours that Plaintiff allowed Mr. Tran  and others to waste watching emails going back and forth for nearly two weeks before informing us the data was "raw" and not to be relied upon.  Mr. Tran's time was extremely valuable to me and the QA Group, as he was the chief architect for the Level 1 team and one of the best engineers in the group, and it was incomprehensible to me that Plaintiff allowed him to spin his wheels on one of the first projects I had assigned to him.

16.     On another occasion, in June 2017, I hosted a staff meeting to discuss a freeze/antifreeze feature in a software product we were currently working on. To complete the software testing tasks, our team needed the client's (HPE) drive firmware. During the meeting, Mr. Tran explained the number of failed tests that prompted his request to HPE. HPE provided the

firmware, and noted that the number of failed tests had not been disclosed earlier when it was initially released. Plaintiff made a negative, sarcastic comment, which I interpreted as directed at Mr. Tran (about the client raising the testing discrepancies and sending the firmware because someone had informed the client about the discrepancies) during a staff meeting I was conducting. I got extremely upset, and told Plaintiff that his behavior "has got to f***ing stop" because Plaintiff was criticizing Mr. Tran's direct communication with the client, when I had previously informed the entire QA Group that I expected the team to communicate openly and directly.

17.     Plaintiff never told me that he was Vietnamese, nor did he ever tell me how old he was. A large number of employees I supervise are Asian, and I have never received any other complaints about alleged discrimination. I also have never received any complaints about the language I use with my colleagues.

18.     In late 2017, I concluded that the QA Group needed only one of the two manual testing managers I had, and one fewer manual test staff engineer. Simply put, we needed fewer manual test employees because I was increasing the QA Group's emphasis on automated testing rather than manual testing. At this time, there were three managers in the QA Group: Plaintiff, Hinendra Somaiya, and Arvind Chandrasekaran.

19.     In late 2017, I reached out to Lisa Manzo, the Human Resources Representative responsible for supporting the QA Group, to tell her my conclusions and direction of the QA Group. I informed Ms. Manzo that I was significantly increasing the use of automated testing and proportionately reducing the QA Group's reliance on manual testing. I specifically told Ms. Manzo that the QA Group needed only one of two managers who supervised manual test engineers (both of whom were located in the United States) and only one of two staff engineers who were architects/planners for manual testing (both of whom were located in the United States).

20.     Shortly after my discussion with Ms. Manzo, the Director of Human Resources, Mike Bondi, informed me through Ms. Manzo of Microsemi's RIF Practice, which was confidential to Human Resources employees and only shared with Microsemi managers who had decided to eliminate positions and/or conduct a layoff. He informed us that, if positions were going to be eliminated and not replaced, we needed to follow the approach outlined in Microsemi's RIF Practice, even if we were going to eliminate just one manager position, and just one staff engineer position, and that process required us to separately rate and rank each the group of employees being reduced. However, Mr. Bondi directed us that the group we needed to evaluate for the RIF was all similarly situated employees, which he defined as all employees in the QA Group whose job title was the same, without regard to their particular function (e.g., whether they were manual or automated test managers). At the time, there were only three individuals in the QA Group whose official job title was manager, and there were only seven individuals in the QA Group whose official job title was "staff engineer."

21.     Mr. Bondi informed me through Ms. Manzo that Microsemi's purpose for not drafting the practice as a policy, or making it generally available to managers or employees, was to ensure employees did not interpret the Practice as a binding policy, as the circumstances of each situation required modifications to aspects of the RIF Practice. The RIF Practice identifies four general evaluation categories: Job Criticality, Flexibility, Performance, and Years of Company Service. Other than the Years of Service category, the categories needed to be tailored for each RIF based on the purpose of the RIF and the impacted positions. The employee with the lowest ranking based on weighted scores is selected for termination under the RIF. Mr. Bondi explained that Ms. Manzo and I needed to work together to clearly articulate the purposes of the RIF, identify the particular factors to be used to evaluate similarly-situated employees for purposes of

determining which employee or employees would be laid off, and apply those factors to select the affected employee(s).

22.     The Job Criticality category in the RIF Practice is determined by scoring each of the similarly-situated employees in the RIF group using one to five points on the factors I was to work with Ms. Manzo to articulate, based on the future direction of the business unit. Mr. Bondi, Ms. Manzo, and I concluded that in this case, the Job Criticality rating should be based on five appropriate, objective factors: 1) Depth of Agile System Understanding; 2) Agile System Engagement and Implementation; 3) Analytical & Troubleshooting Skills; 4) Ability to Quickly Assess and Identify & Solve Validation Issues; and 5) Diversified and Broad Product Knowledge.

23.     Mr. Bondi spoke with Ms. Manzo and me on several occasions in late 2017 and early 2018 to assist us with developing the specific factors to use in evaluating the two different comparator groups. He ultimately approved the final factors I used to compare each of the two different groups, and the ratings and rankings generated by applying those factors.

24.     I evaluated each manager, totaled their scores, and divided each score by five to produce an averaged Job Criticality rating. Plaintiff's overall rating was the lowest. After following this same evaluation process for the staff engineers, Michael Hoang's overall rating was the lowest. [Exs. 5-8 to Motion, Tam Hoang and Michael Hoang RIF Assessments and RIF Candidate Forms.]

25.     As Plaintiff received the lowest score, he was identified as the manager to be laid off. This decision required Mr. Bondi's review and final approval, which he granted and I informed Plaintiff that he was being laid off in late January 2018. Lisa Manzo informed Plaintiff that he would be offered a severance of approximately $85,000.00 because his position was being eliminated.

26.     As my goal was to increase automated testing in the QA Group rather than manual testing, and to eliminate a manual test manager position, I eliminated Plaintiff's position and never

8

hired a manager to replace him. Plaintiff's manual testing responsibilities were transitioned to Mr. Somaiya or elsewhere within the QA Group.

27.     Likewise, I eliminated Michael Hoang's staff engineer position and never hired a staff engineer to replace him.

28.     I followed Microsemi's RIF Practice when implementing the January 2018 RIF in the QA Group, and I had the support of Human Resources throughout the entire process. I did not take into account any employee's age, race, national origin, or any other class protected by the law or the company's policies. My evaluations were based solely on the objective factors in the RIF Practice, including the QA Group's emphasis on automated testing and Agile Manufacturing processes.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed in Texas this 1st day of October 2021.

David Sheffield
Director, Quality Assurance Group
Microsemi Corporation

# Exhibit 2

## DECLARATION OF MIKE TRAN

I, Mike Tran, declare:

1.      I am over eighteen years of age. The facts stated in this Declaration are based on my personal knowledge. If called upon to testify to these facts, I could and would do so competently.

2.      I am employed by Microchip Technology, Inc., and work within the Microsemi Corporation's ("Microsemi") Quality Assurance Group ("QA Group") of the Software Solutions Group ("SSG"). I report to the QA Director, David Sheffield.

3.      I am currently 49 years old and am a U.S. Citizen. I was born in Saigon, Vietnam and my race is Asian. My family relocated to the United States after the Vietnam War ended.

4.      For approximately 15 years, from 1999 until 2014, I worked at Hewlett-Packard Enterprises ("HPE"). I initially worked in a number of different engineering roles, but, in or about 2006, Mr. Sheffield recruited me to be an automated test engineer on his "Level 1" team. From then until Mr. Sheffield left the Level 1 team, HPE in or about 2013, I reported to him.

5.      I have known Mr. Sheffield for approximately 16 years. In that time, I have never heard Mr. Sheffield say a discriminatory or derogatory remark about my Vietnamese national origin, about Vietnamese people or people of Vietnamese decent, or about any person based on their Asian race or national origin.  Nor have I ever heard him make any comment that expressed stereotypical views about Vietnamese people, or about any Asian race or national origin. Nor have I ever witnessed him treat any person or employee differently in a manner I believed was due to their race or national origin.

6.      In the years I have known Mr. Sheffield, including all the years I reported to him, I have never heard him say a discriminatory or derogatory remark about older workers, or about

1

any person based on their age.  Nor have I ever heard him make any comment that expressed stereotypical views about older workers. Nor have I ever witnessed him treat any person or employee differently in a manner I believed was due to their age.

7.     If I had witnessed Mr. Sheffield make any negative comment or take any action that either was clearly, or that I perceived to be, based on any person's Vietnamese national origin or ancestry, I would not have remained working in any group he managed, as all of the companies I have worked provide opportunities in a number of different groups for individuals with my education and experience.  Nor would I ever have recommended that Microsemi hire him to be my manager as the QA Director, nor would I ever have undertaken the efforts I made to recruit Mr. Sheffield to apply for and accept the QA Director job at Microsemi – all of which are described below.

8.     In 2014, HPE sold its "smart array" technology to PMC-Sierra, Inc. At that time, along with about 50 other HPE employees who had been working on/supporting the smart array technology, I moved to PMC-Sierra to continue working as a PMC-Sierra employee on the smart array technology it had acquired from HPE. About a year earlier, Mr. Sheffield had left the team to manage a different team at HPE.  The team he managed did not support the smart array technology and, consequently, he remained with HPE.

9.     In 2015, Microsemi acquired PMC-Sierra, and I became a Microsemi employee in its Software Solutions Group.  From that time until I became a Microchip employee (sometime after Microchip acquired Microsemi in May 2018), my official job title (the title assigned by Human Resources ("HR")) was Technical Lead, Firmware Development.  Throughout that entire period of time, I reported directly to the QA Director.

2

10.     In late 2016, the QA Director resigned. The Vice President of the SSG, John Buck, informed me that the SSG Programing Manager, Kumar Gajjar, would act as the interim manager of the QA Group until he hired a QA Director, and that he had a candidate he expected to hire within several weeks.

11.     In mid-late December 2016, Mr. Buck informed me that the candidate he expected to hire had not worked out, and he asked me if there was anyone whom I could recommend; he also emphasized that his goal for the QA Group was to significantly increase automated testing as a means to drive productivity and efficiency as it implemented agile manufacturing techniques.

12.     Shortly after the holidays in January 2017, I texted David Sheffield from my personal phone to inform him about the job opening to see if he might be interested. As my previous manager whom I respected and knew to be focused on the advantages of automated testing for QA purposes, and who had worked to implement agile manufacturing techniques in QA at HPE, I told Mr. Sheffield that he would be a "perfect" fit for the QA Director role. I believed that his mindset about both automated testing and agile manufacturing techniques was the same as Mr. Buck's.

13.     After I messaged David Sheffield and encouraged him to apply for the QA Director position, he submitted a resume and interviewed for the position. I did not have any additional discussions with HR or Mr. Buck about hiring David Sheffield. I know that, at some point after January 2017, Mr. Buck offered the QA Director job to Mr. Sheffield.

14.     Before Mr. Sheffield accepted Microsemi's offer and/or before he began his employment in May 2017, I spoke with him on several occasions about the QA Group, the challenges I perceived, how it was organized, and the strengths and weaknesses of the QA managers, who would be reporting directly to him. I do not view the comments I shared as making

3

negative statements about any of my colleagues or the QA Group; rather, I simply tried to give Mr. Sheffield an understanding of the challenges he would be facing if he accepted the job.

15.     In mid-February 2017, I became concerned about the direction the QA Group was taking due to a re-organization the interim manager, Mr. Gajjar, had implemented by assigning all of the Level 1 automated test engineers who supported array controllers to report to Plaintiff. I did not perceive Plaintiff as being committed to openness and transparency, which were central to agile manufacturing theory. Also, I knew that Plaintiff did not share Mr. Buck's desire to increase automated testing, nor Mr. Buck's view that automated testing should be the focus of the QA Group. I knew that because, at the time Mr. Gajjar announced the reorganization, Plaintiff told me that he did not believe automated testing was as good as manual testing and he did not intend to increase automated testing since he viewed manual testing as the best way to serve the QA function. I also knew that Plaintiff's entire work history had been as a manual test engineer, or a manager of manual test engineers. I knew that fact both from statements Plaintiff had made to me over the years, and because I knew that to be his role while we were both employees at HPE, then PMC-Sierra, then at Microsemi.

16.     Throughout my time as a PMC-Sierra and later Microsemi employee in the QA Group, I had significant challenges getting information from the manual test engineers who worked for and on Plaintiff's team. I did not have comparable challenges in working with the manual test engineers who worked for/reported to the other manual test manager, Hinendra Somaiya. On several occasions, I was told by the engineers that reported to Plaintiff that they "were not allowed" to share information with me or others in the QA Group, and that I should request the information from Plaintiff. The lack of open communication and sharing of information from the engineers who reported to Plaintiff caused significant delays, inefficiencies, and mistakes.

17.     On one occasion shortly after Mr. Sheffield became the QA Director in early May 2018, he directed the process of collecting and presenting the QA Group's metrics regarding product testing, which was being done manually at the time, to be automated. I started to work with Plaintiff and Plaintiff's team to understand the process they had been using to generate the metrics, so I could automate it.  However, the engineer with whom Plaintiff directed me to work was unable to explain the methodology they had used to generate the metrics that had been presented to the QA management team and more senior management.  Despite my best efforts, I was unable to validate those metrics following the process the engineer informed me was being used. I spent most of my time over the next several days trying to get data from that engineer, and working with the data the engineer provided, but I could not validate the test results Plaintiff provided to the management team. After a number of days, the engineer informed me that she had not actually created the queries to run, and that I needed to have Plaintiff direct a different engineer to respond to my inquiries. I did that, and after several more days, learned that the entire methodology Plaintiff's team was using to generate the metrics, which were then used in the report of the QA Group's testing results, was fatally flawed.  The metrics were flawed, in part, because the queries Plaintiff's team was using did not limit test results to the engineers who were actually testing the particular product. After nearly two weeks of my dedicated efforts – and numerous email exchanges on which Plaintiff had been copied – Plaintiff emailed the group and stated that the data he presented was "raw" and not intended to be reliable.  I was quite surprised by his statement, as we had never been told that we could present "raw" and/or "unreliable data to the SSG management, and we knew that data was shared with the relevant customers on occasion.  I was also very frustrated that Plaintiff had observed all the effort and time I was putting in to validate the data he presented, and waited until I had figured out several of the fundamental

problems with the methodology his team employed, before telling me or the QA management team that the data was "raw" and not reliable. I spoke with Mr. Sheffield about this incident on a number of occasions, and shared my frustration with him.

18.     On another occasion, in June 2017, Mr. Sheffield hosted a staff meeting to discuss a freeze/antifreeze feature in a software product we were currently working on. To complete the software testing tasks, I needed the client's (HPE) firmware driver, and explained the number of failed tests that prompted my request. HPE provided the firmware driver, and noted that the number of failed tests had not been disclosed earlier when it was initially released. Plaintiff made a negative, sarcastic comment which I interpreted as directed at me (about the client raising the testing discrepancies and sending the firmware because someone had informed the client about the discrepancies) during a staff meeting Mr. Sheffield was conducting. My impression was that Plaintiff was upset that I had communicated the testing problem to HPE. Mr. Sheffield responded to Plaintiff in a very angry tone, and told him that his behavior "has got to f***ing stop." I interpreted Mr. Sheffield's anger and comment to be directed at Plaintiff because Plaintiff had criticized my direct communication with the client, while Mr. Sheffield had previously informed the entire QA Group that he expected us to communicate openly and directly. Nothing in Mr. Sheffield's response caused me to perceive he was hostile to Plaintiff for anything other than a legitimate business reason.


**I declare under penalty of perjury that the foregoing is true and correct.**

Executed in Texas this 01 day of October 2021.

Mike Tran

# Exhibit 3

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION

3
Tam Hoang,                    )
4          Plaintiff,         )
                              )          Civil Action
5    v.                       )          No. 4:19-cv-01971
                              )
6    Microsemi Corporation    )
     and Microchip Technology )
7    Incorporated,            )
            Defendants.       )
8

9

10

11

12

13        REMOTE VIDEOCONFERENCED VIDEOTAPED

14            DEPOSITION OF TAM HOANG

15          APPEARING REMOTELY VIA ZOOM

16               August 18, 2021

17               10:06 a.m. CST

18

19

20

21

22

23    ----------------------------------------------------

24    Reported by:  Julie Thomson Riley, RDR, CRR,
                    Texas CSR No. PCR-12009
25                  Registered Professional Reporter

1    you were working on with them were given Microsemi

2    addresses was so that the emails that they sent on

3    those programs would be stored on Microsemi servers?

4            MS. WILLARD:   Objection.   Speculation.

5    A.    I do not know that.

6    Q.    Did you have any training about

7    confidentiality of Microsemi's business information?

8    A.    Yes, I did.

9    Q.    You understood that the programs you

10   were working on involved significant confidential

11   information; correct?

12   A.    Correct.

13   Q.    And some trade secrets of Microsemi; is

14   that correct?

15   A.    Can you repeat the question.

16   Q.    You understood that programs that you

17   worked on involved some trade secrets of Microsemi?

18   A.    Yes.

19   Q.    And before Microsemi, the same was true of

20   PMC Sierra; correct?

21   A.    Yes.

22   Q.    And what kind of training do you recall

23   receiving regarding confidential business information?

24   A.    It's been a long time.   I don't remember

25   all the training.

1      Q.    Did you receive any training about how

2  confidential business information should be stored?

3      A.    Yes.

4      Q.    What do you recall about your training in

5  that regard?

6      A.    My recollection is email should be deleted

7  after some period of time.  That's one.

8            Do not share confidential documents with

9  people who don't need to know.  That's two.

10            That's pretty much what I remember during

11  that time.

12      Q.    Did you receive any information about

13  making sure that Microsemi information was not

14  readily available to third parties?  Like documents,

15  if you had hard copy documents, did you receive any

16  information about how those should be maintained or

17  safeguarded?

18      A.    I do not remember specifically.  I don't

19  specifically remember.

20      Q.    In general, do you recall any training

21  that you were not to allow third parties to have

22  access to confidential business information?

23      A.    Yes, I did.

24      Q.    Are you aware that Microsemi was very

25  concerned or expressed concern to its employees and

HOANG v. MICROSEMI CORPORATION                    Deposition of Tam Hoang

```
 1   1:54 p.m.
 2             You see these are in reverse chronological
 3   order?
 4        A.   Correct.
 5        Q.   And at the top of this entire chain is
 6   this email address fwaudit@outlook.com.
 7             Do you know how that address appears or
 8   why it appears at the top of this chain that you
 9   provided in this litigation?
10        A.   Yes.
11        Q.   Can you explain how.
12        A.   Yes.  I copied the email, so as a
13   precaution, I copied the emails into encrypted USB,
14   and I archived the USB at my house.
15             So when we -- so when I opened the email,
16   when I open the archive, it will show the fwaudit
17   outlook, but I never sent an email to fwaudit.  The
18   email never was sent from PMC laptop.
19        Q.   You wouldn't have done that because you
20   knew it was dangerous for the confidential information
21   you'd send; is that correct?
22        A.   I never --
23             MS. WILLARD:  Objection.  Speculation.
24        Q.   Why did you never do it?
25        A.   Could you rephrase the question.  Could
```

HOANG v. MICROSEMI CORPORATION                    Deposition of Tam Hoang

1    decide what to list as your qualifications?

2        A.    I listed what I believe is attractive to

3    the prospective employer.

4        Q.    Did you have more than one résumé that you

5    used after your employment with Microsemi ended?

6        A.    I believe so, yes.  Yes.

7        Q.    Do you know how many résumés that you used

8    after your employment with Microsemi ended?

9        A.    Yes.  I have two résumés.  I have this

10   résumé to -- this résumé, and I have another résumé,

11   too, for my current job.

12       Q.    So you prepared a different résumé for the

13   job that you currently have --

14       A.    Correct.

15       Q.    -- is that correct?

16       A.    Yes.

17       Q.    And why did you prepare a different résumé

18   for that job?

19       A.    Because that job does -- that job had

20   specific requirements.  So I prepared a résumé

21   specific to the job.

22       Q.    But that's the only job that you prepared

23   a résumé specific to the job; is that correct?

24       A.    Correct.

25       Q.    Otherwise you used this résumé, Exhibit 1

```
 1   document.
 2        Q.    At any time since June of 1990, have you
 3   lived anywhere other than Houston?
 4        A.    No.  I did not live anywhere away from
 5   Houston since 1990.
 6        Q.    Have you considered living anywhere other
 7   than Houston since 1990?
 8        A.    No.
 9        Q.    Is there a reason that you have not
10   considered that?
11        A.    Because I was happy with my job.
12        Q.    I was asking about at any point since June
13   of 1990, is there any reason you have not considered
14   living anywhere other than Houston?
15        A.    No.
16        Q.    Would you be willing to move away from
17   Houston for a job?
18        A.    Yes.
19        Q.    Is there some geographic area where you
20   would not be willing to move for a job?
21        A.    Yes.
22        Q.    What geographic areas would you not
23   consider for a job?
24        A.    Place with snow.
25        Q.    I can understand that.
```

HOANG v. MICROSEMI CORPORATION                    Deposition of Tam Hoang

1      A.    Correct.

2      Q.    You testified earlier that it was important

3  for you to find another job after you lost your job

4  with Microsemi.

5      A.    Yes.

6      Q.    And I'd like to know to find another job

7  did you start applying for jobs right away?

8      A.    I applied for a job in -- I was -- in

9  about a few weeks later, yes.

10     Q.    About three weeks?

11     A.    In about maybe a month later.

12     Q.    Is there a reason you waited three weeks

13  to a month --

14     A.    Yes.

15     Q.    -- before applying?

16     A.    Yes.  I was angry, and I felt very, very

17  bad.  I did not want to do anything because I felt

18  helpless; so, I was not in a state to look for a

19  job.

20     Q.    Did you consult with any mental health

21  professional about how you felt at that time?

22     A.    No.

23     Q.    You're not seeking in this case any kind

24  of emotional distress damages; correct?

25            MS. WILLARD:  Objection.  Calls for a

1    Microsemi in January of 2018 and the time you

2    started working part-time for the community college,

3    you held no other employment.  That's correct?

4        A.    That's correct.

5        Q.    During that period of time, you applied

6    for six jobs; correct?

7        A.    Approximately, yes.

8        Q.    Did you ever go back to your résumé and

9    correct the misspelling you had of your first name?

10       A.    No.

11       Q.    When did you first realize that your first

12   name was misspelled on your résumé?

13       A.    Today.

14       Q.    Nobody pointed that out earlier to you?

15       A.    Nobody.

16       Q.    Do you recall the jobs that you applied

17   for after leaving Microsemi?

18       A.    I applied for a firmware development job.

19   I applied for a test job, and I applied for a

20   software development job.  I applied for a

21   management development job.  I applied for a -- I

22   applied for an IT job at the Houston Community

23   College.  I applied for maybe one or two more jobs

24   in the computer industry, and that's all I -- that's

25   what I remember.

 1        Q.    You don't recall applying for a job at

 2    Halliburton?

 3        A.    Yes, I do recall -- your question is does

 4    it refresh your memory of any other employments?

 5    The answer is no.  I only recall Halliburton.  I do

 6    not recall the others.  Help me.

 7        Q.    So seeing this document now, you recall

 8    applying for a job at Halliburton?

 9        A.    Correct.

10        Q.    Was this the IT position we were just

11    discussing?

12        A.    No.

13        Q.    Okay.  So this letter was sent on

14    February 13, 2018.  It's an email from Halliburton,

15    to you, and you received it on or about February 13,

16    2018; correct?

17        A.    Correct.

18        Q.    And you see the first line it has your

19    name misspelled T-A-R-N?

20        A.    Yes, I do see.

21        Q.    Did that cause you concern that they

22    didn't even have your first name correct?

23        A.    No.

24        Q.    February 13 was about three weeks after

25    your employment with Microsemi ended; is that

1    Q.    Microsemi offered you a severance when

2   your employment was terminated; correct?

3    A.    Correct.

4    Q.    And you were not considering whether to

5   accept it on February 5, 2018?

6    A.    That's correct.

7    Q.    Had you already rejected it?

8    A.    No.

9    Q.    Why were you not considering the severance

10  offer Microsemi made?

11   A.    I was still thinking of what the best

12  option is.

13   Q.    What did you mean you were thinking of

14  what the best option is?

15   A.    I was thinking of whether to take the

16  severance pay or whether to be made compensation.  I

17  need time to think.

18   Q.    So you were thinking about whether to

19  accept the severance Microsemi offered?

20   A.    I don't remember.  At that time, I was

21  still thinking.  I have not made my decision on that

22  day.

23   Q.    Yeah.  My question didn't ask if you had

24  made a decision.  You testified that you weren't

25  considering it when I asked initially.  Then you

1      A.     Yes, approximately.

2      Q.     And your lawyers responded to Microsemi

3  rejecting that offer and demanding more; right?

4      A.     I -- I don't recall the exact -- yes, I

5  believe so.

6      Q.     So Microsemi offered you more; right?

7           MS. WILLARD:  Objection.  Vague.

8      A.     I do not -- I don't remember the details

9  of negotiation amount.

10      Q.     I wasn't asking about details, just a real

11  general question.  Microsemi offered you more money

12  than you had already rejected; right?

13      A.     I don't understand the question.

14           MR. KISICKI:  Can you please read it back,

15  Ms. Riley.

16           (Last question was read back by the court

17  reporter.)

18      A.     Yes.

19      Q.     A lot more money?

20           MS. WILLARD:  Objection.  Vague.

21      A.     I don't -- no.

22      Q.     It was in the six figures; correct?

23      A.     Correct.

24      Q.     And you rejected that offer too; correct?

25      A.     Yes.

1           MS. WILLARD:   Objection.   Misstates the

2     witness testimony.

3           Q.    Do you recall receiving any of these

4     responses other than for your job with respect to

5     the offers that you did not receive?  Do you recall

6     receiving any after March 30 of 2018?

7           A.    Yes.

8           Q.    What other offers did you have turned down

9     after March 30, 2018?

10          A.    I don't understand the question.  I did

11    not get --

12          Q.    What -- did you receive any letters

13    telling you that you had been rejected or either an

14    application or your résumé had been rejected for any

15    position after March 30, 2018?

16          A.    No.

17          Q.    What did you do between March 30, 2018,

18    and the time you started working for the junior

19    college a little more than a year later?

20          A.    I went online and studied Linux, studied

21    system administration skills, because that's what I

22    can do.

23          Q.    You did not look for any employment anywhere

24    in Houston or anywhere else for that matter from

25    March 30, 2018 until you applied for the job at the

```
 1   common Vietnamese name?

 2        A.    Who?

 3        Q.    Tran, T-R-A-N, is that a common Vietnamese

 4   name?

 5        A.    No.

 6        Q.    Is your last name a common Vietnamese

 7   name?

 8        A.    No.

 9        Q.    Did you ever tell Mr. Sheffield you were

10   of Vietnamese descent?

11        A.    Did I ever tell David Sheffield that I was

12   Vietnamese descent?

13        Q.    Yes.

14        A.    No.

15        Q.    Do you think he ever figured that out

16   somehow?

17        A.    I don't know.

18        Q.    And you recalled you were given the

19   opportunity at various points during your employment

20   with various companies to voluntarily disclose your

21   race?

22        A.    No.

23        Q.    You don't recall ever being asked to

24   submit a confidential questionnaire disclosing your

25   race?
```

1  of work with Michael Hoang, what experience did you

2  know that he possessed in automated testing?

3      A.    Michael Hoang has a background in software

4  development.  Michael Hoang knows how to convert

5  test cases into a program to run.  That's my

6  experience.

7      Q.    What experience do you have observing him

8  perform the role of an architect on an automated

9  testing program?

10     A.    None.

11     Q.    Did you ever know Michael Hoang to act as

12 an automated test engineer?

13     A.    No.

14         MR. KISICKI:  Okay.  We'll have the court

15 reporter mark this two-page document as Exhibit 5.

16         THE STENOGRAPHER:  I have six.

17         MR. KISICKI:  I'm sorry.  I'm not good

18 with numbers.

19         THE STENOGRAPHER:  That's quite all right.

20 I just want to make sure.

21         MR. KISICKI:  Thank you.

22         (Document was marked Exhibit No. 6 for

23 identification at the conclusion of the deposition.)

24 BY MR. KISICKI:

25     Q.    Mr. Hoang, did you ever tell David

 1   Sheffield how old you were?

 2        A.    I don't remember.

 3        Q.    Do you have any reason to believe that

 4   David Sheffield knew your age?

 5        A.    Yes.

 6        Q.    What is that?

 7        A.    Because I -- because I look my age.

 8        Q.    What's your age now, sir?

 9        A.    I'm now 63.  62, 63.  I have to do some

10   math.

11        Q.    And you believe you look 63 years old or

12   62 years old?

13        A.    Yes.

14        Q.    Okay.  And you think it's reasonable for

15   people to assume someone's age based on how old they

16   look?

17        A.    No.

18        Q.    You think it's reasonable for somebody to

19   assume someone's national origin based on how they

20   look?

21        A.    Yes.

22        Q.    So it's reasonable for someone to know or

23   assume that a person is Chinese versus Korean?  Is

24   that -- that's your testimony that you can look at

25   them and reasonably make an assumption about what

Case 4:19-cv-01971   Document 53-2   Filed on 10/01/21 in TXSD   Page 35 of 160
218
HOANG v. MICROSEMI CORPORATION                                    Deposition of Tam Hoang

1    race or national origin they are?

2        A.    Yes.

3        Q.    But you didn't know Mike Tran was

4    Vietnamese or believe him to be Vietnamese; correct?

5        A.    I do not know Mike Tran is Vietnamese.

6    That's correct.

7        Q.    You don't believe him to be Vietnamese?

8        A.    I believe he may have been Vietnamese, but

9    I do not know that he's Vietnamese.

10       Q.    Well, sir, if you can look at people and

11   make reasonable assumptions about what national

12   origin they are, what national origin do you think

13   Mike Tran was when you worked with him for years?

14       A.    I do not know.

15       Q.    How many people on this org. chart

16   reporting to you were of Indian national origin?

17       A.    None.

18       Q.    And you have no idea about people

19   reporting to Arvind, correct, other than Pragash?

20   He's the only one you recognize?

21       A.    Yes.   That's the only one I recognize.

22       Q.    When you visited Bangalore, did you see

23   any employees of Mphasis that you thought were not

24   Indian?

25       A.    No.

```
 1    your allegations?
 2         A.    Yes.
 3         Q.    Your current position is under a contract
 4    that renews every year; is that correct?
 5         A.    That is correct.
 6         Q.    Do you have any understanding that -- with
 7    your employer that that contract will be renewed
 8    every year?
 9         A.    Sorry.  I'm confused.
10         Q.    Do you have an understanding that you
11    expect and your employer expects to renew your
12    contract every year, or is it every year as the
13    decision approaches or that contract expires, you
14    have to worry about whether they're going to hire
15    you for the next year?
16         A.    Yes.
17         Q.    Do you worry every year about being hired
18    for the next year?
19         A.    Yes.
20         Q.    Is there some reason before the contract
21    expires every year in any of the years that you've
22    been employed that you haven't gone out and looked
23    for software engineering jobs?
24         A.    Yes.
25         Q.    And what is that reason?
```

1      A.      Because I'm 63.

2      Q.      Is that too old to be a software engineer?

3      A.      Yes.

4      Q.      I'm going to share with you the second

5  résumé you provided.  You testified earlier that you

6  had provided two or you had created two résumés

7  since leaving Microsemi, and this is the second one.

8          Oh, no.  I'm sorry.  That's the first.  So

9  this document it's Bates numbered Hoang 00493 and

10  494, and 495, three pages, or two and a half.

11          This is the résumé you created for your

12  current job; correct?

13     A.      I don't remember.  Can you --

14     Q.      Let me know if you need me to scroll down.

15     A.      Yes.  Please scroll down.

16          (Scrolling screen.)

17     A.      Mark, I do not remember whether I provided

18  this résumé or not.

19     Q.      Earlier when we started the deposition

20  out, you had testified you created two résumés, the

21  one that we spent some time with earlier today, and

22  then you said there was another résumé you created

23  for your current job to I think you said tailor or

24  focus on what you thought was important for that

25  job.

1   meeting with Mr. Sheffield?

2        A.    No, I do not recall.

3        Q.    Do you recall what you were doing before

4   you saw him when --

5        A.    I don't --

6        Q.    -- he gave you the --

7        A.    I do not recall, Mark.

8        Q.    Do you know what Mr. Sheffield was doing

9   before he saw you and gave you the finger?

10       A.    No.

11       Q.    You've heard Mr. Sheffield use the "F"

12   word; right?

13       A.    Yes.

14       Q.    You wrote in your notes on one occasion,

15   but he used it more than that; right?

16       A.    No.  He said it one time to me.

17       Q.    That's the only time?

18       A.    That's the only time that I remember.

19       Q.    Is that the only time you remember him

20   using that word?

21       A.    That's the only time I remember him using

22   that word.

23       Q.    When Mr. Sheffield saw you and you two

24   were alone and he saluted you with his finger,

25   middle finger, you said he was smiling.

```
 1              What did you interpret from him smiling

 2    and doing that?

 3         A.    I thought that he -- I thought that that

 4    was just a friendly salute.

 5         Q.    Did any of your subordinates ever tell you

 6    that he sometimes gave them the finger?

 7         A.    No.

 8         Q.    Did Mike Tran ever tell you that Sheffield

 9    gave him the finger?

10         A.    No.

11         Q.    Did you ever ask Mike Tran?

12         A.    No.

13         Q.    Did Hinu ever tell you that David

14    Sheffield had given him the finger?

15         A.    No.

16         Q.    Did you ever ask Hinu if David Sheffield

17    had ever given him the middle finger?

18         A.    No.

19         Q.    And you don't recall any occasion that you

20    can testify about today other than that one when he

21    saw you and you were alone when he gave you the

22    middle finger?

23         A.    That's -- yes.  Correct.

24              MR. KISICKI:  Okay.  Give me five minutes.

25    I think we're going to wrap up here in just a couple
```

```
 1   minutes.
 2            Back on the record at 0700.
 3            THE VIDEOGRAPHER:  We are going off the
 4   record.  The time is 6:53 p.m.
 5            (Short break taken.)
 6            THE VIDEOGRAPHER:  We are back on the
 7   record.  The time is 7:05 p.m.
 8   BY MR. KISICKI:
 9       Q.    Mr. Hoang, after you became a Microsemi
10   employee, did you get any training about Microsemi's
11   policies that you were expected to enforce and
12   apply?
13       A.    I don't remember, Mark.
14       Q.    You were expected to enforce Microsemi's
15   policies; correct?
16       A.    Correct.
17       Q.    Do you recall seeing the company's EEO
18   policy and EEO and anti-harassment policy?
19       A.    Yes.
20       Q.    You understood there were avenues for
21   employees to complain?
22       A.    Yes.
23       Q.    As a matter of fact, it says employees
24   have to complain about discrimination or harassment?
25       A.    That I do not know.
```

1      Q.    You never complained to anyone at Microsemi

2    that you felt you were being discriminated against,

3    did you?

4      A.    That's correct.

5      Q.    All right.  No other questions.

6            MS. WILLARD:  Okay.  Mr. Hoang, I just

7    have a few questions for you.  I might jump around a

8    little bit.

9                    CROSS-EXAMINATION

10   BY MS. WILLARD:

11     Q.    Starting with David Sheffield and the

12   middle finger.  After David Sheffield gave you the

13   middle finger, were you offended?

14     A.    Yes.

15     Q.    And going back to some of the questions

16   that Mr. Kisicki just asked regarding reporting to

17   human resources, did you feel comfortable reporting

18   to human resources about the discrimination that you

19   experienced from David Sheffield?

20     A.    No.

21     Q.    Why?

22     A.    I fear retaliation.  I was afraid.

23     Q.    And going back to earlier in the day, you

24   stated that after you were terminated that you felt

25   angry.

```
 1                 CHANGES AND SIGNATURE

 2                      TAM HOANG

 3            WEDNESDAY, AUGUST 18, 2021

 4
```

| PAGE/LINE | CHANGE | REASON |
|-----------|--------|--------|
| 154/14 | Change "dry" to "drive." | Typographical error |
| 155/10 | Change "air" to "error." | Typographical error |
| 155/14 | Change "dry" to "drive." | Typographical error |
| 215/7 | Change "stages" to "cases." | Typographical error |
| 155/18 | Change "dry" to "drive." | Typographical error |
| 224/3 | Change "yes" to "no." | Misunderstood the question. |
| 234/25 | Change "that's correct to "that's incorrect." | Misunderstood the question. |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |
| _____ | _____ | |

1

SIGNATURE PAGE

2

3      I, Tam Hoang, have read the foregoing deposition
and hereby affix my signature that same is true and
correct, except as noted on the correction page.

4

5

6                              Tam Hoang

7

8

9   THE STATE OF TEXAS        )
   COUNTY OF  Harris          )

10

11      Before me Christoffer Tadeo on this day
personally appeared Tam Hoang known to me

12   [or proved to me on the oath of                    or
through Texas Driver License (description of

13   identity card or other document)] to be the person
whose name is subscribed to the foregoing instrument

14   and acknowledged to me that he/she executed the same
for the purposes and consideration therein expressed.

15      Given under my hand and seal of office this
23 day of September , 2021.

16

17

18                   NOTARY PUBLIC IN AND FOR
                    THE STATE OF T E X A S

19

20   My Commission Expires:
         10-05-24

21

22

23

24

25

CHRISTOFFER TADEO
Notary Public
STATE OF TEXAS
My Comm. Exp. 10-05-24
Notary ID # 12912303-6

```
1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION
      Tam Hoang,              )
3            Plaintiff        )
                              )
4      vs.                    )
                              )
5      Microsemi             ) CIVIL ACTION NO:
      Corporation and        ) 4:19-CV-01971
6      Microchip             )
      Technology             )
7      Incorporated,         )
                              )
8            DEFENDANT        )

9              REPORTER'S CERTIFICATION
                    DEPOSITION OF
10                    TAM HOANG
              TAKEN AUGUST 18, 2021
11               (REPORTED REMOTELY)

12        I, JULIE THOMSON RILEY, Certified Shorthand
      Reporter in and for the State of Texas, hereby
13    certify to the following:
           That the witness, TAM HOANG, was duly sworn by
14    the officer and that the transcript of the oral
      deposition is a true record of the testimony given by
15    the witness;
           That the deposition transcript was submitted on
16    _____ to the witness or to the attorney
      for the witness for examination, signature and return
17    to DepoTech, by _____;
           That the amount of time used by each party at the
18    deposition is as follows:

19        Mark G. Kisicki - 6 hours:25 minutes
          Brooke Willard -  3 minutes
20
           That pursuant to information given to the
21    deposition officer at the time said testimony was
      taken, the following includes counsel for all parties
22    of record:

23        Mark G. Kisicki - Attorney for Defendants
          Brooke Willard - Attorney for Plaintiff
24

25        I further certify that I am neither counsel for,
      related to, nor employed by any of the parties in the
```

1 action in which this proceeding was taken, and
further that I am not financially or otherwise
2 interested in the outcome of the action.

3      Further certification requirements pursuant to
Rule 203 of TRCP will be certified to after they have
4 occurred.

5      Certified to by me this 24th of August, 2021.

6

7

8      _____
       Julie Thomson Riley, CSR, RDR, CRR
9      Texas CSR NO. PCR-12009
       Expiration Date: 6-30-2024
10     DepoTech

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 4

## <u>DECLARATION OF MIKE BONDI</u>

I, Mike Bondi, declare:

1.      I am over eighteen years of age and authorized to execute this Declaration.

2.      I held the position of Corporate Director of Human Resources at Microsemi Corporation ("Microsemi") from 2006 until it was acquired by Microchip Technology in May 2018. Following the acquisition, I remained in a Human Resources Director role until July 27, 2018.

3.      The facts stated in this Declaration are based on my personal knowledge. If called upon to testify as to these facts, I could and would competently testify to them.

4.      Microsemi did not have a "policy" governing how positions were to be eliminated or layoffs were to be conducted. Rather, Microsemi had a "Reduction in Force ("RIF") Practice", which I had helped create, draft and update. The RIF Practice was not generally disseminated or available to managers or employees. Rather, it was confidential to Human Resources employees and shared only with Microsemi managers who were tasked to eliminate positions and/or conduct a layoff. Microsemi's purpose for not drafting the RIF Practice as a policy, or making it generally available to managers or employees, was to ensure that employees did not interpret the RIF Practice as a binding policy, and because the circumstances of each situation required careful consideration and would occasionally require modification to aspects of the RIF Practice. [Ex. 9 to Motion.]

5.      Under the RIF Practice, a Human Resources manager or representative would work with a manager to identify and document the reasons and purpose of the RIF action and the particular factors that would be used to evaluate groups of similarly situated employees who were subject to the RIF. The business needs as well as the unique skills, capabilities, flexibility, performance and seniority of the employees in the group being assessed were factors that would

be used to determine which employee(s) would be laid off. A point scale was quantified and given to each employee in the various areas being assessed and these factors and scores were used to select the affected employee(s). The RIF Practice dictated that the Corporate Director of Human Resources be involved and give final approval to conduct a RIF, approve the RIF categories, confirm the group of employees to be evaluated which was intended to include all similarly-situated employees, and confirm that the decision-maker(s) had fairly applied the RIF categories and followed any relevant policies and laws, evaluate legal risks, and approve the decision-maker's selection of the affected employee(s). Since I had been largely responsible for creating the Microsemi RIF Practice and had overseen all US RIF actions for Microsemi for the prior five years, I assumed and performed that responsibility for the company, regardless of whether I directly supervised the Human Resources Representative who was directly involved in the RIF.

6.     The RIF Practice has four general evaluation categories: Job Criticality, Flexibility, Performance, and Years of Company Service. Other than the Years of Service category, the categories were intended to be uniquely tailored for each RIF based on the business needs, purpose and circumstances of the RIF and the impacted positions. The employee(s) with the lowest ranking based on the sum of the weighted scores is selected for termination under the RIF Practice.

7.     In May 2017, Microsemi hired David Sheffield as the Director of its Quality Assurance Group ("QA Group"). In late 2017, Lisa Manzo, the Human Resources Representative responsible for supporting the QA Group, informed me that Sheffield was changing the focus of the QA Group to significantly increase the use of automated testing and reduce its reliance on manual testing. As a result, Sheffield had concluded that the QA Group needed only one of the two managers who supervised manual test engineers (both of whom were located in the United

States) and only one of the two staff engineers who were architects/planners for manual testing (both of whom were located in the United States).

8.      I advised Manzo and Sheffield of the RIF Practice, which I concluded should be utilized because the goal was to eliminate (i.e., not replace) one manager position and one staff engineer position. I also concluded that the appropriate comparator group that should be evaluated for purposes of deciding which particular manager to lay off was all individuals in the QA Group who were similarly situated based on having the official job title of "manager," and that the appropriate comparator group of staff engineers they should evaluate for purposes of deciding which particular staff engineer to lay off was all individuals in the QA Group who were similarly situated based on having the job title of "staff engineer." At the time, there were only three individuals in the QA Group whose official job title was manager, and there were seven individuals in the QA Group whose official job title was "staff engineer."

9.      On several occasions in late 2017 and early 2018, I spoke with Sheffield and/or Manzo and assisted them in developing the specific factors to use in evaluating the two different comparator groups. I approved the final factors they used to compare each of the two different groups, and the ratings and rankings they generated by following the RIF Practice.

10.     I approved Sheffield's and Manzo's comparative evaluation of the three QA managers and their selection of Tam Hoang to be laid off because he was the lowest rated of the three QA managers. I also approved Sheffield's and Manzo's comparative evaluation of the seven QA staff engineers, and their selection of Michael Hoang to be laid off because he was the lowest rated of the seven QA staff engineers.

11.     Sheffield and Manzo followed Microsemi's RIF Practice when implementing the January 2018 RIF in the QA Group, and he had the support of Human Resources throughout the

3

entire process. I would not have approved the selection of Plaintiff or Michael Hoang if there had been any indication that their evaluations and rationales were tainted or motivated by any discriminatory animus, or any other basis prohibited by either law or the company's policies.

12.     My date of birth is May 22, 1959.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed in California this 30, day of September 2021.

_Mike Bondi  9/30/2021_
Mike Bondi

# Exhibit 5

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Elimination of Sole Incumbant or elimination of all similar incumbants:** | | | | | | | | | |
| | | | | | | | | | |
| Due to significant process transformations within the QA organization, restructuring within this group is mandated and several positions are being consolidated.  This tra | | | | | | | | | |
| Tam | 0 | Hoang | Tam | 778167 | Mgr, Development | 212300 | Mgr, Software Dev | 09/22/14 | Sheffield, David Arthur |
| Hinendra | H | Somaiya | Hinendra | 778200 | Manager Product Verification | 212300 | Mgr, Software Dev | 09/22/14 | Sheffield, David Arthur |
| Arvind | 0 | Chandrasekaran | Arvind | 777219 | Manager Software Development | 212300 | Mgr, Software Dev | 07/18/12 | Sheffield, David Arthur |

**Microchip-Microsemi000110**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Cost Center | Location | Retain (Y / N) | Job Critical (1 - 5) | Flexibility (1 - 5) | Perf Score 5) | (1- Service Credit (1 - 5) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Elimination of Sole Incumbant or elimina** | | | | | | | | | | | |
| Due to significant process transformations within the QA orgasnformation in our test methodology requires we transition our workforce from a labor model (manu | | | | | | | | | | | |
| Tam | 0 | Hoang | Tam | 778167 | ESCI113004041 | Houston | N | 2.2 | 2 | 2 | 5 |
| Hinendra | H | Somaiya | Hinendra | 778200 | ESCI113004041 | Houston | Y | 3.4 | 3.4 | 4 | 5 |
| Arvind | 0 | Chandrasekaran | Arvind | 777219 | ESCI113004069 | India - Bangalore (ESC - 9A) | Y | 3.8 | 4 | 4 | 2 |

**Microchip-Microsemi000111**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Total (Out of 20) | Weighted Score (1 to 5) | Perf Review Rating | Perf Review Rating Year | Service Date | Years of Service | FLSA Status | Gender (M/F) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| **Elimination of Sole Incumbant or elimina** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Due to significant process transformations within the QA orga** | | | **l) to a skilled labor model (development engineer). Two employees are being eliminated.** | | | | | | | | | |
| Tam | 0 | Hoang | Tam | 778167 | **11.2** | **2.8** | Needs Improvement | 2017 | 06/11/90 | 27.6 | Exempt | Male |
| Hinendra | H | Somaiya | Hinendra | 778200 | **15.8** | **3.95** | Exceeds Expectations | 2017 | 01/13/97 | 21.0 | Exempt | Male |
| Arvind | 0 | Chandrasekaran | Arvind | 777219 | **13.8** | **3.45** | Exceeds Expectations | 2017 | 07/18/12 | 5.5 | Exempt | Male |

**Microchip-Microsemi000112**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Ethnicity | Ethnic Group | Date Of Birth | Age (RIF Date) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| **Elimination of Sole Incumbant or elimina** | | | | | | | | |
| | | | | | | | | |
| **Due to significant process transformations within the QA org** | | | | | | | | |
| Tam | 0 | Hoang | Tam | 778167 | Asian (Not Hispanic or Latino) (United States of America) | | Redacted | 58.6 |
| Hinendra | H | Somaiya | Hinendra | 778200 | Asian (Not Hispanic or Latino) (United States of America) | | Redacted | 46.2 |
| Arvind | 0 | Chandrasekaran | Arvind | 777219 | n/a | | Redacted | 35.5 |

**Microchip-Microsemi000113**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Disabled Employee | Disability Type | Military Status | Disabled Vets 100A | Military Discharge Date | Currency Code |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| **Elimination of Sole Incumbant or elimina** | | | | | | | | | | |
| | | | | | | | | | | |
| **Due to significant process transformations within the QA org** | | | | | | | | | | |
| Tam | 0 | Hoang | Tam | 778167 | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) | N | | USD |
| Hinendra | H | Somaiya | Hinendra | 778200 | N | | C - I choose not to self identify (United States of America) | N | | USD |
| Arvind | 0 | Chandrasekaran | Arvind | 777219 | N | | n/a | N | | INR |

**Microchip-Microsemi000114**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Location Code | Department ID | Department |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| **Elimination of Sole Incumbant or elimina** | | | | | | | |
| | | | | | | | |
| Due to significant process transformations within the QA org | | | | | | | |
| Tam | 0 | Hoang | Tam | 778167 | TX109 | ESCI113004041 | Product Val (113004041) |
| Hinendra | H | Somaiya | Hinendra | 778200 | TX109 | ESCI113004041 | Product Val (113004041) |
| Arvind | 0 | Chandrasekaran | Arvind | 777219 | IND09 | ESCI113004069 | Product Val (113004069) |

**Microchip-Microsemi000115**

**Job Family:  Manager, Software Development**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|
| Tam | 0 | Hoang | Tam | 778167 | Mgr, Development | 212300 | Mgr, Software Dev | 09/22/14 | Sheffield, David Arthur |
| Hinendra | H | Somaiya | Hinendra | 778200 | Manager Product Verification | 212300 | Mgr, Software Dev | 09/22/14 | Sheffield, David Arthur |
| Arvind | 0 | Chandrasekaran | Arvind | 777219 | Manager Software Development | 212300 | Mgr, Software Dev | 07/18/12 | Sheffield, David Arthur |

**Job Family:  Manager, Software Development**          **Job Family:  Manager, Software Development**          **Job Criticality Rating:**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Depth of Agile System Understanding | Agile System Engagement and Implementation | Analytical & Troubleshooting Skills | Ability to quickly assess and identify & solve Validation Issues | Diversified and broad Product Knowledge | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tam | | 0 Hoang | Tam | 778167 | 1 | 1 | 3 | 3 | 3 | 11 | 2.2 |
| Hinendra | H | Somaiya | Hinendra | 778200 | 3 | 3 | 3 | 4 | 4 | 17 | 3.4 |
| Arvind | | 0 Chandrasekaran | Arvind | 777219 | 4 | 4 | 3 | 4 | 4 | 19 | 3.8 |

**Microchip-Microsemi000117**

**Job Family: Manager, Software Development**　　　　**Job Family: Manager, Software Development**　　　　**Job Flexibility Rating:**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Quantity of output | Quality of work | Ability to document findings & communicate findings | Quality of assessments and validation capability using automated tools | Microsemi Values - Exhibit Leadership: Lead by Example and Positively Influence Others | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tam | | 0 Hoang | Tam | 778167 | 3 | 2 | 3 | 1 | 1 | 10 | 2 |
| Hinendra | H | Somaiya | Hinendra | 778200 | 4 | 3 | 4 | 3 | 3 | 17 | 3.4 |
| Arvind | | 0 Chandrasekaran | Arvind | 777219 | 4 | 4 | 4 | 4 | 4 | 20 | 4 |

**Microchip-Microsemi000118**

| Employee ID | Company Code | Company | HR Director Partner | First Name |
|---|---|---|---|---|
| 777219 | INT | Microsemi - International | David Kirjassoff | Arvind |
| 778167 | USA | Microsemi - USA | David Kirjassoff | Tam |
| 778200 | USA | Microsemi - USA | David Kirjassoff | Hinendra |

**Microchip-Microsemi000119**

| Employee ID | Middle Name | Last Name | Preferred Name | Employee Status |
|---|---|---|---|---|
| 777219 | | Chandrasekaran | Arvind | Active |
| 778167 | | Hoang | Tam | Active |
| 778200 | H | Somaiya | Hinendra | Active |

**Microchip-Microsemi000120**

| Employee ID | Leave Type | Business Card Title | Job Code | HR Job Title |
|---|---|---|---|---|
| 777219 | | Manager Software Development | 212300 | Mgr, Software Dev |
| 778167 | | Mgr, Development | 212300 | Mgr, Software Dev |
| 778200 | | Manager Product Verification | 212300 | Mgr, Software Dev |

**Microchip-Microsemi000121**

| Employee ID | FLSA | Manager Name | Job Criticality (1-5) | Job Flexibility (1-5) |
|---|---|---|---|---|
| 777219 | Yes | Sheffield, David Arthur | | |
| 778167 | Yes | Sheffield, David Arthur | | |
| 778200 | Yes | Sheffield, David Arthur | | |

Microchip-Microsemi000122

| Employee ID | Perf Ranking Score (1-5) | Service Credit (1-5) | Total (out of 20) | Weighted Score |
|---|---|---|---|---|
| 777219 | | | | |
| 778167 | | | | |
| 778200 | | | | |

Microchip-Microsemi000123

| Employee ID | Recent Perf Review Rating | Perf Rating Year | Key Employee | DOS |
|---|---|---|---|---|
| 777219 | 4.6 | 2016 | | 7/18/2012 |
| 778167 | 3.3 | 2016 | | 6/11/1990 |
| 778200 | 2.9 | 2016 | | 1/13/1997 |

Microchip-Microsemi000124

| Employee ID | Years of Service | Date of Last Hire | BU | Location Code |
|---|---|---|---|---|
| 777219 | 5.36 | 7/18/2012 | ICSG - SSBU | IND09 |
| 778167 | 27.46 | 9/22/2014 | ICSG - SSBU | TX109 |
| 778200 | 20.87 | 9/22/2014 | ICSG - SSBU | TX109 |

Microchip-Microsemi000125

| Employee ID | Location | Cost Center - ID | Cost Center | Compensation Planner |
|---|---|---|---|---|
| 777219 | India - Bangalore (ESC - 9A) | ESCI113004069 | Product Val (113004069) | David Sheffield |
| 778167 | Houston | ESCI113004041 | Product Val (113004041) | David Sheffield |
| 778200 | Houston | ESCI113004041 | Product Val (113004041) | David Sheffield |

| Employee ID | Race/Ethnicity | Pre 2007 Ethnic Data | DOB | Age |
|---|---|---|---|---|
| 777219 | | | Redacted | 35 |
| 778167 | Asian (Not Hispanic or Latino) (United States of America) | | Redacted | 58 |
| 778200 | Asian (Not Hispanic or Latino) (United States of America) | | Redacted | 45 |

Microchip-Microsemi000127

| Employee ID | Gender | Disabled Employee | Disability | Military Status |
|---|---|---|---|---|
| 777219 | Male | N | | |
| 778167 | Male | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) |
| 778200 | Male | N | | C - I choose not to self identify (United States of America) |

Microchip-Microsemi000128

| Employee ID | Military Discharge Date | Notes | Disabled Vets | Annual Rate |
|---|---|---|---|---|
| 777219 | | | N | 62,942.35 |
| 778167 | | | N | 161,712.07 |
| 778200 | | | N | 118,000.00 |

**Microchip-Microsemi000129**

| Employee ID | Currency | Annual Rate USD | Bonus Code |
|---|---|---|---|
| 777219 | INR | 4,087,165.69 15 | |
| 778167 | USD | 161,712.07 10 | |
| 778200 | USD | 118,000.00 10 | |

**Systems Design Engineers (US Based)**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | HR Manager | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|---|

**Systems Design Engineers (US Based)**                    **Job Criticality Rating:**

| Systems Analysis & Design Capabilities | Understanding of Device Physics and system interface issues | effectively translate customer specs into meaningful and feasible products | Diversified and relevant Systems knowledge & Depth for products on road-map | of Telecommunications ications Market and Standards Committee issues that | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Systems Design Engineers (US Based)**                    **Job Flexibility Rating:**

| d ability to Multitask and deal with multiple issues simultaneously | Team Focused Efforts with a record of sharing knowledge and findings | Breadth of Design Expertise across multiple technology platforms | Commitment to and history of Innovation | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|

**Senior Layout Designers (Aliso Viejo)**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | HR Manager | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|---|

**Senior Layout Designers (Aliso Viejo)**                    **Job Criticality Rating:**

| Ability & record of completing complex analog IC layout projects | Demonstrated ability to perform Block Level Layout | Demonstrated ability to perform Top Level Floor Planning | Ability to attain tight schedules with accurate Layouts (Efficient Layouts) | CAD Tool Understanding and PDK Knowledge | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Senior Layout Designers (Aliso Viejo)**                    **Job Flexibility Rating:**

| Proactive & Ability to see programs to completion | Ability to worky | Breadth & Depth of knowledge of Analog Circuits | Ability to work independently | Quality of Layout (1st time success) | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Systems Aps Engineers (Aliso Viejo)**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | HR Manager | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|---|

**Systems Aps Engineers (Aliso Viejo)**                    **Job Criticality Rating:**

| Ability to effectively build Product Evaluation Boards | Depth of Systems Understanding | Schematic Reading and technical understanding | Ability to troubleshoot and quickly assess and solve customer issues | Ability to effectively communicate and present solutions that solve internal as well as customer issues. | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Systems Aps Engineers (Aliso Viejo)**                    **Job Flexibility Rating:**

| Quantity of output | Ability to work independently | Speed at solving real-time issues. Ability to prioritize and handle urgent initiatives. | Quality of findings and deliverables | Ability to work independently with little oversight | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Validation Engineers (Aliso Viejo)**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | HR Manager | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|---|

**Validation Engineers (Aliso Viejo)**                    **Job Criticality Rating:**

| Ability to Build Application Boards | Analytical & Troubleshooting Skills | Ability to quickly assess and identify & solve Validation Issues | Depth of systems knowledge of core products | Understanding of Device Physics and system interface issues | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Validation Engineers (Aliso Viejo)**                    **Job Flexibility Rating:**

| Quantity of output | Innovation & simplicity in designing evaluation boards | Ability to document findings & findings | Quality of assessments and validation capability using automated tools | Working Independently with little oversight | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Production (NPI) Planner:**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | HR Manager | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|---|

**Production (NPI) Planner:**                    **Job Criticality Rating:**

| Military Product Requirements Understanding | Working System Knowledge of AXAPTA | Back-Log & WIP Inventory Understanding | Knowledge of unique packing requirement for S-Level & Military | Diversified and deep Product Famiarly and Knowledge | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Production (NPI) Planner:**                    **Job Flexibility Rating:**

| Quality of work | Quantity of work | Ability to perform multiple roles | Ability to work autonomously and deliver on key tasks | S-Level & Military Product Test Knowledge | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Assemblers/Inspection**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | HR Manager | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|---|

**Assemblers/Inspection**                    **Job Criticality Rating:**

| Wire bonding Capability | Solder Dip Capability | Understanding and capability in Reliability Testing | Visual Inspection Ability | Diversified and broad Product Knowledge | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Assemblers/Inspection**                    **Job Flexibility Rating:**

| Quality of work | Quantity of work | Ability to perform Burn-In (NPI) | Ability to perform Probe & Final Test (NPI) | Teamwork / Collaboration with other groups (flexibility) | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Microchip-Microsemi000131**

**Electronic Testers: Job Criticality**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | HR Manager | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

**Electronic Testers: Job Criticality**   **Job Criticality Rating:**

| Probe & Final Test Skills | Equipment Set Up (Probe, final test Handler) | Accuracy of Uploading Electronic Test Data | Ability to accurately calibrate Test Equipment | Burn-In & Packing capability | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|
| | | | | | | |

**Electronic Testers: Job Criticality**   **Job Flexibility Rating:**

| Quality of work | Quantity of work | Ability to assess and solve reasonable anomalies with minimal oversight | Ability to interpret NPI process and follow instructions | Effective communications (keeps lead and/or supervisor informed of relevant issues) | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|
| | | | | | | |

**Test Equipment Technician**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | HR Manager | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

**Test Equipment Technician**   **Job Criticality Rating:**

| Calibration of Lab Equipment | Capital Purchase Process (PO & Negotiation) | Facility Repair & Maintance Abilities | Test Equipment Repair (NPI) | Knowledge of Equip Capability & function (NPI) | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|
| | | | | | | |

**Test Equipment Technician**   **Job Flexibility Rating:**

| Team Focused Efforts | Appropriate and effective Interaction with Customers & Vendors | Attention to detail | Ability to work autonomously | Ability to Multitask and achieves milestones in timely manner | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|
| | | | | | | |

Microchip-Microsemi000132

| Score | Scoring in Performance Category |
|---|---|
| 5 | Outstanding.  Highest Performance among peers |
| 4 | Above Average. Exceeds standards |
| 3 | Average. Meets all basic standards. |
| 2 | Below Average. Some shortfalls when compared to others |
| 1 | Lowest Performance & may not meet basic standards |

| Score | Scoring in Job Criticality Sub-Category |
|---|---|
| 5 | Most or very solid expertise and capability in this area |
| 4 | Above Average & capable and able to perform in this area |
| 3 | Average or capable to perform basic functions but some growth needed |
| 2 | Below Average or lacks understanding to perform task today- Barriers exist. |
| 1 | Least. or Skillsets/capabilities/experience are not present or lacking to perform this function |

| Score | Scoring in Flexibiltiy Sub-Category |
|---|---|
| 5 | Most or very solid and strongest demonstration and capability in this area |
| 4 | Above Average & capable demonstration to perform complex or advanced vs. peers in this area |
| 3 | Average or capable to perform basic functions but some growth needed for more complex aspects |
| 2 | Below Average or does not demonstrate capability to perform at expectation today- Barriers are noted and may exist |
| 1 | Least or weakest behavior (below standards) & individual has demonstrated inability to meet expectations in this area |

| Score | Complete Years of Service |
|---|---|
| 5 | 16+ years |
| 4 | 10 to 15 years |
| 3 | 6 to 9 years |
| 2 | 3 to 5 years |
| 1 | 0 to 2 years |

**Microchip-Microsemi000133**

# Exhibit 6

**Reduction in Force**
Candidate Form

_____ICSG-SSBU_____ *is undergoing a reduction in force that is resulting in the elimination and/or consolidation of functions and the elimination of various positions.*

**Name:**             **Tam Hoang**

**Title:**             **Manager, Development**

**Department:**        **Software Development**

**Separation Date:**   **01/23/18**

*Indicate elements used in determining candidate selection in the following areas:*

**Summary (Reason for Action):**   Due to significant process transformations within the QA organization, restructuring within this group is mandated and several positions are being consolidated.  This transformation in our test methodology requires we transition our workforce from a labor model (manual) to a skilled labor model (development engineer). One Software Manager and one QA Software Engineer position are being eliminated.

**Job Criticality:**
Tam was rated 2.2 vs Hinendra who is rated 3.4 and Arvind rated 3.8. The test automation role and the move to agile testing and development require the successful leader to understand at the low level the storage domain and solution stack, test development, agile process and a strong tolerance for risk.  In the category of "Depth of Agile System Understanding", Tam was rated lower than his peers and this is because he has failed to demonstrate the key leadership traits of a successful agile leader, namely; trust, transparency, open communication, team and individual empowerment, tolerance for, and encouragement of, fast failure.  This is preventing Tam's team from adopting and fully participating in the agile system.  Which has resulted in uneven results across the team's delivery.  Tam's peers have demonstrated the traits above and are enabling their teams to fully participate resulting in consistent results toward the stated objective of agile testing. The final and most significant hurdle that Tam has not been able to overcome is the transition to the "Servant Leader", which without this personal transformation, the traits listed above will remain out of reach.   As such, leaders without a firm understanding of this test and development methodology will restrict or prevent achieving full benefit and success.

In addition, in the category of "Agile System Engagement and Implementation", he was also rated lower than his peers due to several situations where project deliverables pertaining to milestones pertaining to the Luxor project were released and signed off by him as being complete.  However, it was determined that the final defect identification process and audit had not been done and was missed.  This created an embarrassing and costly situation to resolve.  Tam has not demonstrated an ability or willingness to transition his approach to the

new model.  The two reference peers have fully embraced the transition and in one case is already delivering results above expectations.  This has been discussed with Tam on multiple occasions and Tam has not demonstrated any move to address the deficiencies and Tam has demonstrated active and passive resistance to mandated change.

The lower ratings in these key areas resulted in him having a lower overall Criticality score than his peers which impacted this decision.

**Flexibility**:
Tam was rated 2.0 vs Hinendra who is rated 3.4 and Arvind rated 4.0. In the category of "Quality of assessments and validation capacity using automated tools", Tam was rated lower than his peers because he has not demonstrated an ability to understand how automated test methodologies, behave differently and where this approach to testing is particularly well suited nor has Tam made any discernable movement to learning or adopting the new test strategy.  Tam has also failed to empower all members of his team, allowing the individual to execute independently of direct control, as required by the agile process whereas his peers have successfully rolled out the new automated tools across their teams.  Tam's peers are actively driving changes in expectations and behaviors in their respective organizations towards the enablement of agile testing.  This empowerment and willingness to experiment with empowerment and process change is the type of leadership that will see a successful transformation to the agile test methodology.

In addition, in the category of "Microsemi Values – Exhibit Leadership: Lead by Example and Positively Influence Others", Tam was also rated lower than his peers because he fails to demonstrate the open, transparent, empowering and collaborative type leadership that we at Microsemi look for in our leadership team. Tam's peers have, each in different ways, embraced the transformation and delivered measurable and meaningful results since we have embarked on this transformation.  The peers have exhibited the ideal role model leadership qualities of the Microsemi management team providing a tangible example for their teams to emulate.  Tam has not embraced this transformation and continues to model behaviors that are not consistent with the Microsemi values despite multiple conversations and feedback sessions.

The lower ratings in these key areas resulted in him having a lower overall Flexibility score than his peers which impacted this decision.

**Current Performance:** Tam was recently rated as "Needs Improvement"

Prepared By:

Signature _____

Date  1/18/2018

MC-MS000054

**Microchip-Microsemi000069**

# Exhibit 7

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Elimination of Sole Incumbant or elimination of all similar incumbants:** | | | | | | | | | |
| | | | | | | | | | |
| Due to significant process transformations within the QA organization, restructuring within this group is mandated and several positions are being consolidated. This tra... | | | | | | | | | |
| Michael | 0 | Hoang | Michael | 778187 | Staff Software Development Engineer | 510400 | Staff Engineer, Software Dev | 09/22/14 | Hoang, Tam |
| Daniel | 0 | Fick | Daniel | 778179 | Staff Software QA Engineer | 510400 | Staff Engineer, Software Dev | 09/22/14 | Sheffield, David Arthur |
| Nowell | D | Godfrey | Nowell | 778184 | Staff Software Development Engineer | 510400 | Staff Engineer, Software Dev | 09/22/14 | Hoang, Tam |
| Larry | L | Hinshaw | Larry | 800906 | Staff Quality Software Engineer | 510400 | Staff Engineer, Software Dev | 09/26/16 | Sheffield, David Arthur |
| Iyyappan | 0 | R | Iyyappan | 775772 | Staff Software Development Engineer | 510400 | Staff Engineer, Software Dev | 10/12/10 | Chandrasekaran, Arvind |
| Lee Chuan | 0 | Yang | Lee Chuan | 775508 | Staff System Validation Engineer | 510400 | Staff Engineer, Software Dev | 06/09/10 | Somaiya, Hinendra H |
| Guohua | 0 | Zhang | Tony | 775511 | Staff Engineer - System Validation | 510400 | Staff Engineer, Software Dev | 06/09/10 | Somaiya, Hinendra H |

**Attorneys' Eyes Only**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Cost Center | Location | Retain (Y / N) | Job Critical (1 - 5) | Flexibility  (1 - 5) | Perf Score 5) | (1- Service Credit  (1 - 5) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Elimination of Sole Incumbant or elimina** | | | | | | | | | | | |
| **Due to significant process transformations within the QA organ** | | | | | | **sformation in our test methodology requires we transition our workforce from a labor model (manu** | | | | | |
| Michael | 0 | Hoang | Michael | 778187 | ESCI113004041 | Houston | N | 1.2 | 1.6 | 3 | 5 |
| Daniel | 0 | Fick | Daniel | 778179 | ESCI113004041 | Houston | Y | 3.8 | 4 | 4 | 5 |
| Nowell | D | Godfrey | Nowell | 778184 | ESCI113004041 | Houston | Y | 3.2 | 3.4 | 4 | 5 |
| Larry | L | Hinshaw | Larry | 800906 | ESCI113004036 | ID Home Office | Y | 3.6 | 4 | 3 | 1 |
| Iyyappan | 0 R | Godfrey | Iyyappan | 775772 | ESCI113004069 | India - Bangalore (ESC - 9A) | Y | 3.8 | 3.8 | 4 | 3 |
| Lee Chuan | 0 | Yang | Lee Chuan | 775508 | ESCI113004007 | Sunnyvale - Bordeaux Dr | Y | 3.4 | 2.6 | 3 | 5 |
| Guohua | 0 | Zhang | Tony | 775511 | ESCI113004007 | Sunnyvale - Bordeaux Dr | Y | 3.2 | 2.6 | 3 | 5 |

**Attorneys' Eyes Only**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Total (Out of 20) | Weighted Score (1 to 5) | Perf Review Rating | Perf Review Rating Year | Service Date | Years of Service | FLSA Status | Gender (M/F) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Elimination of Sole Incumbant or elimina** | | | | | | | | | | | | |
| **Due to significant process transformations within the QA orga l) to a skilled labor model (development engineer). Two employees are being eliminated.** | | | | | | | | | | | | |
| Michael | 0 | Hoang | Michael | 778187 | **10.8** | **2.7** | Achieves Expectations | 2017 | 05/28/96 | 21.7 | Exempt | Male |
| Daniel | 0 | Fick | Daniel | 778179 | **16.8** | **4.2** | Exceeds Expectations | 2017 | 01/22/01 | 17.0 | Exempt | Male |
| Nowell | D | Godfrey | Nowell | 778184 | **15.6** | **3.9** | Exceeds Expectations | 2017 | 05/17/99 | 18.7 | Exempt | Male |
| Larry | L | Hinshaw | Larry | 800906 | **11.6** | **2.9** | Achieves Expectations | 2017 | 09/26/16 | 1.3 | Exempt | Male |
| Iyyappan | 0 | R | Iyyappan | 775772 | **14.6** | **3.65** | Exceeds Expectations | 2017 | 10/12/10 | 7.3 | Exempt | Male |
| Lee Chuan | 0 | Yang | Lee Chuan | 775508 | **14** | **3.5** | Achieves Expectations | 2017 | 08/30/99 | 18.4 | Exempt | Female |
| Guohua | 0 | Zhang | Tony | 775511 | **13.8** | **3.45** | Achieves Expectations | 2017 | 06/26/00 | 17.6 | Exempt | Male |

**Attorneys' Eyes Only**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Ethnicity | Ethnic Group | Date Of Birth | Age (RIF Date) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| **Elimination of Sole Incumbant or elimina** | | | | | | | | |
| | | | | | | | | |
| Due to significant process transformations within the QA orga | | | | | | | | |
| Michael | 0 | Hoang | Michael | 778187 | Asian (Not Hispanic or Latino) (United States of America) | | Redacted | 53.3 |
| Daniel | 0 | Fick | Daniel | 778179 | White (Not Hispanic or Latino) (United States of America) | | | 39.6 |
| Nowell | D | Godfrey | Nowell | 778184 | White (Not Hispanic or Latino) (United States of America) | | | 52.1 |
| Larry | L | Hinshaw | Larry | 800906 | White (Not Hispanic or Latino) (United States of America) | | | 56.9 |
| Iyyappan | 0 R | | Iyyappan | 775772 | Asian (India) | | | 33.1 |
| Lee Chuan | 0 | Yang | Lee Chuan | 775508 | Asian (Not Hispanic or Latino) (United States of America) | | | 59.2 |
| Guohua | 0 | Zhang | Tony | 775511 | Asian (Not Hispanic or Latino) (United States of America) | | | 57.3 |

**Attorneys' Eyes Only**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Disabled Employee | Disability Type | Military Status | Disabled Vets 100A | Military Discharge Date | Currency Code |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| **Elimination of Sole Incumbant or elimina** | | | | | | | | | | |
| | | | | | | | | | | |
| **Due to significant process transformations within the QA org** | | | | | | | | | | |
| Michael | 0 | Hoang | Michael | 778187 | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) | N | | USD |
| Daniel | 0 | Fick | Daniel | 778179 | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) | N | | USD |
| Nowell | D | Godfrey | Nowell | 778184 | N | | C - I choose not to self identify (United States of America) | N | | USD |
| Larry | L | Hinshaw | Larry | 800906 | N | | A - I identify as one or more of the classifications of protected veteran listed above (United States of America) | N | 03/01/88 | USD |
| Iyyappan | 0 | R | Iyyappan | 775772 | N | | | N | | INR |
| Lee Chuan | 0 | Yang | Lee Chuan | 775508 | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) | N | | USD |
| Guohua | 0 | Zhang | Tony | 775511 | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) | N | | USD |

**Attorneys' Eyes Only**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Location Code | Department ID | Department |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| **Elimination of Sole Incumbant or elimina** | | | | | | | |
| | | | | | | | |
| Due to significant process transformations within the QA org | | | | | | | |
| Michael | 0 | Hoang | Michael | 778187 | TX109 | ESCI113004041 | Product Val (113004041) |
| Daniel | 0 | Fick | Daniel | 778179 | TX109 | ESCI113004041 | Product Val (113004041) |
| Nowell | D | Godfrey | Nowell | 778184 | TX109 | ESCI113004041 | Product Val (113004041) |
| Larry | L | Hinshaw | Larry | 800906 | ID101 | ESCI113004036 | Product Validation - SSBU Idaho |
| Iyyappan | 0 | R | Iyyappan | 775772 | IND09 | ESCI113004069 | Product Val (113004069) |
| Lee Chuan | 0 | Yang | Lee Chuan | 775508 | CA136 | ESCI113004007 | Product Val (113004007) |
| Guohua | 0 | Zhang | Tony | 775511 | CA136 | ESCI113004007 | Product Val (113004007) |

**Attorneys' Eyes Only**

**Job Family:  Staff Software Engineer**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Business Card Title | Job Code | HR Job Title | Date Of Last Hire | Manger Name |
|---|---|---|---|---|---|---|---|---|---|
| Michael | 0 | Hoang | Michael | 778187 | Staff Software Development Engineer | 510400 | Staff Engineer, Software Dev | 09/22/14 | Hoang, Tam |
| Daniel | 0 | Fick | Daniel | 778179 | Staff Software QA Engineer | 510400 | Staff Engineer, Software Dev | 09/22/14 | Sheffield, David Arthur |
| Nowell | D | Godfrey | Nowell | 778184 | Staff Software Development Engineer | 510400 | Staff Engineer, Software Dev | 09/22/14 | Hoang, Tam |
| Larry | L | Hinshaw | Larry | 800906 | Staff Quality Software Engineer | 510400 | Staff Engineer, Software Dev | 09/26/16 | Sheffield, David Arthur |
| Iyyappan | 0 | R | Iyyappan | 775772 | Staff Software Development Engineer | 510400 | Staff Engineer, Software Dev | 10/12/10 | Chandrasekaran, Arvind |
| Lee Chuan | 0 | Yang | Lee Chuan | 775508 | Staff System Validation Engineer | 510400 | Staff Engineer, Software Dev | 06/09/10 | Somaiya, Hinendra H |
| Guohua | 0 | Zhang | Tony | 775511 | Staff Engineer - System Validation | 510400 | Staff Engineer, Software Dev | 06/09/10 | Somaiya, Hinendra H |

**Attorneys' Eyes Only**

**Job Family: Staff Software Engineer**     **Job Family: Staff Software Engineer**     **Job Criticality Rating:**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Depth of Agile System Understanding | Agile System Engagement and Implementation | Analytical & Troubleshooting Skills | Ability to quickly assess and identify & solve Validation Issues | Diversified and broad Product Knowledge | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Michael | | 0 Hoang | Michael | 778187 | 1 | 1 | 1 | 1 | 2 | 6 | 1.2 |
| Daniel | | 0 Fick | Daniel | 778179 | 4 | 4 | 4 | 4 | 3 | 19 | 3.8 |
| Nowell | D | Godfrey | Nowell | 778184 | 4 | 3 | 3 | 3 | 3 | 16 | 3.2 |
| Larry | L | Hinshaw | Larry | 800906 | 4 | 4 | 4 | 3 | 3 | 18 | 3.6 |
| Iyyappan | | 0 R | Iyyappan | 775772 | 4 | 4 | 4 | 4 | 3 | 19 | 3.8 |
| Lee Chuan | | 0 Yang | Lee Chuan | 775508 | 3 | 3 | 4 | 4 | 3 | 17 | 3.4 |
| Guohua | | 0 Zhang | Tony | 775511 | 3 | 3 | 4 | 3 | 3 | 16 | 3.2 |

**Attorneys' Eyes Only**

**Job Family:  Staff Software Engineer**          **Job Family:  Staff Software Engineer**          **Job Flexibility Rating:**

| First Name | Middle Name | Last Name | Preferred Name | Employee ID | Quantity of output | Quality of work | Ability to document findings & communicate findings | Quality of assessments and validation capability using automated tools | Microsemi Values - Exhibit Leadership: Lead by Example and Positively Influence Others | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Michael | 0 | Hoang | Michael | 778187 | 2 | 2 | 2 | 1 | 1 | 8 | 1.6 |
| Daniel | 0 | Fick | Daniel | 778179 | 4 | 4 | 4 | 4 | 4 | 20 | 4 |
| Nowell | D | Godfrey | Nowell | 778184 | 4 | 4 | 4 | 2 | 3 | 17 | 3.4 |
| Larry | L | Hinshaw | Larry | 800906 | 4 | 4 | 4 | 4 | 4 | 20 | 4 |
| Iyyappan | 0 | R | Iyyappan | 775772 | 4 | 4 | 4 | 4 | 3 | 19 | 3.8 |
| Lee Chuan | 0 | Yang | Lee Chuan | 775508 | 2 | 3 | 3 | 2 | 3 | 13 | 2.6 |
| Guohua | 0 | Zhang | Tony | 775511 | 2 | 3 | 3 | 2 | 3 | 13 | 2.6 |

**Attorneys' Eyes Only**

| Employee ID | Company Code | Company | HR Director Partner | First Name |
|---|---|---|---|---|
| 778179 | USA | Microsemi - USA | David Kirjassoff | Daniel |
| 778184 | USA | Microsemi - USA | David Kirjassoff | Nowell |
| 800906 | USA | Microsemi - USA | David Kirjassoff | Larry |
| 778187 | USA | Microsemi - USA | David Kirjassoff | Michael |
| 775772 | INT | Microsemi - International | David Kirjassoff | Iyyappan |
| 775508 | USA | Microsemi - USA | David Kirjassoff | Lee Chuan |
| 775511 | USA | Microsemi - USA | David Kirjassoff | Guohua |

**Attorneys' Eyes Only**

| Employee ID | Middle Name | Last Name | Preferred Name | Employee Status |
|---|---|---|---|---|
| 778179 | | Fick | Daniel | Active |
| 778184 | D | Godfrey | Nowell | Active |
| 800906 | L | Hinshaw | Larry | Active |
| 778187 | | Hoang | Michael | Active |
| 775772 | | R | Iyyappan | Active |
| 775508 | | Yang | Lee Chuan | Active |
| 775511 | | Zhang | Tony | Active |

**Attorneys' Eyes Only**

| Employee ID | Leave Type | Business Card Title | Job Code | HR Job Title |
|---|---|---|---|---|
| 778179 | | Staff Software QA Engineer | 510400 | Staff Engineer, Software Dev |
| 778184 | | Staff Software Development Engineer | 510400 | Staff Engineer, Software Dev |
| 800906 | | Staff Quality Software Engineer | 510400 | Staff Engineer, Software Dev |
| 778187 | | Staff Software Development Engineer | 510400 | Staff Engineer, Software Dev |
| 775772 | | Staff Software Development Engineer | 510400 | Staff Engineer, Software Dev |
| 775508 | | Staff System Validation Engineer | 510400 | Staff Engineer, Software Dev |
| 775511 | | Staff Engineer - System Validation | 510400 | Staff Engineer, Software Dev |

Attorneys' Eyes Only

| Employee ID | FLSA | Manager Name | Job Criticality (1-5) | Job Flexibility (1-5) |
|---|---|---|---|---|
| 778179 | Yes | Sheffield, David Arthur | | |
| 778184 | Yes | Hoang, Tam | | |
| 800906 | Yes | Sheffield, David Arthur | | |
| 778187 | Yes | Hoang, Tam | | |
| 775772 | Yes | Chandrasekaran, Arvind | | |
| 775508 | Yes | Somaiya, Hinendra H | | |
| 775511 | Yes | Somaiya, Hinendra H | | |

**Attorneys' Eyes Only**

| Employee ID | Perf Ranking Score (1-5) | Service Credit (1-5) | Total (out of 20) | Weighted Score |
|---|---|---|---|---|
| 778179 | | | | |
| 778184 | | | | |
| 800906 | | | | |
| 778187 | | | | |
| 775772 | | | | |
| 775508 | | | | |
| 775511 | | | | |

**Attorneys' Eyes Only**

| Employee ID | Recent Perf Review Rating | Perf Rating Year | Key Employee | DOS |
|---|---|---|---|---|
| 778179 | 3.4 | 2016 | | 1/22/2001 |
| 778184 | 4.2 | 2016 | | 5/17/1999 |
| 800906 | | | | 9/26/2016 |
| 778187 | 3.0 | 2016 | | 5/28/1996 |
| 775772 | 4.5 | 2016 | | 10/12/2010 |
| 775508 | 3.3 | 2016 | | 8/30/1999 |
| 775511 | 3.0 | 2016 | | 6/26/2000 |

**Attorneys' Eyes Only**

**Microchip-Microsemi000379**

| Employee ID | Years of Service | Date of Last Hire | BU | Location Code |
|---|---|---|---|---|
| 778179 | 16.85 | 9/22/2014 | ICSG - SSBU | TX109 |
| 778184 | 18.53 | 9/22/2014 | ICSG - SSBU | TX109 |
| 800906 | 1.17 | 9/26/2016 | ICSG - SSBU | ID101 |
| 778187 | 21.5 | 9/22/2014 | ICSG - SSBU | TX109 |
| 775772 | 7.12 | 10/12/2010 | ICSG - SSBU | IND09 |
| 775508 | 18.24 | 6/9/2010 | ICSG - SSBU | CA136 |
| 775511 | 17.42 | 6/9/2010 | ICSG - SSBU | CA136 |

**Attorneys' Eyes Only**

| Employee ID | Location | Cost Center - ID | Cost Center | Compensation Planner |
|---|---|---|---|---|
| 778179 | Houston | ESCI113004041 | Product Val (113004041) | David Sheffield |
| 778184 | Houston | ESCI113004041 | Product Val (113004041) | David Sheffield |
| 800906 | ID Home Office | ESCI113004036 | Product Validation - SSBU Idaho (113004036) | David Sheffield |
| 778187 | Houston | ESCI113004041 | Product Val (113004041) | David Sheffield |
| 775772 | India - Bangalore (ESC - 9A) | ESCI113004069 | Product Val (113004069) | David Sheffield |
| 775508 | Sunnyvale - Bordeaux Dr | ESCI113004007 | Product Val (113004007) | David Sheffield |
| 775511 | Sunnyvale - Bordeaux Dr | ESCI113004007 | Product Val (113004007) | David Sheffield |

Attorneys' Eyes Only

| Employee ID | Race/Ethnicity | Pre 2007 Ethnic Data | DOB | Age |
|---|---|---|---|---|
| 778179 | White (Not Hispanic or Latino) (United States of America) | | Redacted | 39 |
| 778184 | White (Not Hispanic or Latino) (United States of America) | | | 51 |
| 800906 | White (Not Hispanic or Latino) (United States of America) | | | 56 |
| 778187 | Asian (Not Hispanic or Latino) (United States of America) | | | 53 |
| 775772 | Asian (India) | | | 32 |
| 775508 | Asian (Not Hispanic or Latino) (United States of America) | | | 59 |
| 775511 | Asian (Not Hispanic or Latino) (United States of America) | | | 57 |

**Attorneys' Eyes Only**

| Employee ID | Gender | Disabled Employee | Disability | Military Status |
|---|---|---|---|---|
| 778179 | Male | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) |
| 778184 | Male | N | | C - I choose not to self identify (United States of America) |
| 800906 | Male | N | | A - I identify as one or more of the classifications of protected veteran listed above (United States of America) |
| 778187 | Male | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) |
| 775772 | Male | N | | |
| 775508 | Female | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) |
| 775511 | Male | N | | B - I am not a protected veteran (or have never been a veteran) (United States of America) |

**Attorneys' Eyes Only**

| Employee ID | Military Discharge Date | Notes | Disabled Vets | Annual Rate |
|---|---|---|---|---|
| 778179 | | | N | 96,406.59 |
| 778184 | | | N | 120,383.62 |
| 800906 | 3/1/1988 | | N | 124,000.00 |
| 778187 | | | N | 113,666.52 |
| 775772 | | | N | 39,232.21 |
| 775508 | | | N | 124,200.40 |
| 775511 | | | N | 110,300.00 |

**Attorneys' Eyes Only**

| Employee ID | Currency | Annual Rate USD | Bonus Code |
|-------------|----------|-----------------|------------|
| 778179 | USD | 96,406.59 | 10 |
| 778184 | USD | 120,383.62 | 10 |
| 800906 | USD | 124,000.00 | 10 |
| 778187 | USD | 113,666.52 | 10 |
| 775772 | INR | 2,547,546.16 | 10 |
| 775508 | USD | 124,200.40 | 10 |
| 775511 | USD | 110,300.00 | 10 |

Attorneys' Eyes Only

# Exhibit 8

## Reduction in Force
Candidate Form

_____ICSG-SSBU_____ _is undergoing a reduction in force that is resulting in the
elimination and/or consolidation of functions and the elimination of various positions._

**Name:** _____**Michael Hoang**_____

**Title:** _____**Staff Software Development Engineer**_____

**Department:** _____**Software Development**_____

**Separation Date:** _____**01/23/18**_____

_Indicate elements used in determining candidate selection in the following areas:_

**Summary (Reason for Action):**   Due to significant process transformations within the QA
organization, restructuring within this group is mandated and several positions are being
consolidated.  This transformation in our test methodology requires we transition our
workforce from a labor model (manual) to a skilled labor model (development engineer).
One Software Manager and one QA Software Engineer position are being eliminated.

**Job Criticality:**    Michael was rated 1.2 vs. his peers, scoring 3.2 and higher.  In the
category of "Depth of Agile System Understanding", Michael was rated lower than his peers
and this is because he has struggled to demonstrate an effective approach to rapid problem
solving and effective test planning, whereas Michael's peers have demonstrated solid
analytical approaches to troubleshooting and problem solving.  Michael's inability to
understand the agile test planning and rapid problem solving has resulted in redundant
coverage which results in inefficient deployment of people and equipment. Which has
lowered productivity and limited product coverage this ultimately results in gaps in coverage.

In addition, in the category of "Agile System Engagement and Implementation", he was also
rated lower than his peers due to several situations where he has failed to rapidly understand
new feature implementations.  His peers have quickly adapted and are able to quickly
understand new features, feature implementation and develop new coverage at the pace of
agile deployment.  An example is the End-to-End Cache Flush During I/O test planning:
Michael took over 4 weeks to understand the feature and its implementation resulting in
ineffective coverage for early (agile) testing.  It became necessary for Michael's peers, who
would be expected to work from Michael's test plan, to engage directly with the firmware to
understand the feature and its implementation developer prohibiting them from developing
the coverage to begin.  This task would be expected to have been completed within the span
of 1 week and not required additional discovery by Michael's peers.  Michaels failure to
understand the feature, its implementation and develop a test plan resulted in delays for
Luxor feature coverage and an uncoordinated deployment of people and equipment to

**Microchip-Microsemi000108**

adequately test.  Michael has failed to demonstrate the traits and skills necessary to be successful in the role.

The lower ratings in these key areas resulted in him having a lower overall Criticality score than his peers which impacted this decision.


**Flexibility:**  Michael was rated 1.6 vs. his peers who are rated 2.6 and higher.  In the category of "Quality of assessments and validation capacity using automated tools", Michael was rated lower than his peers because he has not demonstrated an ability to assess test requirements and develop and effective approach in the context, nor the pace, of the agile test methodology whereas his peers have demonstrated an ability to rapidly understand new architectures and develop test strategies and test cases to support both manual and automated test methodologies.  Michael has not demonstrated an understanding of how product validation might occur with an automated approach and therefore has been unable to design tests to take complete advantage of strength of automation.  Michael has failed to demonstrate an ability to rapidly adjust planning for the new automated test methodology, understand how to use automated testing to its fullest potential and deploy against the most appropriate coverage whereas his peers have adopted the new automated tools quickly and have been successful.

In addition, in the category of "Microsemi Values – Exhibit Leadership: Lead by Example and Positively Influence Others", Michael was also rated lower than his peers because he is unable to lead by example and demonstrate the values we would like to see adopted across our organization. Michael's peers have engaged in, and attempted to foster, open communication, test plan reviews, feedback, debate and discussion in a drive to adapt to the change and encourage others to adopt the change.  Michael has been unable to positively influence others and help build momentum in driving change.

The lower ratings in these key areas resulted in him having a lower overall Flexibility score than his peers which impacted this decision.


**Current Performance:** Michael was recently rated "Achieves Expectations" by his manager, Tam Hoang.


Prepared By:

Signature                                                            Date

# Exhibit 9



**Policies, Programs & Practices**

# Reduction In Force (RIF) Practice

*This document should not be viewed and/or disseminated to employees outside of Human Resources.*

Microsemi (the "Company") strives to continue growing and providing ongoing employment opportunities for our employees, however when business conditions change or other factors beyond the Company's control occur, expense control actions may be required and a Reduction In Force (RIF) may become necessary.

| | |
|---|---|
| **Effective Date** | **May 9, 2017** |
| **Expiration Date** | **N/A** |
| **Supersedes Date** | **November 15, 2016** |

| | |
|---|---|
| **Eligibility** | This Practice applies to all employees. |

| | |
|---|---|
| **Responsibilities** | Under the guidance of and only after receiving the approval of Human Resources, managers are responsible for personally notifying impacted employees of a RIF. Managers and Human Resources will work together to coordinate the communication of such decisions and the transition process.<br><br>Managers are responsible for identifying employees for a RIF, based on business expense control actions. A RIF is not to be used as a means to avoid performance management and/or to avoid appropriate disciplinary action. |

| | |
|---|---|
| **Guidelines** | **Final Pay**<br>At the time of termination, impacted employees will receive their final paycheck which will include pay for all wages earned or owed through the separation date as well as a payout for unused but accrued vacation through the termination date (less applicable payroll taxes and deductions). Any legitimate and outstanding business expenses incurred by an employee prior to their separation date must be submitted to and approved by management no later than 30 days after the termination action. Company expense reimbursement guidelines and approvals will apply.<br><br>**Pay in Lieu of Notice**<br>The Company will typically provide 2-weeks in lieu of notice pay to employees impacted by a RIF. This 2-week notice pay is typically included on the final paycheck provided to an impacted employee. The 2-week notice pay is not authorized and will not be provided if the RIF action is pre-announced or if advance notice (of two (2) weeks or more) of the job loss action is provided to the impacted employee. |

MC-MS000036
Microchip-Microsemi000049

**Severance Pay**

Employees impacted by a RIF will be required to sign a standard release in order to receive severance pay and severance benefits. Severance pay is calculated by adding a 3-week (base pay) baseline plus adding one (1) week of base pay for every full year of service. For example: *An employee with 10 years and 9 months service at time of separation would be entitled to 3 weeks baseline plus 10 weeks service based severance for a total of 13 weeks of base pay as severance.* For severance calculation purposes, base pay excludes items such as: Shift and/or Lead Differentials, Overtime, Auto Allowances and Bonus and/or Sales plans. Severance will be paid via a lump sum payout at the next regular Company payroll cycle that corresponds after exhausting any legally binding waiting period for the separation agreement to become valid and complying with normal payroll approval cut-off dates and normal payroll/pay-date schedules.

**Continuation of Health Coverage**

Employees enrolled in Company benefits (medical, dental, vision and FSA) at the time of separation may elect to continue their medical, dental, vision and FSA Company plans in accordance with applicable Federal and State law.  COBRA is typically available for up to a maximum of 18 months after Company benefits end. Employees who experience a job loss due to RIF and who sign the standard separation release will be provided with a COBRA subsidy to offset the cost of continuing their Company benefits after their employment ends.  This COBRA subsidy is paid directly to the COBRA vendor and will be equal to the amount the Company would have paid for an active employee's benefits under the same Company medical, dental and vision plan(s).  This COBRA subsidy will be available for up to five (5) months after existing Company benefits end due to the loss of employment. Benefits continuation may differ for employees depending on their work location in accordance with applicable Federal and State law. Additional information regarding continuation can be found on MiResources under *COBRA Program*.

**Outplacement Counseling Job Transition Assistance**

Employees impacted by a RIF will be required to sign a standard release in order to receive Outplacement Counseling.  Outplacement Counseling that focuses on Job Transition assistance will be made available and will be provided by a vendor selected and paid for by the Company. Outplacement Counseling must be completed within six (6) months of the employee's termination date.  Additional assistance will be provided to the extent required by and in accordance with applicable law.

**Unemployment Insurance**

Employees impacted by a RIF will be eligible for unemployment insurance. Final determinations regarding eligibility for unemployment insurance benefits are strictly up to the agency that oversees these programs. It is the employees' responsibility to file for State unemployment insurance.

MC-MS000037
Microchip-Microsemi000050

**Employment Verification**

Employees are provided with information and the company password for the vendor that provides web-based employment verification.  Current and former employees have the ability to authorize and grant individuals and companies access to the following employment information using this vendor and website: Dates of employment, job title and salary. This system allows current and former employees to control (and authorize) which individuals and companies they wish to grant access to their employment data.

**Re-employment**

Any employee leaving the Company in "good standing" is eligible for re-employment.

| | |
|---|---|
| **Approvals** | Approval details are contained in the Guidelines section of this Practice. |
| **Business Process** | **N/A** |
| **Recordkeeping** | **N/A** |

MC-MS000038

Microchip-Microsemi000051

## Detailed Steps in Reduction in Force Selection Process

1. Define the organizational unit (Division, Business Unit, Section, department, and/or location) where surplus actions are necessary.  Draft a high level summary that clearly illustrates why the actions are required.

   I.e.:  **High Level Summary**: Due to a shortfall in meeting revenue targets for the XYZ Business Unit and a cancellation of the ABC product development initiative, a 15% or $5 million annual expense reduction initiative is required and a reduction in force that impacts the XYZ Business Unit will take place in Q3.

2. The manager and HR must consider & document areas, roles and locations that are slated for elimination of positions and the selection process used to determine those selected for redundancies.  A descriptive explanation must be drafted to specify the actions being taken for a subset or group of employees in similar roles.

   I.e.: **Subgroup Explanation**: Due to the cancellation of the ABC product development initiative, 3 analog design engineering positions supporting XYZ project are being eliminated.  The 3 individuals selected for position elimination were those that had the lowest combined ratings in: Job Criticality, Flexibility, Performance and Company Service. Ratings in Job Criticality, Flexibility and Performance were derived from assessing and taking into consideration essential skills and abilities needed to support core design initiatives that will remain key priorities for the R&D team after the RIF action.

3. Once the team has Identified and defined the larger organizations unit and the more specific subgroup where surplus actions are needed; expenses, supplemental workers, jobs (and the employees in those jobs) should be grouped and compared to similar roles.  When assessing employees, grouping multiple levels of similar roles in a comparison group is appropriate; i.e.:  Test Engineers and Sr. Test Engineers in the same subgroup.  The first action should be to review, assess and release or schedule for release supplemental workers (temporaries, contract workers, consultants, etc.) that work in the areas where the surplus actions are needed.  The regional Human Resources Director and Business Unit or Department Managers will review and approve exceptions to this guideline.  Supplemental workers with critical skills or unique roles who are performing essential tasks may be retained. Documentation on retention actions of supplemental workers may be required.

4. If a surplus situation still exists, managers will assess incumbent employees in the areas (job groupings) that have been identified as having surplus workers.  The four criteria that each employee will be assessed against will include:
   a. **Job Criticality**
   b. **Flexibility**
   c. **Performance**
   d. **Years of Company Service**

   Point values will be assigned to these four criteria (Job Criticality, Flexibility, Performance, and Service) for each employee in each grouping of similar employees.  Clear assessment criteria will be applied to derive the scores in each of these four criteria.  For Job Criticality and Flexibility, the scores assigned will be based on the most important factors and characteristics that are deemed essential to the ongoing and key efforts of the business.  The Performance score will be assigned by the manager after comparing each employee in the subgroup against others and assigning a relative score. Stack ranking and assessing each employee against their peers will drive this score. The Service score will be based on a formula where longer tenured employees will be assigned a higher point value. The sum of these scores (for the four criteria) will determine the overall score for each employee.  A higher summed score reflects the higher value an employee has to the business. Those receiving lower summed points within a designated group will be in jeopardy of being selected for a reduction in force. Those selected for a reduction in force must be derived from the lowest overall ranked individuals in each subgroup or can be a single incumbent (with no other peers) or all incumbents in a subgroup if all in that subgroup are slated elimination.

**MC-MS000039**
**Microchip-Microsemi000053**

5. RIF Candidate Forms: Once the grouping of employees and the scores are validated that determine the vulnerable employees, a write-up documenting the selection process that was used and individual narratives for each employee slated for RIF will be required. These individual RIF Candidate forms should elaborate on the reasons that the impacted individual was selected from RIF and why the individual received lower scores in key areas. Notes on skill differentiations between employees that were retained should be included with details that clarify why the individual was selected and is being recommended for RIF. The manager must ensure that each criterion was accurately scored and that the RIF Candidate form cites and gives details on why the impacted employees was scored lower in key areas than others being retained.  If an impacted individual rated lower than anyone else in their subgroup in a specific area on the Job Criticality, Flexibility or Performance score, then the narrative on the RIF Candidate form should spell out what was lacking and why that employee received the detrimental score in that area. Details that led to a low score in a category or subcategory must be clarified, factual and logical. A clear and defensible rationale for RIF selection is essential.  Sometimes, identifying and citing the reasons for retaining others in that employee grouping and the reason for making these decisions is valid. The RIF Candidate forms are an essential aspect of the RIF assessment and justification process and these documents must be 100% accurate. The Spreadsheets that shows the scores given to each employee and the individual write-ups for each employee selected for RIF will be retained as internal documents (by HR), but these documents are discoverable if an adverse impact is alleged.

6. Managers will contribute to and review and submit the master spreadsheets and draft the RIF Candidate forms on the impacted workers and submit these to regional HR.

7. Backup documentation will be checked for accuracy. Regional HR will assess the accuracy of the employee data, performance ratings, leave of absence information, etc., for those individuals within the selected group(s).

8. Regional HR will check for any "areas of concern" and point out or elevate any issues that require mitigation or resolution.

9. The completed spreadsheet and the completed RIF Candidate forms on each individual being recommended for RIF must be forwarded to the Corporate Director of HR responsible for RIF reviews and approvals at least two weeks before the planned RIF action.  This will provide adequate time for review and approval of the actions as well as time for creation of Separation Release Documents and the logistics associated with obtaining final pay checks and termination packets for impacted individuals.

# Reduction in Force Process
# Criteria for Scoring

**Job Criticality** - Relative to all assignments within the job functions, how critical are aspects of that job to the success of the operation at the time of ranking?  In some cases, an entire population of incumbents may be slated for reduction. In other cases, several from a group of similar employees are slated for job elimination.  When some are selected for RIF and others are retained, several key aspects or subset criteria that validate the Job Criticality score should be documented and all individuals in that similar group should be assessed against the same criteria. When multiple individuals are being assessed, a matrix citing the specific skills, abilities or specific foundations of knowledge should be specified and scored. Normally5 unique subset skills, abilities, capabilities or foundations of knowledge will be identified and scored to derive the Job Criticality rating. The subset criteria should be based on the most essential skills, abilities and specific foundations of knowledge that will be needed for on-going and future work related efforts. The subset areas will be scored for each individual and the sum of the scores divided by the number of subset skills will determine the weighted score for Job Criticality.  Examples of subset areas for **Job Criticality** in various job groupings are listed below:

**Analog Design Engineers:**

| Complex Analog Design Capabilities | Mixed Signal Understanding and capability | Depth of Systems Device Knowledge | CAD Design Tools Capability | Ability to resolve complex design interface issues | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Systems Engineers:**

| Systems Analysis & Design Capabilities | Understanding of Device Physics and system interface issues | Ability to effectively translate customer specs into meaningful and feasible products | Diversified and relevant Systems knowledge & Depth for products on road-map | Knowledge of Telecommunications Market and Standards Committee issues that are relevant to future products | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Layout Design Engineers:**

| Ability & record of completing complex analog IC layout projects | Demonstrated ability to perform Block Level Layout | Demonstrated ability to perform Top Level Floor Planning | Ability to attain tight schedules with accurate Layouts (Efficient Layouts) | CAD Tool Understanding and PDK Knowledge | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Systems Applications Engineers:**

| Ability to effectively build Product Evaluation Boards | Depth of Systems Understanding | Schematic Reading and technical understanding | Ability to troubleshoot and quickly assess and solve customer issues | Ability to effectively communicate and present solutions that solve internal as well as customer issues. | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Validation Engineers:**

| Ability to Build Application Boards | Analytical & Troubleshooting Skills | Ability to quickly assess and identify & solve Validation Issues | Depth of systems knowledge of core products | Understanding of Device Physics and system interface issues | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Assemblers/Inspection:**

| Wire bonding Capability | Solder Dip Capability | Understanding and capability in Reliability Testing | Visual Inspection Ability | Diversified and broad Product Knowledge | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Electronic Testers:**

| Probe & Final Test Skills | Equipment Set-Up (Probe, final test Handler) | Accuracy of Uploading Electronic Test Data | Ability to accurately calibrate Test Equipment | Burn-In & Packing capability | Total (out of 25) | Job Criticality Weighted Score |
|---|---|---|---|---|---|---|

**Flexibility** - Relative to all individuals within similar job roles, this area rates how flexible the individual is in performing their various job tasks.  This criterion can include the level of cross-training to perform multiple roles or tasks and the overall broad-based experience. It can also include characteristics in how a person performs their job (speed, quality, teamwork, etc.).  For any similar group of employees where some are selected for RIF and others are retained, several key aspects that validate the Flexibility Score should be documented and all employees in that specific grouping be assessed against the same criteria. Normally 5 unique subset characteristics that can be used to quantify flexibility should be identified and scored to derive the Flexibility score.  These subset criteria should be based on the most valuable characteristics and contributions needed for on-going and future work related efforts. These subset areas will be scored for each individual and the sum of the scores assigned to each person divided by the number of subsets will determine weighted score point value assigned to the **Flexibility** criteria.  Examples of subset areas for **Flexibility** in various job groupings are listed below:

**Analog Design Engineers:**

| Ability to achieve Design Schedule Milestones | Ability to Multitask and support different design efforts | Team Focused Efforts. Sharing findings with others. | Creative design capability and ability to innovate | Quality of Design (1st time Tape-Out Success) | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Systems Engineers:**

| Ability to achieve and deliver on schedule milestones | Demonstrated ability to Multitask and deal with multiple issues simultaneously | Team Focused Efforts with a record of sharing knowledge and findings | Breadth of Design Expertise across multiple technology platforms | Commitment to and history of Innovation | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Layout Design Engineers:**

| Proactive & Ability to see programs to completion | Ability to efficiently and effectively work independently | Breadth & Depth of knowledge of Analog Circuits | Ability to solve complex design issues and challenges | Quality of Layout (1st time success) | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Systems Applications Engineers:**

| Quantity of output | Ability to work independently | Speed at solving real-time issues. Ability to prioritize and handle urgent initiatives. | Quality of findings and deliverables | Ability to solve difficult systems integration issues with little oversight | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Validation Engineers:**

| Quantity of output | Innovation & simplicity in designing evaluation boards | Ability to document findings & communicate findings | Quality of assessments and validation capability using automated tools | Working Independently with little oversight | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Assemblers/Inspection:**

| Quality of Work | Quantify of output | Ability to solve reasonable anomalies independently | Reliability - Employee is timely and ensures efficient "hand-off" to next shift | Relevant and efficient communicator. Brings appropriate issues to Lead or Supervisor | Total (out of 25) | Job Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Electronic Testers:**

| Quality of work | Quantity of work | Ability to assess and solve reasonable anomalies with minimal oversight | Ability to interpret NPI process and follow instructions | Effective communications (keeps lead and/or supervisor informed of relevant issues) | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|

**Current Performance** - Assessment of job performance at the time of ranking (not the last performance review rating). How well is the individual currently performing the full range of tasks they have been assigned? To accomplish a non-biased score for this category, a stack rank by job family and assigning scores based on quartiles may be used. Performance review scores may or may not necessarily reflect the results due to the diligence of this process to assess performance of individuals in the same subgroup that may be overseen or managed by different team leaders or managers.

**Ranking & Description of Performance**

| Score | Scoring in Performance Category |
|---|---|
| 5 | Outstanding. Highest Performance among peers |
| 4 | Above Average. Exceeds standards |
| 3 | Average. Meets all basic standards. |
| 2 | Below Average. Some shortfalls when compared to others |
| 1 | Lowest Performance & may not meet basic standards |

**Years of Company Service** - Calculate complete years of Microsemi service from service date to the proposed date of the reduction action and use the matrix and scoring table provided below:

| Score | Complete Years of Service | |
|---|---|---|
| 5 | 16+ years | |
| 4 | 10 to 15 years | |
| 3 | 6 to 9 years | |
| 2 | 3 to 5 years | |
| 1 | 0 to 2 years | |

## Reduction in Force Criteria & Scoring

| | Criteria for Ranking | | | |
|---|---|---|---|---|
| **Measurement/Point Values** | **Job Criticality** | **Flexibility** | **Current Performance** | **Years of Service** |
| | Least            1<br>Skillsets/capabilities / experience is not present or lacking to perform this function | Least            1<br>weakest<br>Behavior is below standards & individual has demonstrated inability to meet expectations in this area | Poor             1<br>Lowest Performance & may not meet basic standards | 0 - 2            1 |
| | Below            2<br>Average<br>Lacks understanding to perform task today-Barriers exist | Below            2<br>Average<br>Does not demonstrate capability to perform at expectation today-Barriers are noted may exist | Below            2<br>Average<br>Shortfalls in some areas when compared to others | 3 - 5            2 |
| | Average          3<br>Capable to perform basic functions but some growth needed | Average          3<br>Capable to perform basic functions but some growth needed for more complex aspects | Average          3<br>Meets all basic standards | 6 - 9            3 |

| Above Average 4 | Above Average 4 | Above Average 4 | 10 - 15 4 |
|---|---|---|---|
| Capable and able to perform in this area | Capable demonstration to perform complex or advanced vs. peers in this area | Exceeds standards | |
| Most 5 | Most 5 | Most 5 | 16+ 5 |
| Very solid expertise and capability in this area | Very solid & strongest demonstration and capability in this area | Outstanding. Highest Performance among peers | |

## High Level Summary of Reduction in Force Process

1. Pull employee information into spreadsheet and format groupings of employees by similar roles.

2. **Years of Service** - Assign points based on service. Calculate complete years of service (as of the projected RIF date) and assign scores per the following grid:

| Score | Complete Years of Service | |
|---|---|---|
| 5 | 16+ years | |
| 4 | 10 to 15 years | |
| 3 | 6 to 9 years | |
| 2 | 3 to 5 years | |
| 1 | 0 to 2 years | |

3. **Performance -** Evaluate current performance and assign point values based on peer group.

4. **Job Criticality** – Based on similar jobs in categories, assess job functions/key tasks according to how critical they are to the organization. Select jobs for elimination and evaluate aspects of those jobs to identify critical components that are important to the success of the on-going and future operation of the business. If multiple incumbents exist within a subgroup, identify core and essentials aspects of those jobs and rate each person against these areas. Assign points. (Build a matrix if possible)

| Score | Scoring in Job Criticality Sub-Category | |
|---|---|---|
| 5 | Most or very solid expertise and capability in this area | |
| 4 | Above Average & capable and able to perform in this area | |
| 3 | Average or capable to perform basic functions but some growth needed | |
| 2 | Below Average or lacks understanding to perform task today- Barriers exist. | |
| 1 | Least or Skillsets/capabilities/experience are not present or lacking to perform this function | |

5. **Employee's Flexibility** - Establish the specific measures to be used to derive the flexibility score. Assign points.
   - Unique Components of a job that employee can perform
   - Different jobs or roles in which an employee is competent
   - Skills and work characteristics that the employee possesses
   - Differing functions or characteristics deemed important to on-going business that employee is competent to perform. (Build a matrix if possible)

**MC-MS000045**
**Microchip-Microsemi000059**

| Score | Scoring in Flexibiltiy Sub-Category | | | | | | |
|---|---|---|---|---|---|---|---|
| 5 | Most or very solid and strongest demonstration and capability in this area | | | | | | |
| 4 | Above Average & capable demonstration to perform complex or advanced vs. peers in this area | | | | | | |
| 3 | Average or capable to perform basic functions but some growth needed for more complex aspects | | | | | | |
| 2 | Below Average or does not demonstrate capability to perform at expectation today- Barriers are noted and may exist | | | | | | |
| 1 | Least or weakest behavior (below standards) & individual has demonstrated inability to meet expectations in this area | | | | | | |

6. **Performance-** Assess job performance at time of ranking (not the last performance review).  How well is the individual currently performing the full range of tasks they have been assigned?  It may be beneficial to stack rank by job family and assign scores based on quartiles. Performance review scores may or may not reflect the results since performance is relative to individuals who may be overseen or managed by different team leaders or managers and business needs may have changed.

| Score | Scoring in Performance Category |
|---|---|
| 5 | Outstanding.  Highest Performance among peers |
| 4 | Above Average. Exceeds standards |
| 3 | Average. Meets all basic standards. |
| 2 | Below Average. Some shortfalls when compared to others |
| 1 | Lowest Performance & may not meet basic standards |

Reduction in Force Candidate Form:

## Reduction in Force
### Candidate Form

_____ *has undergone a reduction in force that has resulted in*
*the elimination or consolidation of the functions of various positions.*

**Name:** _____

**Title:** _____

**Department:** _____

**Separation Date:** _____

*Indicate elements used in determining candidate selection in the following areas:*

**Job Criticality:** _____
_____
_____
_____
_____

**Flexibility:** _____
_____
_____
_____
_____

**Current Performance:** _____
_____
_____
_____
_____

Prepared By:

_____          _____
Signature                                                                    Date

## <u>Reduction in Force Spreadsheet Generation</u>

Gathering employee data for RIF assessments.  Log onto Workday and type in "RIF" in the search box:



Select "MSCC RIF Analysis Report"



**MC-MS000048**

**Microchip-Microsemi000062**

Select appropriate location, business Unit or other filters and run report.



Once critera are selected you can name the report and then press "RUN". Download the report by pushing the "X" document icon in the upper right corner.

On the Master RIF Spreadsheet, programming is being done that will permit the Service calculator tobe auto-generated after enterring a projected RIF Date. To derive the Years of Company Service calculation, you can also insert the following formula (where $X$1 is the cell that has the projected RIF Date and Z98 gets replaced with the line that denotes the employees' service date):

=IF(($X$1-Z98)/365<3,1,IF(AND(($X$1-Z98)/365>=3,($X$1-Z98)/365<6),2,IF(AND(($X$1-Z98)/365>=6,($X$1-Z98)/365<10),3,IF(AND(($X$1-Z98)/365>=10,($X$1-Z98)/365<15),4,5))))

Once the Spreadsheet is exported. Group the employees by Subgroup (ie: place all Analog Engineers together and all Assemblers together). Since the Service score should be derived by using the provided formula; the first and a Performance score should be assessed after stack ranking and assigning values relative to peers.

If a sole incumbent exists in a role (where there are no peers) and this job is redundant. Insert a coment above the position to describe the reason for the action. Below is an example of Sole Incumbent designation:

| First Name | Last Name | Employee ID | Business Card Title | Job Code | HR Job Title | Manger Name | Location | Job Critical (1 - 5) | Flexibility (1 - 5) | Part Score (1- 5) | Service Credit (1 - 5) | Total (Out of 20) | Weighted Score (1 to 5) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Elimination of Sole Incumbant or elimination of all similar incumbants:** | | | | | | | | | | | | | |
| AMSG Design Engineering Mgmt (Aliso Viejo): | | | | | | | | | | | | | |
| Due to the significant restructuring within AMSG and the decreased focus on Design Efforts in Aliso Viejo, the Design Director role is being eliminated. There are not enough Design employees remaining in AV to justify this senior mgmt role | | | | | | | | | | | | | |
| John | James | 002319 | Sr Director, Mixed Signal Engineering | 006500 | Electr Dsgn Engrg Mgmt 5 | Asvadi,Amir | Aliso Viejo | 2 | 3 | 5 | 1 | 11 | 2.75 |
| FAE (DC/DC Power Mgmt) Remote Employee: | | | | | | | | | | | | | |
| Business Decision to de-emphasise DC/DC Products and eliminate key roles supporting this product line. Sole FAE position is being eliminated. Inability to sustain investment. Lack of customer design wins and forcasted decrease in revenue | | | | | | | | | | | | | |
| Michael | Jacoby | | FAE - DC/DC | | FAE | Strobel, Doug | CO Office | 2 | 2 | 1 | 1 | 6 | 1.5 |
| Supply Chain Manager: | | | | | | | | | | | | | |
| Business Decision to eliminate Supply Chain Manager position in AMSG Garden Grove. Decreased AMSG R&D Investment and cancelation of programs resulted in this decision. AMSG unable to support Corporate Ops Investment in mgmt r | | | | | | | | | | | | | |
| Kevin | Cotton | 002325 | Supply Chain Manager | 140400 | Materials Mgmt 4 | Nguyen, Tiffany | Garden Grove | 2 | 2 | 3 | 1 | 8 | 2 |
| Equipment Maintenance Enginering: | | | | | | | | | | | | | |
| Equipment Maintenance Engineering Offshoring Action: May & Sept Events (two Engineers will leave in May....the 3rd will leave in September after the successful XFR of Assy & Test Production and shipment of all production equip to Asia. V | | | | | | | | | | | | | |
| Jessica | Walker | 001640 | Senior Test Maint Engr | 731400 | Test Equipment Maint Tech 4 | Van Dange, Mark T | Garden Grove | 2 | 3 | 3 | 5 | 13 | 3.25 |
| Mark | Victor | 001203 | Prod Test Maint Facilities Mgr | 130300 | Prdtn Line Maint Mgmt 3 | Speyer, Christopher J | Garden Grove | 2 | 4 | 3 | 5 | 14 | 3.5 |

After addressing sole incumbent redundancies, move on to sections that contain multiple incumbents in a subgroup (or like skilled employees). Copy the pertanant information for the all employees in a subgroup (employee name, EE#, Business Card title, HR Job title, Manager Name) and paste it into a section below the main employee data and derive the criteria to be used for the Job Criticality and the Flexibility score. After the subset criteria are selected and scored, the summed and weighted score for Job Critcality and Flexibility should be linked to the appropriate Job Criticality and Flexibility cell on the main employee data spreadsheet.

An example is pasted below:



| First Name | Last Name | Employee ID | Business Card Title | Job Code | HR Job Title | Manger Name | Location | Job Critical (1 - 5) | Flexibility (1 - 5) | Part Score (1- 5) | Service Credit (1 - 5) | Total (Out of 20) | Weighted Score (1 to 5) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Comparison when one or more from many incumbents were selected for RIF:** | | | | | | | | | | | | | |
| Analog Design Engineers (Senior Level): | | | | | | | | | | | | | |
| Due to the significant restructuring within AMSG and the cancellation of key design projects in DC/DC Power Mgmt and Emerging Technologies, and the philisophical desicsion for decreased focus on Design Efforts in Aliso Viejo, the 4 Analog D | | | | | | | | | | | | | |
| Chii-Fa | Chiou | 002102 | Analog Design Engineer & Eng Validation Team Lead | 006500 | Electronic Design Engineer 6 | De Veirman, Geert A | Aliso Viejo | 2.6 | 3.6 | 3 | 3 | 12.2 | 3.05 |
| Eric | Campos | 001620 | Senior Principal Design Engr | 006500 | Electronic Design Engineer 5 | De Veirman, Geert A | Aliso Viejo | 2.2 | 2.4 | 3 | 5 | 12.6 | 3.15 |
| Ali Mehmet | Tan | 002353 | Principal Analog Design Engineer | 489500 | Analog Engineer 5 | De Veirman, Geert A | Aliso Viejo | 2.4 | 4 | 3 | 1 | 10.4 | 2.6 |
| Paul | Okada | 002112 | Principal Design Engineer | 006500 | Electronic Design Engineer 6 | De Veirman, Geert A | Aliso Viejo | 3 | 2.6 | 3 | 3 | 11.6 | 2.9 |
| William | Chan | 002144 | Design Engineering Team Leader | 006500 | Electronic Design Engineer 5 | Barnea, Nadav | Aliso Viejo | 4.6 | 4.6 | 5 | 2 | 16.2 | 4.05 |
| Yuji | Isobe | 002105 | Principal Design Engineer | 006500 | Electronic Design Engineer 5 | Barnea, Nadav | Aliso Viejo | 3.2 | 4 | 4 | 3 | 14.6 | 3.65 |
| Kai | Kwan | 002143 | Senior Staff Design Engineer | 006400 | Electronic Design Engineer 4 | Barnea, Nadav | Aliso Viejo | 3.8 | 4.2 | 4 | 2 | 14 | 3.5 |
| Yuji | Yoshida | 002106 | Senior Staff Design Engr | 006400 | Electronic Design Engineer 4 | De Veirman, Geert A | Aliso Viejo | 2.8 | 4 | 3 | 3 | 12.8 | 3.2 |
| Paul | Walker | 002146 | Senior Staff Design Engr | 006400 | Electronic Design Engineer 4 | De Veirman, Geert A | Aliso Viejo | 4.4 | 4.4 | 4 | 2 | 14.8 | 3.7 |
| Systems Engineering / Systems Architects: | | | | | | | | | | | | | |

**Analog Design Engineers (Aliso Viejo) - Job Criticality Rating:**

| First Name | Last Name | EE ID | Business Card Title | Job Code | HR Job Title | Manger Name | Complex Analog Design Capabilities | Mixed Signal Understanding and capability | Depth of Systems Device Knowledge | CAD Design Tools Capability | Ability to resolve complex design | Total (out of 25) | Job Criticality Rated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chii-Fa | Chiou | 002102 | Analog Design Engineer & Eng Validation Team Lead | 006500 | Electronic Design Engineer 6 | De Veirman, Geert A | 4 | 3 | 2 | 1 | 3 | 13 | 2.6 |
| Eric | Campos | 001620 | Senior Principal Design Engr | 006500 | Electronic Design Engineer 5 | De Veirman, Geert A | 3 | 2 | 1 | 2 | 3 | 11 | 2.2 |
| Ali Mehmet | Tan | 002353 | Principal Analog Design Engineer | 489500 | Analog Engineer 5 | De Veirman, Geert A | 4 | 1 | 2 | 2 | 3 | 12 | 2.4 |
| Paul | Okada | 002112 | Principal Design Engineer | 006500 | Electronic Design Engineer 6 | De Veirman, Geert A | 4 | 4 | 1 | 3 | 3 | 15 | 3 |
| William | Chan | 002144 | Design Engineering Team Leader | 006500 | Electronic Design Engineer 5 | Barnea, Nadav | 5 | 5 | 4 | 4 | 5 | 23 | 4.6 |
| Yuji | Isobe | 002105 | Principal Design Engineer | 006500 | Electronic Design Engineer 5 | Barnea, Nadav | 4 | 4 | 3 | 4 | 1 | 16 | 3.2 |
| Kai | Kwan | 002143 | Senior Staff Design Engineer | 006400 | Electronic Design Engineer 4 | Barnea, Nadav | 4 | 4 | 3 | 4 | 4 | 19 | 3.8 |
| Yuji | Yoshida | 002106 | Senior Staff Design Engr | 006400 | Electronic Design Engineer 4 | De Veirman, Geert A | 4 | 2 | 3 | 3 | 2 | 14 | 2.8 |
| Paul | Walker | 002146 | Senior Staff Design Engr | 006400 | Electronic Design Engineer 4 | De Veirman, Geert A | 5 | 4 | 4 | 4 | 5 | 22 | 4.4 |

**Analog Design Engineers (Aliso Viejo) - Job Flexibility Rating:**

| Ability to achieve Design Schedule | Ability to Multitask | Team Focused Sharing | Creative ability to innovate | Quality of Design (1st time Tape-Out | Total (out of 25) | Flexibility Weighted Score |
|---|---|---|---|---|---|---|
| 2 | 4 | 3 | 5 | 4 | 18 | 3.6 |
| 3 | 1 | 3 | 1 | 4 | 12 | 2.4 |
| 4 | 4 | 4 | 4 | 4 | 20 | 4 |
| 4 | 3 | 3 | 1 | 2 | 13 | 2.6 |
| 5 | 4 | 4 | 5 | 5 | 23 | 4.6 |
| 4 | 5 | 4 | 4 | 5 | 22 | 4.4 |
| 5 | 4 | 4 | 4 | 4 | 21 | 4.2 |
| 4 | 4 | 4 | 4 | 4 | 20 | 4 |
| 4 | 5 | 5 | 4 | 4 | 22 | 4.4 |

## Reduction in Force Planning Steps

All RIF Actions and documents must be submitted to and be approved by Corporate Director Human Resources (Mike Bondi).  After RIF actions have been approved, the following arrangements need to be made:

- Normally, the day of the RIF event should not be a Monday or Friday due to higher than average absenteeism on these days of the week (Tues/Wed or Thurs are best days); however, sometimes, we don't have flexibility in choosing the day of the week

- Since company benefits end on the last day of the month that a termination action takes place, it's best to avoid the last week in a month for RIF notifications (if possible)

- Once the RIF date has been determined, HR must request Payroll to generate Final Paychecks with a "pay-through" date and include clear instructions on whether or not "2-weeks in lieu of notice" is to be included on final check.  If advanced notice of the action was provided to the employee, "in lieu of notice pay" is NOT to be included.  Payroll should receive the final check request with at least one full week's notice before the day of the RIF – Payroll must be provided with a spreadsheet that lists the employees' name, EE# and Term Date as well as "pay-through date" and whether 2-weeks' notice is to be included – The spreadsheet must be signed by two-levels of mgmt. and HR Director – Instructions on where checks should be delivered is also important.  Do NOT enter Termination Actions in Workday until the day of the notification since two levels of mgmt. approval are required and we've had situations where a manager who was also impacted by a RIF was in the approval process

- Separation Releases & Letters with Severance specified must be requested and produced by Corporate HR (William Caine) – The Separation Release & Letter will have the HR Manager's signature block and contact information so HR person requesting the Separation Releases must provide William with HR Business Partner name, job title, email and office number to be included on the Separation Releases & Letters

- Termination Folders need to be created and will include standard Separation Documents as well as two complete copies of the Separation Release & Letters as well as Outplacement Career Transition materials (and these packages should exclude the exit interview questionnaire).  The business card of the HR Business Partner should also be included with the package

MC-MS000051

Microchip-Microsemi000065

- The week before the event, HR should create a schedule for the actions denoting managers who will do the notifications and escorts  – normally, HR is the lynchpin on the schedule since the manager takes only 15 minutes for their notification action….but HR discussions generally take 30-minutes

- Manager RIF Training should be scheduled by the HR Business Partner and should be required for all managers (and HR staff) that will provide support during the RIF actions – Managers should memorize the script but not look stilted when delivering the message

- Managers should be told to be prepared to call impromptu meeting of all "surviving" employees to share that a reduction in force occurred and that all who were impacted in their department have been notified.  Be aware that "surviving" employee meetings in the days and weeks following the RIF are extremely important to work on balancing workloads and address key business and departmental objectives

## Workday Actions and Final Lump Sum Payouts

**After** a RIF notification has been personally delivered to an employee, HR should go into Workday and enter the "separation" action and enter the last day worked and the last day paid.  Before entering this action make certain that neither the 1st or 2nd level managers were impacted with the RIF action because if either of these individuals are no longer active in Workday, the Workday Approval action will not be able to be approved.

Then, **AFTER** a RIF'd employee returns their signed release, and making certain that the 7-day "cooling off" period will have expired, HR should enter the Lump Sum Severance Payout by entering the dollar amount of the payout in Workday with an effective date of the Friday before the next normal payroll date.

Severance checks will be taxed at supplemental rates and will be paid to the employee via the same methods that were paid to them when they were active employees (ie: Direct Deposit or paper check).  Severance payouts are processed on normal payroll cycles.

# Exhibit 10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TAM HOANG, | § |
|      Plaintiff, | § |
| | § |
| vs. | § |
| | § |
| MICROSEMI CORPORATION and | § |
| Microsemi TECHNOLOGY | § |
| INCORPORATED, | § |
|      Defendants. | § |

**EXPERT REPORT**

**Dwight D. Steward, Ph.D.**
Economist

**September 1, 2020**

Phone: (512) 476-3711
dsteward@employstats.com

**Introduction and Summary**

1.      My name is Dwight Steward and I am an economist.  I have been retained by Ogletree, Deakins, Nash, Smoak & Stewart, P.C. to perform an economic and labor market analysis in this lawsuit.

2.      I am a labor economist with over 20 years of extensive experience teaching and researching the labor market analyses that I will present in this expert report.  I have taught dozens of courses in labor market economics and statistics to advanced undergraduate and graduate students at the University of Texas at Austin that cover the labor market issues such as unemployment and re-employment, expected job unemployment duration, job skill transferability in the labor market, and the determination of an employee's wage rate in the labor market that I will present in this expert report.  I have also taught and lectured on these types of labor market topics in graduate level courses in The Red McCombs College of Business at the University of Texas at Austin.

3.      In addition to university teaching of the labor market methodologies and labor market data that I utilize in this expert report in this case, I have also presented peer-reviewed labor economic research on these labor market methodologies and data at numerous major national economic conferences.  I have organized research panels on the labor market analysis of economic damages, employment and re-employment in employment cases at a number of American Economic Association (AEA) conferences.  The AEA is the nation's largest and most

established professional group for economists.    At these professional economic conferences, I have presented my work on the labor market analysis of these issues to my peers and reviewed the work of my economist peers.   My labor market economics writings include a research paper titled "Back Pay and Front Pay Calculations in Employment Termination Cases: Accounting for re-employment and mitigation efforts", a published journal article on the "Labor Market Analysis of the Worklife Expectancy of Mexican Migrant Workers in the U.S." and a labor economics textbook titled "Analysis of Employment Data in Discrimination Lawsuits and EEO Audits".   These writings and research utilize the generally accepted and peer-reviewed labor market research methodologies and labor market data that I will use to formulate my expert report in this case.   I have also utilized my labor market research and textbook in the labor market courses I have taught.   In my professional work, I regularly provide peer review of the labor market research of other professional economists that deal with the labor and employment analyses and methodologies that I will present in this expert report in this case.

4.     In addition to my labor market teaching and writing, I have provided trial testimony on labor market issues similar to those in this case in Federal and State Courts in Texas and outside of Texas.   In Monica Hague v. University of Texas Health Science Center at San Antonio, in the United States District Court for the Western District of Texas, San Antonio Division, Civil Action No. SA-11-CA-1101-OG and in Michael Chatterton v. Beelman Ready Mix, Inc., in the Circuit of the Twentieth Judicial Circuit St. Clair County, Illinois, No. 14-L-221, I provided deposition and trial testimony

2

on issues including labor employability, expected employment duration, labor market demand, and wage rates, as I do in my expert report in this case.  In Coleman et al. v. Newsom et al,  United States District Court for the Eastern District of California, I have been appointed as a labor economist by the Court to assist the Court's Special Master in the case.  As a labor economist for The Court's Special Master, I am conducting a labor market availability and salary analysis to help the Court study the labor market issues in the Coleman v. Newsom case.   My full curriculum vitae is attached to this report.

5.      In this lawsuit, Mr. Tam Hoang alleges that his position as a Systems Development Manager at Microsemi Technology ('Microsemi') was wrongfully terminated by the Defendant on January 23, 2018.  Mr. Hoang alleges that he has incurred lost back and front pay wages as a result of his alleged wrongful termination. As of October 2019, Mr. Hoang claims that he has incurred back pay damages of $413,448 and front pay damages of $1,356,916.

6.      It is my opinion that Mr. Hoang has not incurred anywhere near the level of economic loss that has been alleged in this case.  As will be discussed, there was employer demand for individuals with Mr. Hoang's knowledge, expertise, and work experience around the time his employment ended with Microsemi in January 2018.  Mr. Hoang's post-Microsemi employment termination job search time was not consistent with, and longer than, other individuals with his work background.  Had Mr. Hoang performed a sufficiently diligent job search he could have been reasonably expected to have obtained replacement employment sooner, and his back pay damages would be a

3

fraction of what he alleges.  Further, it is likely that Mr. Hoang would have been able to find employment with benefits and salary comparable to what he was earning at Microsemi.   There was employer demand for individuals with Mr. Hoang's work background following the end of his employment with Microsemi.

7.     My opinions are discussed in detail in the following sections of this report.   I respectfully reserve the right to supplement and/or modify this report.   The documents that I have reviewed in this case are discussed in the text of this report and shown in the attached Exhibits.

**Mr. Hoang's Employment History**

8.     Mr. Hoang was employed as a Systems Development Manager at the time his employment ended at Microsemi in Houston, Texas.   As a Systems Development Manager, Mr. Hoang managed an engineering lab and tested equipment (See no. 1 in Exhibit B).   At the time his employment as a Systems Development Manager ended with Microsemi, Mr. Hoang had an annual base salary of approximately $161,712 (See no. 1 in Exhibit B).

9.     Mr. Hoang was hired as a Systems Engineer for Microsemi's predecessor Compaq Computers in 1990 (See no. 1 in Exhibit B).   Mr. Hoang was subsequently promoted to Engineering Manager with Compaq Computers.   In 2014, Mr. Hoang was promoted from Engineering Manager to Systems Development Manager, a position that he remained in until his employment ended in 2018 (See no. 1 in Exhibit B).   According to his resume, Mr. Hoang obtained a Bachelor of Science

degree in Computer Engineering from the University of California San Diego in 1983. Mr. Hoang has qualifications in various operating systems, coding languages, and databases (See no. 1 in Exhibit B).

10. Mr. Hoang sought employment following the termination of his employment at Microsemi in January 2018. Mr. Hoang provided job search records for eight job search related activities over the 13 month time period February 5, 2018 through March 21, 2019 (See no. 2 in Exhibit B). Mr. Hoang's eight job search activities over this time period consisted of signing up for two job notification alerts and six job applications in two months following his employment termination in 2018. According to his employment records, Mr. Hoang was offered a severance package that included 30 weeks of severance pay and outplacement assistance (See no. 1 in Exhibit B).

11. Mr. Hoang obtained employment as a System Administrator for Wharton County Junior College. Mr. Hoang accepted the position with Wharton County Junior College more than one year after his employment ended with Microsemi (See no. 2 in Exhibit B). According to his Wharton County Junior College employment records, Mr. Hoang is currently earning $71,402 annually in his position with Wharton County Junior College (See no. 2 in Exhibit B).

12. In the Plaintiff's Rule 26 Disclosures, Mr. Hoang claims that he has suffered back pay losses in the amount of $413,448 from the date of his termination through October 2019 and front pay losses in the amount of $1,356,916 (See no. 2 in Exhibit B). As will be discussed, Mr. Hoang has not incurred anywhere near the level of economic loss that has been alleged in this case.

**There was demand for Mr. Hoang's knowledge, expertise and experience**

13.     There was documented employer demand for individuals with Mr. Hoang's knowledge, expertise, and work experience in the Houston area around the time his employment ended in January 2018.  Mr. Hoang could have been expected to obtain a job position comparable to the one he held at Microsemi within a reasonable period of time following his termination had he performed a sufficiently diligent and expansive job search.

14.     Specifically, Mr. Hoang's reported period of unemployment is inconsistent with the employer demand that existed for his knowledge, skills, abilities, and experience at the time his employment ended at Microsemi in January 2018.  Mr. Hoang had over 30 years of experience working in Computer Engineering positions and had worked in a managerial position for at least 20 years at the time his employment ended with Microsemi (See no. 1 in Exhibit B).  Individuals with work backgrounds similar to Mr. Hoang generally experience rates of unemployment and job search time that is less than other workers.   For instance, the rate of unemployment for individuals similar to Mr. Hoang in Computer Engineering is nearly half that of individuals in other occupations (See no. 2 in Exhibit A).

15.     Mr. Hoang's job search activities following his employment termination in January 2018 are inconsistent with an individual who was diligently attempting to obtain comparable replacement employment.  Mr. Hoang performed only nine job search activities during the more than 60 week period between the date his employment ended in 2018 and the date he obtained employment in April 2019.  Mr.

6

Hoang's job search records show that he actually only applied for seven job positions, six of which occurred in the first two months following his employment termination.  Mr. Hoang's job search records do not show any job applications following the two months after his employment ended until March 22, 2019.   On this date, Mr. Hoang's job search records show that he applied to Wharton County Junior College and was subsequently hired by the employer.

16.    In contrast to Mr. Hoang's job search, a person performing a diligent job search would be expected to perform a consistent and expansive job search.  On average, Mr. Hoang performed less than one job search activity per month following his employment termination at Microsemi.   Individuals who are diligently seeking to obtain replacement employment can be expected to perform substantially more job searches than Mr. Hoang performed.   For instance, the Texas Workforce Commission ('TWC') typically requires individuals to perform at least three job search activities per week to receive unemployment benefits (See no. 2 in Exhibit B).

17.    In addition, it is my understanding Mr. Hoang did not participate in job placement services offered to him at the time his employment ended with Microsemi.   According to Mr. Hoang's separation summary, Mr. Hoang was offered outplacement counseling assistance intended to assist with resume building and job search strategies (See no. 1 in Exhibit B).  It is my understanding that Mr. Hoang did not accept the outplacement counseling assistance.

18.    Furthermore, there was employer demand for individuals with Mr. Hoang's knowledge, skills, and expertise at the time Mr. Hoang's employment ended at

Microsemi in January 2018.   There were employers of various sizes in the Houston metropolitan statistical area that had openings for positions in which Mr. Hoang would have been qualified.   For instance, according to data from the Texas Workforce Commission (TWC), in February 2018, the month following Mr. Hoang's termination, there were dozens of job openings for System Development Managers in the Houston area (See no. 4 in Exhibit A).   Mr. Hoang would have been qualified to apply for any number of these positions.   Mr. Hoang's experience and work history would have likely given him an advantage over many other job seekers.

19.    The typical wages associated with these System Development Manager positions is comparable to the compensation that Mr. Hoang earned at Microsemi before the end of his employment.   TWC and Salary.com data indicate the average base earnings of these positions Mr. Hoang would have been qualified to hold with his work experience and expertise is approximately $159,979 to $187,052 annually in the Houston area (See no. 4 and no. 5 in Exhibit A).   As mentioned, employment records indicate that Mr. Hoang's base annual salary was $161,712 at Microsemi in his last full year of employment.   Given Mr. Hoang's experience, he could expect higher earnings than average.

20.    These job positions also typically offer benefits such as health insurance, retirement contributions to 401K and pension, bonuses, and paid time off. According to Salary.com, Systems Development Managers in Houston, Texas typically receive additional compensation including bonuses, contributions to retirement, healthcare and pension benefits (See no. 5 in Exhibit A).

21.     It is reasonable to expect that, given the employer demand that existed for Mr. Hoang's expertise and experience at the time his employment ended at Microsemi, had Mr. Hoang performed a sufficiently diligent and expansive job search he would have found comparable employment within a reasonable period of time.  Labor market data from the U.S. Bureau of Labor Statistics (BLS) indicate that Mr. Hoang could have reasonably been expected to obtain employment within approximately 35.8 weeks of beginning a sufficient job search (See no. 2 in Exhibit A).

**Plaintiff's Damage Calculation Is Flawed**

22.     The calculation of Mr. Hoang's alleged back pay damages are flawed.  Mr. Hoang alleges that had his employment with Microsemi not ended, he would have received a salary of $203,640 in 2018 and in the following years for which damages are calculated.  Mr. Hoang calculates this salary based on his 2017 W2 wages.  As mentioned, employment records from Microsemi indicate that Mr. Hoang's base salary was $161,712.  It is my understanding that Mr. Hoang's total annual compensation included some compensation that was not guaranteed and subject to fluctuations.  Had the Plaintiff's damages calculation utilized Mr. Hoang's actual annual base salary, the alleged damages would have been lower.

23.     In addition, the Plaintiff's alleged back pay and front pay damages assume that Mr. Hoang is only capable of earning $2,500 per month, or $30,000 per year through his retirement.  Mr. Hoang's employment records show that he actually earns significantly more than the amount assumed in the Plaintiff's calculations.

According to employment records from Mr. Hoang's current employer, Mr. Hoang earns $71,402, and not $30,000 as assumed in the Plaintiff's damage calculation. The Plaintiff's calculations do not incorporate the actual salary that Mr. Hoang is receiving in his current employment. Had the Plaintiff's calculations taken into account Mr. Hoang's actual salary, the alleged damage numbers would be significantly lower.

24.     Even more problematic, the Plaintiff's damage calculations do not account for the possibility that Mr. Hoang could obtain a job position that is more comparable to the one he held at Microsemi. As mentioned above, there were job openings for individuals with Mr. Hoang's knowledge, skills and expertise in the Houston area following his termination that Mr. Hoang would have been qualified to hold. These earnings and benefits for these positions are comparable to those Mr. Hoang received at Microsemi. Mr. Hoang could have been expected to obtain comparable replacement employment within 35.8 weeks following his termination.

25.     Further, Mr. Hoang claims that he would have continued working for Microsemi and calculates his alleged front pay damages though age 67 had he not been terminated (See no. 2 in Exhibit B). The Plaintiff's damage calculation assumes that Mr. Hoang would have worked at Microsemi for over 36 years had his employment not ended. The Plaintiff's assumptions are unrealistic and inconsistent with actual labor market data. For instance, BLS data shows that less than 1.0% of individuals have the job seniority assumed by the Plaintiff's in their damage calculation (See no. 2 in Exhibit A). Additionally, BLS data indicates that the age of System Development Manager retirees is substantially less than the age of 67 that the Plaintiff assumes in the damage

calculation (See no. 2 in Exhibit A).   Had the Plaintiff's damage model utilized more appropriate job seniority assumptions, the alleged damages would have been lower.

**Summary**

26.     As was discussed, it is my opinion that there was employer demand for individuals with Mr. Hoang's knowledge, expertise, and work experience around the time his employment ended with Microsemi in January 2018.   Mr. Hoang's post-Microsemi employment termination job search time was not consistent with, and longer than, other individuals with his work background.   Had Mr. Hoang performed a sufficiently diligent job search he could have been reasonably expected to have obtained replacement employment sooner, and his back pay damages would be a fraction of what he alleges.   Further, it is likely that Mr. Hoang would have been able to find employment with benefits and salary comparable to what he was earning at Microsemi.   There was employer demand for individuals with Mr. Hoang's work background following the end of his employment with Microsemi.

Executed on September 1, 2020.

Dwight D. Steward

11

## Exhibit A: Treatises and Other Information Relied Upon

**Num.**   **Description**

1.      U.S. Bureau of Labor Statistics
        http://www.bls.gov/

2.      U.S. Bureau of Labor Statistics, Current Population Survey
        http://www.bls.gov/cps/

3.      U.S. Bureau of Labor Statistics, Occupational Employment Survey
        http://www.bls.gov/oes/

4.      Texas Workforce Commission
        https://twc.texas.gov/

5.      Salary.Com
        https://www.salary.com/

**Exhibit B: Case-related Documents**

**Num.   Description**

1.      Hoang.pdf
2.      Hoang (2).pdf

# Exhibit 11



Tarn Hoang
11403 Chalk Maple Ct.
Houston, TX 77095
832-909-2290

## <u>POSITION</u>   ENGINEERING MANAGER

### 2014 – 2018 ENGINEERING MANAGER, MICROSEMI, Houston, TX 77070
Managed of team of 50+ Houston-based system engineers and offshore contractors to qualify the firmware for the Microsemi SmartRaid controllers.
Represented Microsemi in Quality meeting with test architects from important customer accounts Hewlett Packard and Dell.
Responsible for an operating expense of $1.5 millions.

### 2003 – 2014 ENGINEERING MANAGER, HEWLETT PACKARD, Houston, TX 77070
Managed of team of 60+ geographically dispersed QA testers and software developers from Inventec Taiwan, Foxconn China and Mphasis India to qualify the firmware of HP Smart Array controller and storage enclosure backplane. Conducted weekly meetings to plan and execute test plans in support of the ProLiant server's delivery schedules.
Responsible for an operating expense budget of $1.5 million.
Actively participated in the design and implementation of a Kernel-based test tool. The tool was self-contained within a 4 GB USB key and was innovative at its introduction for its ability to run on bare-metal proto servers that were not OS-ready.

### 1997 – 2003 ENGINEERING MANAGER, COMPAQ COMPUTER, Houston, TX 77070
Managed a team of system engineers to qualify the firmware of the Compaq Smart Array Raid controllers. The team was known for having a strong QA process with comprehensive, manual test procedures, detailed and auditable test reports. Additional responsibility includes qualifying backplane firmware for all ProLiant storage enclosures.

### 6/90 - 1997   SYSTEM ENGINEER, COMPAQ COMPUTER, Houston, TX 77070
Developed Emulator software that runs on the ADAPTEC SDS3 SCSI Tester to emulate any physical SCSI-2 tape or hard drive. The Emulator has been successfully used to emulate an HP 4 GB Digital Audio Tape drive and a MICROPOLIS 1.3 GB hard disk to help uncovering firmware bugs and improving error handling. Software written in C and Assembler.
Developed embedded firmware for a multi-channel EISA SCSI-2 disk array controller to manage 56 1.3 GB drives based on Intel 25-Mhz 80386 CPU and NCR 53C700 SCSI I/O Processor. Firmware written in C and Assembler. Received Vice President's letter of recognition.

### 6/89 - 6/90   SENIOR ENGINEER, ARCHIVE Corp., Costa Mesa, CA 92680
Developed real time embedded firmware for the first ARCHIVE streaming Digital Audio Tape drive based on the NEC V50 CPU and the NCR 53C94 SCSI-2 controller. Firmware written in C and Assembler. Received Vice President's awards and bonuses.

### 1/86 - 6/89   PRINCIPAL ENGINEER, MAI BASIC FOUR, Inc., Tustin, CA 92680
Developed microcode for a high performance multi-CPU system based on the Texas Instruments 74AS8832 bit slice ALU. Firmware, running at 80 nano-second instruction cycles, managed code and data caches, interfaced with I/O processors, emulated a set of 280 CISC

instructions to concurrently support 256 users. Received Vice President's DIRECTOR AWARD and bonuses.

## 1/85 - 1/86   SOFTWARE ENGINEER, UNISYS Corp., Mission Viejo, CA 92630

Part of a software design team to develop a maintenance LAN for A-series minicomputers. Responsible for developing firmware for an Intel 8096 microcontroller to monitor onboard sensors and operate internal diagnostic buses, and download CPU microcode.

## 6/83 - 1/85   COMPUTER ENGINEER, ECO SYSTEM, Solana Beach, CA 92705

Developed real time software for an 8086-based satellite tracking navigation system running under Intel iRMX86 multi-tasking Kernel. Functions included processing telemetry data from satellites and shored-based transponders, operating shipboard data collection equipments.

## <u>QUALIFICATION</u>

. Experienced with real-time embedded software for Intel 80x86 CPU. In-depth knowledge of SCSI-2 protocol. Proficient with C, C+ +, Pascal, Assembly language, PC software development tools (Microsoft, Borland, Watcom, and UNIX), and SCSI bus analyzers and testers (ADAPTEC, ANCOT, PED). Software device TSR and drivers experience with DOS, OS/2, NOVELL, UNIX, and Microsoft Window 3.0. . Worked with IDE and SCSI peripherals.

<u>EDUCATION</u> BS in COMPUTER ENGINEERING, University of California, San Diego in 1983.

<u>PERSONAL</u>  US citizenship, married, male, born in Vietnam, 5'10", 165 Ibs, in good health.

**Hoang 00492**

**Hoang**
**Exhibit 3**
8-18-21

**tam.hoang229@outlook.com**

| | |
|---|---|
| **From:** | Global.Recruitment <DO_NOT_REPLY@emerson.com> |
| **Sent:** | Monday, February 5, 2018 5:08 PM |
| **To:** | tam.hoang229@outlook.com; Tam Hoang |
| **Subject:** | Emerson Careers \| Application Received- 17008811 |
| **Attachments:** | this_message_in_html.html |

Thank you for your interest in a career with Emerson!
This email is to notify you that we have received your application for our Engineering Manager, Analytical Systems Integration position 17008811.
We are currently reviewing your submission.

Regards,
Emerson Careers Team

**Hoang 00499**

**tam.hoang229@outlook.com**

| | |
|---|---|
| **From:** | Halliburton HIRES <system@successfactors.com> |
| **Sent:** | Tuesday, February 13, 2018 12:01 PM |
| **To:** | Tarn Hoang |
| **Subject:** | Halliburton Application Status |

Hello Tarn,

Thank you for your interest in Halliburton.

Unfortunately, you have not been chosen to move forward in the selection process for US Houston: Sr R&D Electrical Engineer to R&D Electrical Engineering Advisor - Firmware Development - 49598.

However, your candidate profile will be maintained in our active files. Please remember to keep your candidate profile updated as our recruiting team continuously searches our database to identify candidates with specific qualifications.

We encourage you to create a Job Alert in our career site. The Job Alert allows you to select search criteria for positions that match your interests.

Once positions are posted that match your search criteria, you will receive an email notification.

We look forward to your continued interest in employment opportunities with Halliburton.

Regards,
Halliburton Recruiting Team

This is an automated email.  Please do not reply.

**Hoang 00501**

**tam.hoang229@outlook.com**

| | |
|---|---|
| **From:** | Houston ISD <mailbot@applitrack.com> |
| **Sent:** | Wednesday, March 7, 2018 3:45 PM |
| **To:** | tam.hoang229@outlook.com |
| **Subject:** | Houston ISD Application Started |

Thank you for starting your application with Houston ISD.

Use the link below to log into your application.
 http://www.applitrack.com/houstonisd/OnlineApp/

As a reminder, your application will expire in 7 days if not completed.

Thank you,

Houston ISD Frontline MailBot

**Hoang 00513**

**tam.hoang229@outlook.com**

| | |
|---|---|
| **From:** | Cisco Recruiting <donotreply@cisco.avature.net> |
| **Sent:** | Wednesday, March 14, 2018 8:42 PM |
| **To:** | tam.hoang229@outlook.com |
| **Subject:** | You have applied to Cisco Job SYSTEM ENGINEER, Job ID 1225158 |

## Cisco Jobs

Hi Tam,

Thank you for applying at Cisco! We think it's a great place to work, and we're excited that you're interested in joining us as a SYSTEM ENGINEER, Job ID 1225158 here.

What's next? Please upload your resume to your Cisco Jobs profile if you haven't done so already. We'll use the information you provided and assess your background based on the role requirements.  If there's a potential match for the position, we will contact you to discuss next steps.

We may also use this information to consider you for future openings that match your skills and experience, in which case we would contact you directly. To update your profile, view application status, or search for other exciting opportunities, please visit Cisco Jobs.

Meanwhile, keep checking for other roles that might match your interests, and even set up job alerts to notify you of any new openings.

Thank you again for your interest in Cisco.

Best Regards,
Cisco Recruiting

Email ID: 122

This address is unattended and cannot help with questions or requests. To receive these auto-notifications, please add donotreply@cisco.avature.net to your address book.

**Hoang 00514**

Follow We Are Cisco 

©2017 Cisco and/or its affiliates

Jobs Help  Cisco.com  Privacy Statement  Trademarks

**Hoang 00515**

**tam.hoang229@outlook.com**

| | |
|---|---|
| **From:** | Apache @ icims <apache+autoreply@agents.icims.com> |
| **Sent:** | Friday, March 30, 2018 8:55 AM |
| **To:** | tam.hoang229@outlook.com |
| **Subject:** | Thank You for Your Online Application! |

Dear Tarn,

Thank you for your recent online application for the Manager, IT Automation Systems opening at Apache. A representative from Apache will contact you in the event that your background meets our current needs for this role.

*This is an automated email response. Please do not reply.*

---

This message was sent to tam.hoang229@outlook.com. If you don't want to receive these emails from this company in the future, please go to:
https://apache.icims.com/icims2/?r=CFAF80937&contactId=207350&pid=79

1

**Hoang 00516**

**tam.hoang229@outlook.com**

| | |
|---|---|
| **From:** | IBMRecruitment_noreply@us.ibm.com <Enterprise@trm.brassring.com> |
| **Sent:** | Friday, March 30, 2018 9:17 AM |
| **To:** | tam.hoang229@outlook.com |
| **Subject:** | Congratulations! You have successfully submitted your IBM job application. |



Hi Tam

Thank you for applying to IBM. We're excited that you're interested in joining us for the position of Managing Consultant, Digital Technology and Data Strategy - Ref:128389BR.

Our team will review your application to see if there's a good match between your skills, experience, other information provided as part of your application and this position's requirements. If there's a potential match, we will contact you to discuss next steps.

You can check the status of your application any time on the IBM Careers Portal.

Follow us on our social channels where you can engage with us, see what life at IBM is like, and learn about what is happening inside IBM.

   

Thank you again for taking the time to apply and your interest in IBM.

IBM Recruiting Team

Ref: 128389BR - Managing Consultant, Digital Technology and Data Strategy

1

**Hoang 00517**

**tam.hoang229@outlook.com**

| | |
|---|---|
| **From:** | Enterprise@trm.brassring.com on behalf of IBMRecruitment_noreply@us.ibm.com <Enterprise@trm.brassring.com> |
| **Sent:** | Friday, March 30, 2018 2:15 PM |
| **To:** | tam.hoang229@outlook.com |
| **Subject:** | Application status update |



Ref: 128389BR - Managing Consultant, Digital Technology and Data Strategy

Dear Tam,

With reference to the interview for the above position, we regret to inform you that at this time IBM is pursuing other candidates whose expertise is more closely aligned to the job requirements.

In keeping with our company policies, your application will be kept active in our system for other IBM Recruiters to review for 12 months (or 6 months for residents of Germany and Austria).

We highly encourage you to consider other opportunities at IBM and hope that you have continued interest in a career with us.

Sincerely,

Melissa Kennedy

Follow us on our social channels where you can engage with us, see what life at IBM is like, and learn about what is happening inside IBM.



Ref: 128389BR - Managing Consultant, Digital Technology and Data Strategy

Hoang 00518

# Tam Hoang

11403 Chalk Maple Ct                                          mobile: 832-909-2290
Houston, Texas 77095                              tam.hoang229@outlook.com

**CAREER OBJECTIVE**

To seek a challenging part time System Administrator position utilizing my extensive experience in managing, maintaining, and supporting mission critical applications.

**Engineering System Manager/Architect**
**Microsemi Corporation**
**2014-2018**
Managed an engineering lab of 25+ servers and test equipment
- Worked with the Director of Engineering to budget and purchase IT requirements for the department lab, including servers, third party hardware and licensed software. Negotiated with third party vendors for maintenance service contracts for test equipment and licensed software
- Led the automation of system administration tasks by using solely free and open source software for all lab servers (e.g. cron, Window task scheduler)
- Introduced a Preboot Execution Environment (PXE) server to hold images of all licensed software and operating systems, allowing automatic installation of all Windows Operating Systems and all supported Linux distributions remotely without human intervention
- Wrote and implemented the department backup and recovery plan. The plan included both a short-term disaster prevention/recovery plan that guaranteed the availability of all servers during disasters and a long-term equipment refresh plan to protect database hardware from technology obsolescence

**Senior System Support/Administrator**
**Hewlett Packard Enterprise**
**2007-2014**
Responsibilities were expanded with the additional requirement of inventory control
- Fully responsible for the inventory control project which required infrastructure planning and design: in hardware, servers, and capacity storage, along with selection of contractors to develop the database application to track servers, equipment, parts, etc.. The project required holding weekly meetings with user groups and managing frequent specification changes without missing the schedule
- Wrote test plan to audit the department disaster recovery plan. The plan verified that all critical lab servers were backed up nightly, that all backed up images were backed up weekly and that backed up images were mirrored offsite
- Managed and maintained Tomcat servers to support the inventory control application
- Proactively monitored Tomcat catalina.out log file to detect and resolve errors as soon as possible to prevent database and/or application failures
- Supported Oracle database administrators to perform the following tasks: ensure production database are up and running optimally, monitor minimum available free

Hoang 00520

space threshold in critical table spaces, ensure both hot and cold backup are completed successfully, monitor production database alert log files for rows lock contentions and critical Oracle (ORA-) errors

- Created and maintained a Linux NAS (Network Attached Storage) completed with a local DNS network for multiple teams. The NAS was integrated with the company's existing DNS via System Security Services Daemon (SSSD) to allow engineers to logon from their Windows laptops

**System Support/Administrator**
**Hewlett Packard Enterprise**
**2003-2007**
Analyzed and supported the department's test requirements for the R.A.I.D. controller development

- Responsibilities included procuring, managing, maintaining the servers, third party software and test equipment for system engineering department
- Translated software and hardware needs of end-user system engineers into software license contracts and hardware purchase orders, then acted as the department contact with vendors for all in-house support requests
- Installed and configured servers for third party software, established regular software maintenance schedules and procedures for software updates and patches. Generated, tracked and escalated tickets for bugs and new feature requests into service tickets in the vendor's support portals
- Wrote and implemented department disaster recovery plan for lab servers to ensure business continuity during hurricanes and unforeseen events as per the Director of Engineering policy. The plan included data backup procedure and provided mirror sites for the production database. During hurricane Ike, the plan was activated and enabled engineers to continue working from home even when the campus was closed

**System Engineer**
**Compaq Computer Corporation**
**1990-2003**
Led a team of 4 software engineers to develop a driver for Linux. The driver supported SCSI tape and disk drives and was used by the Compaq R.A.I.D. development engineers to test the controller software

Wrote an emulator software to emulate any SCSI tape and disk drives. The emulator was used by R.A.I.D. development engineers to find bugs in the controller's error handler. The software was written in C

Wrote the driver stack software for a R.A.I.D. controller, based on Intel-x86 processor. The software interfaced with 56 hard drives and a tape drive.  The software was written in C. Received Vice President's letter of recognition

**Software Development Engineer**
**Mai Basic Four, Inc., Tustin, California**
**1986-1990**
Wrote the software for a multi-CPU minicomputer. The software managed code and data caches, interfaced with I/O processors, concurrently supported 256 users.

Received Vice President's Director Award and bonuses

---

**QUALIFICATIONS**
<u>OS/Network</u>: Windows, Unix/Linux : RedHat, SUSE, Ubuntu, Oracle Linux
                 MS Active Directory, DNS
<u>Language</u>: SQL, PL/SQL, Java, html, xml, C++, C, Pascal, Fortran, Ada, Cobol, Assembly
<u>Databases</u>: Oracle 11g/12c, SQL Server 2014, MS Access 2016, MySQL 5.x
<u>Web Servers</u>: Tomcat 7x/8x, Apache 2.x, Weblogic 11g/12c
<u>Hardware</u>: Intel, Motorola and MIP CPU.
<u>System Bus experience</u>: PCI, PCIe, SAS, SATA, SCSI
<u>Productivity tools</u>: MS Office, Visio, Toad, SQL*Plus, Logic Analyzer, Analog scope, DVM
                     soldering iron

---

**EDUCATION**     Bachelor of Science in Computer Engineering
                               University of California - San Diego


**REFERENCES**    Available upon request

**tam.hoang229@outlook.com**

| | |
|---|---|
| **From:** | Auld, Lois <AuldL@wcjc.edu> |
| **Sent:** | Monday, April 1, 2019 4:03 PM |
| **To:** | tam.hoang229@outlook.com |
| **Cc:** | Popek, Deborah; Novak, Kerri; Chuc, Bryan |
| **Subject:** | Welcome to WCJC!!! |
| **Attachments:** | I-9 Acceptable Documents.pdf; I-9 Instructions.pdf; I-9 Print Version.pdf |

We are so excited that you have accepted the Part Time System Administrator position with Wharton County Junior College!! Welcome!

As a new employee, you will need to complete an I-9 form and this must be done before or on your first day in person.  I have attached a list of documents we will need to do so.  You can provide an original documents off List A - or original documents off List B and List C.  I have also attached the I-9 instructions for you to reference.  The document is lengthy so there is no need for you to print it out.  Our office is located at the Wharton Campus in the Administration building on the second-floor in room A-206.  However, you are welcome to complete this form at our other locations in Sugar Land and Richmond. Please let us know which time/date/location is more convenient for you and I will set it up.

HR also, needs your official transcripts.  **Please note: They do not need to arrive in a sealed envelope but they cannot state "issued to student" on them to be "official."  If you are requesting them to come directly to us, please specify they send to HR.  If they come to the Registrar's office, we probably will not hear that they have arrived.  In addition, we cannot accept electronic copies.**


We look forward to hearing from you!!


*Lois Auld*
Human Resources Technician
Wharton County Junior College
911 Boling Highway, A-206B
Wharton, TX  77488
979-532-6947
979-532-6928 Fax

**Hoang 00523**

# Exhibit 12

## DECLARATION OF LAUREN CARR

I, Lauren Carr, declare:

1.      I am over eighteen years of age and authorized to execute this Declaration.

2.      I am the Senior Vice President, Global Human Resources at Microchip Technology, Inc. ("Microchip").

3.      The facts I am stating in this Declaration are based on my personal knowledge and my review of business records.

4.      If called upon to testify as to the facts set forth in this Declaration, I could and would competently testify to them.

5.      On May 29, 2018, Microchip acquired Microsemi Corporation ("Microsemi"), and began the process of integrating the two companies.  I was responsible for overseeing the human resources-related aspects of the transition.  Immediately upon the completion of the Microsemi acquisition by Microchip, I became responsible for overseeing all human resources-related matters involving Microsemi employees. Because Microsemi's senior human resources management team left immediately upon, or within a few weeks after, the close of the acquisition, I informed the remaining Microsemi human resources professionals that they were to bring to my attention all serious policy violations, and I either personally made the termination decisions, or approved all terminations, of Microsemi employees.

6.      Microsemi's handbook contains a Confidentiality Policy (the "Policy") that applied to all Microsemi employees. [Ex. 13 to Motion.]

7.      The Policy defines "confidential information" to include: "financial records; business, marketing, and strategic plans; personnel and payroll records regarding current and former Employees; the identity of, contact information for, and any other account information on

customers, vendors, and suppliers; inventions, programs, trade secrets, formulas, techniques, and processes; and any other documents or information regarding the Company's operations, procedures, or practices."

8.     The Policy also dictates that "[a]ll records and files maintained by the Company are confidential and remain the property of the Company. Records and files are not to be disclosed to any outside party without the express written permission of the appropriate Director or Manager of Human Resources."

9.     On November 21, 2019, as part of his lawsuit against Microchip and Microsemi, Tam Hoang disclosed copies of Microsemi emails that he accessed through his private email account.

10.     These Microsemi emails contained confidential information, including formulas, techniques, and formulas used within Microsemi's Quality Assurance Group.

11.     I have been informed by David Sheffield, Tam Hoang's manager at the time, that Mr. Hoang did not receive express written permission to make copies of Microsemi's confidential information or access Microsemi's confidential information through his personal email account.

12.     Microsemi terminated Mr. Hoang's employment in January 2018, four months before Microchip acquired Microsemi and I had become responsible for making or approving decisions terminating Microsemi employees.  Because Microsemi's senior and mid-level human resources managers were no longer employed in 2019 when Tam Hoang filed his lawsuit, I lack sufficient information to state whether, before May 29, 2018, Microsemi would have terminated his employment if it had learned of his conduct.

13.     However, after May 29, 2018, I would have been informed if a Microsemi employee engaged in such conduct by the human resources professionals who report to me.  Upon

learning of such conduct, I would have spoken to Mr. Hoang to inquire why he had been violating the Confidentiality Policy and, unless I became convinced that he had done so because it was necessary for him to fulfill his responsibilities to the Company, I would have terminated his employment.

14.     As we now know from his deposition testimony, Mr. Hoang had, over a period of several months, deliberately copied numerous emails containing confidential information, and he did so for reasons other than performing his job.

15.     Protecting Microsemi's and Microchip's confidential information from intentional and inadvertent disclosure is extremely important, and all employees receive regular reminders about the importance of complying with the company's confidentiality policies. If I had been apprised that Mr. Hoang had repeatedly over time violated the Policy by copying numerous emails containing confidential information, without having obtained the permission of his manager, and that he had done so for personal reasons unrelated to the performance of his job as a manager, I would have terminated his employment for such conduct.

16.     My reasoning for dealing harshly with an employee in such circumstances, and terminating the employee's employment, is because I have an obligation as the Senior Vice President of Human Resources to protect the company. In the absence of compelling evidence that violated the Policy in the manner Mr. Hoang did, I believe I would not be fulfilling my obligations to the company if I did not assume the employee's Policy violations were for nefarious purposes, or to cause the company harm.

17.     I am aware of only one situation in which the company learned about a similar violation of the Policy by a current Microsemi employee.  The situation involved a senior Microsemi manager, Stephen [last name has been provided to Plaintiff but is not included here for

3

privacy reasons]. This manager worked at a Microsemi campus in California. We discovered the manager's misconduct in early November 2018 (a few months after the acquisition), and on November 2, 2018, I directed a local human resources representative who worked at the same California campus to direct the manager to a private office where the Vice President with business responsibility over the employee and I spoke to him by phone. We confronted the manager with the emails he had sent containing confidential information and others containing derogatory statements about the company and its senior executives, and fired him during that call.

18.     To my knowledge, the company has not learned of any other current Microsemi employee who was violating, or had violated, the Policy in a manner similar to Mr. Hoang and the manager identified in the preceding paragraph.

19.     However, I know of one situation in which the company learned about a similar violation of the Policy, but discovered the violation after the employee was no longer employed. By way of background, the employee was one of a number of Microsemi employees the company let go in the months after Microchip acquired Microsemi.  The company laid off the employees for non-performance reasons; consequently, these employees were offered severance. Shortly after laying off one such employee in a July 2018 reduction in force, the company learned that he had violated the Policy by emailing confidential business information to a third party.  Because of his violation of the Policy, on August 8, 2018 I revoked the severance that the company had offered him.  Had I learned about his conduct while he was employed, I would have terminated his employment and he would not have been eligible to receive a severance offer.

**I declare under penalty of perjury under the laws of the state of Arizona that the foregoing is true and correct to the best of my knowledge.**

Dated this _30__ day of September 2021.

_____
Lauren Carr
Senior Vice President
Global Human Resources
Microchip Technology, Inc.

# Exhibit 13



# Employee Handbook

## Microsemi Corporation

Revised/Effective: January 1, 2011

Microchip-Microsemi000443



federal agencies in accordance with applicable law.  All requests to review an Employee's personnel file should be referred to Human Resources.

Confidential health/medical records are not included in your personnel file. The Company will safeguard them from disclosure as required by applicable federal and State laws.

**CONFIDENTIALITY**

Information about Microsemi, its Employees, customers, suppliers, and vendors is to be kept confidential and divulged only to individuals within the Company with both a need to receive and authorization to receive the information.  If in doubt as to whether information should be divulged, err in favor of not divulging information and discuss the situation with your Supervisor.

All records and files maintained by the Company are confidential and remain the property of the Company.  Records and files are not to be disclosed to any outside party without the express written permission of the appropriate Director or Manager of Human Resources.  Confidential information includes, but is in no way limited to: financial records; business, marketing, and strategic plans; personnel and payroll records regarding current and former Employees; the identity of, contact information for, and any other account information on customers, vendors, and suppliers; inventions, programs, trade secrets, formulas, techniques, and processes; and any other documents or information regarding the Company's operations, procedures, or practices.  Confidential information may not be removed from Company premises without express authorization.

Confidential information may be used only as necessary and appropriate to carry out assigned job duties during employment with the Company. Confidential information may not be used or disclosed for any purpose after leaving Microsemi.  The Company will take appropriate legal action against any Employee who makes any improper use or disclosure of confidential information.

All Employees may be required to enter into written agreements for the protection of confidential information.

Microsemi Corporation
Revised/Effective: January 1, 2011

**Microchip-Microsemi000444**